# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE COLUMBIA PIPELINE GROUP, MERGER LITIGATION | ) ) ) | CONSOLIDATED C.A. No. 2018-0484-JTL |

## POST-TRIAL OPINION ADDRESSING LIABILITY FOR AIDING AND ABETTING

Date Submitted: November 22, 2022
Date Decided: June 30, 2023

Ned Weinberger, Derrick Farrell, Brendan W. Sullivan, LABATON SUCHAROW LLP, Wilmington, Delaware; Gregory V. Varallo, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Stephen E. Jenkins, Marie M. Degnan, ASHBY & GEDDES, P.A., Wilmington, Delaware; Jeroen van Kwawegen, Lauren A. Ormsbee, Thomas G. James, Margaret Sanborn-Lowing, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; *Counsel for co-lead plaintiffs*.

Martin S. Lessner, James M. Yoch, Jr., Kevin P. Rickert, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Brian J. Massengill, Michael Olsen, Matthew C. Sostrin, Linda X. Shi, MAYER BROWN LLP, Chicago, Illinois; *Counsel for defendant TC Energy Corporation*.

**LASTER, V.C.**

# TABLE OF CONTENTS

I.    FACTUAL BACKGROUND ................................................................. 11

     A.    Columbia ........................................................................... 13

     B.    The Spinoff ......................................................................... 14

         1.    Spectra And Dominion Contact Skaggs. .......................... 17

         2.    TransCanada Approaches Smith. ..................................... 18

         3.    The Two-Track Strategy ................................................. 20

         4.    The Launch Of The November Sale Process ..................... 21

         5.    The Management Team Favors Berkshire And TransCanada. ................. 23

         6.    The End Of The November Sale Process ........................... 25

     C.    Poirier's November 25 Call With Smith ............................... 27

     D.    Girling's December 2 Call To Skaggs ................................... 29

     E.    Fornell's Interactions With Skaggs And Smith ...................... 31

     F.    Poirier's December 17 Call To Smith .................................... 32

     G.    Skaggs Primes The Directors For A Deal. ............................. 33

     H.    The Lead-Up To The January 7 Meeting ............................... 34

     I.    The January 7 Meeting ........................................................ 36

     J.    TransCanada Begins Due Diligence. ..................................... 41

     K.    The Debate Over A Request To Make A Proposal ................. 43

     L.    The January 25 Proposal ...................................................... 48

     M.    The End-Of-January Board Meeting ..................................... 49

     N.    The Deal Process Moves Forward. ........................................ 51

1. The February 9 Meeting ...................................................................53

2. TransCanada Slows Down The Process. ...................................................54

3. TransCanada Lays The Groundwork For Dropping Its Price. .................56

4. Columbia Extends Exclusivity. .....................................................58

5. TransCanada Drops Its Price. ......................................................60

6. The Board Rejects TransCanada's Offer. ..........................................62

O. The Process Resumes. ...............................................................62

1. The Wall Street Journal Leak ......................................................64

2. The $26 Deal .....................................................................66

3. The Board Is "Freaking Out" And Wants A Deal "Whatever It Takes.". 68

4. The Renewed Exclusivity Agreement ................................................70

5. Columbia Declines To Engage With Spectra. ........................................73

6. TransCanada Signs Off On The Script. .............................................74

7. The $25.50 Offer .................................................................77

8. Columbia Accepts The $25.50 Offer. ..............................................81

P. The Merger Agreement ..............................................................84

Q. The Proxy Statement ...............................................................86

R. The Deal-Related Litigation .......................................................92

1. The Appraisal Proceeding .........................................................92

2. This Lawsuit .....................................................................93

II. LEGAL ANALYSIS ...................................................................94

A. The Sale Process Claim ............................................................94

1.   The Fiduciary Relationship For The Sale Process Claim..........................96

2.   The Breaches Of Duty In The Sale Process ...........................................112

3.   Knowing Participation In The Sale Process Breaches ...........................132

4.   Damages For The Sale Process Claim......................................................153

B.   The Disclosure Claim ...................................................................................156

1.   The Fiduciary Relationship For The Disclosure Claim..........................157

2.   The Breaches Of The Duty Of Disclosure .............................................161

3.   Knowing Participation In The Disclosure Violations ............................165

4.   Damages For The Disclosure Claim........................................................169

5.   A Remedy For The Disclosure Claim .....................................................178

C.   Are The Remedies Concurrent Or Cumulative?............................................188

III.   CONCLUSION ........................................................................................................191

In June 2016, TC Energy Corp. ("TransCanada") paid $25.50 per share in cash to acquire Columbia Pipeline Group, Inc. ("Columbia" or "CPG"). Columbia was a newly minted public company, spun off one year earlier.

During the sale process, Robert Skaggs, Jr. served as Columbia's Chief Executive Officer and chair of its board of directors (the "Board"). Stephen Smith served as Columbia's Executive Vice President and Chief Financial Officer. Both men held the same roles at Columbia's parent company before the spinoff. Both wanted to retire early. Both thought 2016 was the ideal year to retire, and both wanted to cash out through a merger that would trigger their change-in-control benefits. Both supported the spinoff and joined Columbia expecting to get it sold.

Immediately after the spinoff, buyers came calling. Skaggs led a haphazard sale process, during which each bidder entered into a non-disclosure agreement ("NDA") containing a don't-ask-don't-waive standstill. That type of provision *both* serves the traditional standstill's role of prohibiting a bidder from seeking to acquire the target without the target board's permission *and* provides the additional protection of barring the bidder from asking the target to waive the standstill or otherwise grant permission. It puts the target board in the driver's seat, because a bidder can only make an approach if the target board invites it.

TransCanada was one of the bidders. Francois Poirier, TransCanada's Senior Vice President for Strategy and Corporate Development, led TransCanada's deal team. Poirier is a savvy former investment banker and repeat player in the M&A game. He fully

1

understood the implications of the standstill, both from his work as an M&A professional and from a briefing by TransCanada's in-house counsel.

During an earlier stage in his career, Poirier had spent a decade as a relationship manager for J.P. Morgan Chase & Co., and he visited Smith regularly in that role. Poirier made Smith his principal point of contact for the sale process, and that tactical decision proved pivotal. Smith was an experienced CFO, but he had never been on the front lines of an M&A negotiation. Plus Smith is trusting, team-oriented, and transparent—all virtues for a public company CFO, but vulnerabilities for a neophyte dealmaker on his first and only assignment. Smith shared information freely. He has no poker face. For Poirier, Smith was a compliant informant.

At the end of November 2015, the Board shut down the sale process so that Columbia could shore up its balance sheet with an equity offering. Under the standstill, TransCanada could not contact Columbia without an invitation. Poirier immediately made a backchannel call to Smith. Through that call, Poirier learned that management still wanted to sell and planned to resume the effort in a couple months.

During December 2015, Poirier and his colleagues engaged in further communications with Smith and Skaggs. Most notably, Poirier told Smith on December 19 that TransCanada remained interested in a deal and could pay up to $28 per share. He asked Smith to meet during the first week of January 2016. With Skaggs's signoff, Smith agreed.

On January 7, 2016, Poirier and Smith had a face-to-face meeting. Smith was an open book. He told Poirier that management wanted to sell and that TransCanada would not face any competition from other bidders. After the meeting, Skaggs and Smith created

2

a data room so that TransCanada could start conducting due diligence. During the last week of January, TransCanada's CEO called Skaggs and provided an oral expression of interest in a deal at $25 to $28 per share.

Those interactions breached the standstill, but Skaggs and Smith made no effort to enforce it. Instead, Columbia's in-house counsel told his TransCanada counterpart that nothing TransCanada was doing implicated the standstill. The TransCanada lawyer knew better and questioned that interpretation, but went along. Skaggs and Smith opened the gates, invited TransCanada in, and demonstrated their eagerness to sell.

After TransCanada's CEO provided his oral expression of interest, Skaggs finally went to the Board and obtained permission to engage in exclusive negotiations with TransCanada. As Poirier and his team pressed forward, Skaggs and Smith undercut Columbia's bargaining leverage through solicitous responses and a lack of pushback. Poirier grew so confident about management's desire to sell that TransCanada's first offer came in at $24 per share, one dollar below its indicative range. Skaggs and Smith were offended. TransCanada immediately upped its price to $25.25 per share, just inside its indicative range. That made matters worse, because it showed Skaggs and Smith that TransCanada had been trying to take advantage of them. Skaggs and Smith recommended that the Board reject the offer, which the Board did.

For twenty-four hours, the deal was dead. Through its banker, TransCanada reengaged and asked for a counter. Skaggs and Smith proposed $26 per share in cash. TransCanada agreed to $26 but offered 90% in cash and 10% in stock. Smith and Poirier agreed in principle. Both sides believed they had a deal.

3

Then came a *Wall Street Journal* story about the negotiations. TransCanada's exclusivity had expired, so when a second bidder contacted Skaggs, Columbia could have engaged. But Skaggs and Smith believed they had a deal and were on the verge of signing a formal merger agreement, so they recommended that the Board renew exclusivity. Skaggs prepared a script for incoming bidders which said that Columbia only would respond to a serious written offer. That was more than TransCanada had ever provided, even after receiving diligence. Skaggs sent the script to TransCanada, and when Poirier asked Smith about it, Smith told him that management wanted to get a deal done with TransCanada and the script would help them do that.

Confident that Skaggs and Smith were wedded to a sale, and believing that the leak put pressure on the Board, Poirier reneged on the agreement in principle at $26 per share, lowered TransCanada's bid to $25.50 per share in cash, demanded an answer within three days, and threatened to announce publicly that the negotiations were dead unless Columbia accepted the reduced offer.

The standstill prohibited TransCanada from threatening to make the parties' discussions public, but permitted TransCanada to make disclosures required by law. Had TransCanada decided to break off negotiations if Columbia said no, then Poirier's statement about disclosure would not have been a threat. It would have been an accurate description of the consequence of Columbia's decision. But as Poirier admitted, the $25.50 offer was not best and final. If Columbia had said no, TransCanada would not have broken off negotiations. Consequently, Poirier's statement about public disclosure was a threat that violated the standstill.

4

Skaggs and Smith considered countering at $25.75 per share, but they did not want to lose a benefits-triggering deal. Rather than pushing back, they recommended that the Board take what TransCanada offered. The Board did, resulting in TransCanada acquiring Columbia for $25.50 per share in cash (the "Merger").

The plaintiffs sued Skaggs, Smith, and TransCanada. They asserted that Skaggs and Smith breached their duty of loyalty during the sale process. They also asserted that Skaggs and Smith breached their duty of disclosure because the proxy statement issued in connection with the Merger (the "Proxy Statement") was false and misleading. The plaintiffs asserted claims against TransCanada for aiding and abetting the actionable breaches of duty by Skaggs and Smith, as well as exculpated breaches of the duty of care by the Board. Skaggs and Smith settled. TransCanada fought the case through trial.

The plaintiffs proved that TransCanada aided and abetted breaches of fiduciary duty during the sale process. They proved that Skaggs and Smith breached their duty of loyalty because, when pursuing a sale of the Company, they were seeking a transaction that would trigger their change-in-control benefits and enable them to retire in 2016, as they wanted to do. That conflict of interest led them to take actions that fell outside the range of reasonableness. The plaintiffs also proved that the Board breached its duty of care by failing to provide active oversight over the sale process.

The plaintiffs proved that TransCanada knowingly participated in the breaches of duty that took place during the sale process. Knowing participation requires both knowledge that the fiduciary is breaching a duty and culpable participation by the aider and abettor.

5

Knowledge can be actual or constructive. TransCanada recognized in real time that Skaggs and Smith were behaving eccentrically, even bizarrely, for sell-side negotiators. They showed little interest in using available sources of negotiating leverage, did not care about the standstill, shared information freely, extended exclusivity even after a leak and an approach from a second bidder, and seemed inordinately eager to get a deal done. TransCanada knew that Skaggs and Smith stood to receive lucrative change-in-control payments and that there would be no social issues in the deal, meaning that Skaggs and Smith had no plans to stick around. TransCanada had reason to know that Skaggs and Smith were pursuing their own interests in securing a deal and that the Board was not providing sufficient oversight.

Participation is a closer call. For a third-party buyer to participate in a sell-side breach of fiduciary duty requires that the buyer create, exacerbate, or exploit the breach. A third-party buyer might create or exacerbate a breach by offering the sell-side fiduciary a side deal or by seducing a sell-side fiduciary with visions of great wealth. A third party can also exploit an existing conflict that the buyer did not create or exacerbate. One recognized form of exploitation involves a buyer working in conjunction with a disloyal sell-side fiduciary to obtain inside information and violate boundaries for the sale process that the sell-side board established.

TransCanada did not create or exacerbate the conflict of interest that Skaggs and Smith faced. TransCanada nevertheless culpably participated by exploiting their conflicts of interest. The decisive moment came when Poirier reneged on the agreement in principle at $26 per share, lowered TransCanada's bid to $25.50 per share in cash, demanded an

6

answer within three days, and threatened to announce publicly that the negotiations were dead unless Columbia accepted the reduced offer. The standstill prohibited TransCanada from taking that step, and TransCanada only took it because Poirier was confident that Skaggs and Smith were wedded to a deal. TransCanada and Columbia had a win-win transaction at $26 per share, but Poirier wanted more for his side, and he knew he could take it by exploiting Skaggs and Smith's conflict.

Poirier was only able to deliver the coup de grâce because he had been exploiting Skaggs and Smith for months. He and his colleagues had persistently and knowingly breached the standstill and used their interactions with Skaggs and Smith to obtain inside information. Poirier was particularly skillful at exploiting Smith. He gained Smith's trust by playing on their past professional friendship, then manipulated Smith into thinking that they were working together behind the scenes, scripting the conversations between their respective CEOs, and keeping everything on track. But Poirier was not working with Smith. He was working over Smith.

The totality of the circumstances matters. Poirier and TransCanada did not engage in an isolated breach of the standstill or have a single conversation in which Skaggs or Smith let information slip. Poirier and TransCanada pushed on Skaggs and Smith for months, inducing them to commit errors and give away points. Even still, TransCanada would not be liable for aiding and abetting without the final act of reneging on the deal at $26 per share, dropping the price to $25.50 per share, and making a coercive threat that the standstill prohibited. That double cross caused the tower of actions that TransCanada had taken over the preceding months to topple across the line of culpability.

7

By knowingly participating in the breaches of the duty of loyalty committed by Skaggs and Smith, TransCanada caused Columbia's stockholders to lose the benefit of an agreement in principle at $26 per share, comprised 90% in cash and 10% in stock. TransCanada's stock price increased between signing and closing, such that Columbia's stockholders would have received value of $26.50 per share. The appropriate remedy for the sale process claim is damages of $1.00 per share based on the lost value of the alternative transaction.

The plaintiffs also proved that TransCanada is liable for aiding and abetting breaches of the duty of disclosure. The plaintiffs proved that Skaggs, Smith, and the directors breached their fiduciary duties by failing to disclose all material information to Columbia's stockholders in connection with the vote on the Merger. Most significantly, the Proxy Statement failed to disclose several of Skaggs and Smith's interactions with TransCanada and did not explain that those interactions violated the standstill. Through selective disclosure, the Proxy Statement painted a misleading picture of arm's-length negotiations. The actual timing, tenor, and frequency of those interactions were different.

TransCanada had the right under the merger agreement to review the Proxy Statement and an obligation to inform Columbia of any material omissions. Knowledgeable TransCanada personnel reviewed the Proxy Statement, including Poirier and other individuals who were involved in the omitted communications. TransCanada had an easy means of fulfilling its contractual obligation and avoiding a claim for aiding and abetting: send comments on the draft flagging the problems and proposing accurate language. Columbia might have rejected TransCanada's comments, and the Proxy

Statement might have been misleading in any event, but TransCanada would have had a powerful response to any charge of culpable participation. Rather than calling for a fair description, TransCanada wrote off the Proxy Statement as Columbia's document. By knowingly permitting the sell-side fiduciaries to issue the Proxy Statement, TransCanada aided and abetted their breaches of the duty of disclosure.

The question of remedy for the disclosure claim is difficult. The case was litigated on the premise that the plaintiffs needed to prove reliance, causation, and damages to recover compensatory or rescissory damages for a disclosure violation. The plaintiffs sought rescissory damages of $3.032 billion with no alternative damages theory.

The plaintiffs did not introduce any evidence of reliance. The defendants say that failure is fatal. If so, then virtually every effort to recover disclosure-based damages on behalf of a class of stockholders in a publicly traded company is doomed. Yet Delaware authorities clearly view an award of post-closing monetary damages as an available remedy for a breach of the duty of disclosure in a public company setting.

Building on recent precedent, this decision recognizes the following rebuttable presumption: If corporate fiduciaries distribute a proxy statement to public stockholders and ask them to vote, and if the proxy statement contains a material misstatement or omission, then there is a presumption that the stockholders relied on the proxy statement such that individualized proof of reliance is not required. The presumption is rebuttable. Under the Delaware Rules of Evidence, an evidentiary presumption causes the opposing party to bear the burden of proving that the nonexistence of the presumed fact is more probable than the existence of the presumed fact. The defendants would bear that burden.

9

This decision cannot apply the presumption. To reiterate, this case was litigated on the premise that the plaintiffs bore the burden of proving reliance. It would be unfair to TransCanada to introduce the presumption after trial, when TransCanada no longer had the opportunity to prove the nonexistence of presumed facts.

The plaintiffs therefore cannot recover rescissory damages. But that is not the end of the line, because equity will not suffer a wrong without a remedy. A court of equity has broad discretion when fashioning relief and is not limited to picking an option provided by the parties.

Precedent teaches that when disclosure violations have deprived stockholders of their ability to cast an informed vote on a matter affecting their economic interests, then a court can award damages equal to a relatively small percentage of the equity value of each share. Traditionally, this type of award has been called nominal damages, but not in the sense of a nominal award of $1 for a breach where the plaintiff cannot prove any other damages. "Nominal" in this sense just means small.

Precedent supports awards of $1.00 to $2.00 per share, or 2.5% to 4.7% of equity value. Most recently, Chancellor McCormick awarded damages of $1.00 per share, which equated to 2.7% of equity value. *See In re Mindbody, Inc., S'holder Litig.*, 2023 WL 2518149, at *3, *47 (Del. Ch. Mar. 15, 2023).

This decision awards damages of $0.50 per share for the breaches of the duty of disclosure, which equates to 1.96% of equity value. Whether judged in absolute or percentage terms, that figure is reasonable compared to precedent. The evidence that prior cases have deemed sufficient is both present in this case and justifies that figure. As a cross-

10

check, this decision looks to various methodologies that scholars have used to value voting rights, because at a minimum, the breaches of the duty of disclosure prevented the stockholders from freely exercising their right to vote on the Merger. The percentage that this decision awards falls at the low end of the values that scholars have derived.

The sale process damages and the disclosure damages are not additive. The sale process damages are economic damages, which Delaware law prioritizes. The disclosure damages establish a remedial floor. Because the sale process damages exceed the disclosure damages, the stockholders are entitled to the former.

This decision does not calculate a specific damages award or request a final order, because there is still work to do. TransCanada has flagged issues like contribution, and the plaintiffs will want a fee award. The parties will discuss next steps and report to the court.

## I.     FACTUAL BACKGROUND

The factual record is substantial. Trial lasted five days. Fifteen fact witnesses and four expert witnesses testified. The parties introduced 1,928 exhibits, including deposition transcripts from twenty-nine individuals.

In the pre-trial order, the parties agreed to nearly 450 stipulations of fact.[1] The court thanks litigation counsel for preparing those stipulations as officers of the court. This decision relies on them when applicable.

---

[1] Citations in the form "PTO ¶ —" refer to stipulated facts in the pre-trial order. *See* Dkt. 434. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JTX — at —" refer to a trial exhibit, with the

11

For TransCanada, some facts were established before trial, because this is the second time that TransCanada has litigated the events surrounding the Merger to a final judgment. After the Merger, hedge funds pursued an appraisal (the "Appraisal Proceeding"). As the acquirer, TransCanada was the real party in interest. In a post-trial decision, the court made findings of fact and held that the fair value of Columbia as a standalone entity at the time of the Merger was equal to the deal price of $25.50 per share. *In re Appraisal of Columbia Pipeline Gp., Inc.* (*Appraisal Decision*), 2019 WL 3778370, at *1 (Del. Ch. Aug. 12, 2019). Because TransCanada litigated the Appraisal Proceeding to judgment, TransCanada is bound by the factual findings in the *Appraisal Decision*. The appraisal petitioners are also bound. The named plaintiffs and the rest of the stockholder class are not bound.

Discovery in this case unfolded differently than in the Appraisal Proceeding. The different discovery record resulted in a different trial record. The different trial record has led to some different factual findings, some of which favor the plaintiffs and others which favor TransCanada. This decision also addresses some matters that were not raised during the Appraisal Proceeding.

The plaintiffs bore the burden of proving their case by a preponderance of the evidence. The following facts were proven under that standard.

---

page designated by the internal page number. If a trial exhibit used numbered paragraphs or sections, then references are by paragraph or section. Witnesses in this case have testified in related litigation, so to avoid confusion, citations to previous depositions or trial testimony appear in the form "JTX — at —."

### A.  Columbia

Before the Merger, Columbia was a publicly traded Delaware corporation that developed, owned, and operated natural gas pipelines, storage facilities, and other midstream assets. As a midstream company, Columbia's success depended on its contracts with oil and gas producers, known as counterparty agreements.

For many years, Columbia was a wholly owned subsidiary of NiSource Inc., a publicly traded utility. Skaggs served as CEO of NiSource and chair of its board of directors. Smith served as CFO. A third executive, Glenn Kettering, was Executive Vice President and Group Chief Executive Officer of the Columbia business unit.

Skaggs, Smith, and Kettering had been friends and colleagues for decades. All three were aging executives who were planning for retirement. All three had selected 2016 as their target year for retirement. All three saw a spinoff of the Columbia business unit as a means to achieve that goal.

Skaggs had served as CEO since 2005, and he believed that a CEO had a shelf-life of about ten years. Skaggs would turn sixty in 2016, and he saw himself only staying on through July 2016 at the latest. His financial advisor used March 31, 2016, as his target retirement date and told him that "the single greatest risk" to his retirement plan was his "single company stock position in NiSource." *Appraisal Decision*, 2019 WL 3778370, at *2. As CEO, Skaggs could not easily sell his shares in the market without suggesting that he lacked confidence in the company. In a cash sale of the company, however, Skaggs could gain immediate liquidity.

13

Smith had been thinking about retirement all his life. Smith Tr. 1134–35. He viewed fifty-five as the "magical age" to retire and his "retirement wish date." *See* JTX 32 at 2; JTX 1527 at 4. He would turn fifty-five in March 2016. As CFO, Smith faced the same dilemma about monetizing his equity holdings.

Kettering also used 2016 as a target year for retirement. Like Skaggs, Kettering would turn sixty in 2016. But Kettering was more open to working beyond 2016, and in two retirement planning documents, he used mid-2017 as a target date. He wanted to retire, but not with the same yearning as Skaggs and Smith.

All three executives had lucrative change-in-control agreements with NiSource under which a sale of the company would cause their unvested equity to vest. Skaggs would receive three times his base salary and target annual bonus if terminated after a change of control. Smith and Kettering had a two-times multiplier.

Because of NiSource's size, a sale of Columbia would not qualify as a change of control. But if NiSource spun off Columbia, and if Skaggs, Smith, and Kettering went with the new entity, then a sale would trigger their benefits. Skaggs and his management team recommended a spinoff to the NiSource board of directors (the "Spinoff").

## B.    The Spinoff

In September 2014, NiSource announced that it would pursue the Spinoff. NiSource also announced a plan to form Columbia Pipeline Partners LP ("CPPL"), a master limited partnership, to serve as Columbia's primary vehicle for raising capital. Post-Spinoff, CPPL

would issue equity periodically, each time using the proceeds to purchase assets from Columbia through drop-down transactions.[2]

In December 2014, the NiSource board of directors approved Skaggs, Smith, and Kettering's request to join Columbia. Each received a comparable change-in-control agreement from Columbia. Skaggs lobbied successfully for Smith and Kettering to receive a three-times multiplier.[3]

The change-in-control agreements gave Skaggs, Smith, and Kettering personal reasons to secure a deal when disinterested stockholders might prefer a standalone option. Their agreements expired in 2018, which meant that it was safer to sell sooner rather than later. For Skaggs and Smith, the expiration date was a secondary factor. Both wanted to sell and retire in 2016.

Skaggs, Smith, and Kettering expected Columbia to become an acquisition target, so they engaged Goldman, Sachs & Co. ("Goldman") and Lazard Frères & Co. ("Lazard") to prepare. After meeting with Smith, the lead Goldman banker told his colleagues that Skaggs and Smith "'don't want to work forever.'" JTX 56. Goldman believed that Skaggs and Smith were eyeing "a sale in the near term." *Appraisal Decision*, 2019 WL 3778370, at *3. In a memorandum from the same time frame, Skaggs's personal financial advisor

---

[2] *See* PTO ¶¶ 86, 142; JTX 18; JTX 21; JTX 27; JTX 30; JTX 39; JTX 40; JTX 42; JTX 43.

[3] Viewed in isolation, the increased multiple is an insignificant point. Viewed as part of the larger story, it fits with the pattern of three long-standing colleagues planning to exit through a sale.

15

wrote that Columbia "could be purchased as early as Q3/Q4 of 2015." JTX 114 at 1. He added, "I think they are already working on getting themselves sold before they even split. This was the intention all along. [Skaggs] sees himself only staying on through July of 2016." *Id.*

Lazard identified a group of possible buyers that included TransCanada, Dominion Energy Inc. ("Dominion"), Berkshire Hathaway Energy ("Berkshire"), Spectra Energy Corp. ("Spectra"), Enbridge Inc., and NextEra Energy Inc. ("NextEra"). In May 2015, Lazard contacted TransCanada and conveyed that Columbia "may be put into play" after the Spinoff and "that social issues may not be a significant consideration." JTX 109. In other words, Skaggs, Smith, and Kettering were not interested in sticking around. All of TransCanada's proposals assumed that Skaggs, Smith, and Kettering would leave with their change-in-control benefits.

On July 1, 2015, NiSource completed the Spinoff, and Columbia became an independent, publicly traded company. The Board comprised seven members: Skaggs, Sigmund Cornelius, Lester P. Silverman, Marty R. Kittrell, W. Lee Nutter, Deborah S. Parker, and Theresa A. Taylor. Other than Skaggs, none were members of management. Except for Silverman, all were also directors of NiSource.

Cornelius served as the lead outside director. He was the President and Chief Operating Officer of a liquefied natural gas terminal, and he previously had a thirty-year career at ConocoPhillips Co., a Fortune 100 integrated energy company. Skaggs consulted regularly with Cornelius and relied on his advice, often treating Cornelius as a proxy for the full Board.

16

Contemporaneous with the Spinoff, oil and gas prices declined sharply, which put downward pressure on the stock prices of midstream companies. Immediately after the Spinoff, Columbia's stock traded over $30 per share. By August 2015, Columbia's stock was trading below $25 per share. In September, Columbia's stock closed below $20 per share. It stayed in that range until March 10, 2016, when news of the Merger leaked.

### 1. Spectra And Dominion Contact Skaggs.

Five days after the Spinoff, Spectra's CEO left a voicemail for Skaggs about opportunities for their companies. They spoke the next day. Skaggs believed a bid from Spectra would involve stock. With increasing uncertainty in the oil and gas markets, Skaggs and Smith did not want a stock deal. They told Goldman that they did "[n]ot [have] a lot of interest in engaging with Spectra." JTX 1013 at 1.

Later that month, Dominion's CEO called Skaggs about opportunities for their companies. On July 14, 2015, Skaggs sent an email to Cornelius in which he asked to confer about "two inbound CEO calls." PTO ¶ 164. Although both CEOs had used virtually the same opening line, Skaggs described Spectra as a "casual pass" and Dominion as "notable/substantive." *Id.* Skaggs is a savvy communicator who could shape his message to advance his goals, and the description he gave to Cornelius was an early example. Skaggs favored a deal with Dominion, and his description pointed in that direction.

On July 20, 2015, Skaggs met personally with Dominion's CEO. During the meeting, Dominion's CEO expressed interest in buying Columbia for $32.50 to $35.50 per share in cash. Skaggs did not meet with Spectra's CEO.

The Board discussed Dominion's expression of interest during a regularly scheduled meeting on August 3 and 4, 2015. On August 5, Skaggs told Dominion's CEO that he needed to raise his bid to the "upper-$30s." *Id.* ¶ 167. Dominion's CEO told Skaggs that Dominion wanted to move forward.

On August 12, 2015, Columbia and Dominion executed an NDA. It contained a don't-ask-don't-waive standstill.

After obtaining due diligence, Dominion's CEO told Skaggs that Dominion was no longer interested in a deal at the price they had discussed. They agreed to terminate discussions, and Dominion destroyed the confidential information it had received.

### 2. TransCanada Approaches Smith.

In September 2015, TransCanada began its pursuit of Columbia. Poirier led the deal team. Wells Fargo Securities, LLC was TransCanada's investment banker. Eric Fornell led the Wells Fargo team.

Spectra and Dominion had contacted Skaggs, but Poirier and Fornell targeted Smith. The three had met in 1999 when Smith was the Treasurer of American Electric Power, Inc., and Fornell and Poirier were investment bankers with J.P. Morgan.[4] From 1999 until 2007,

---

[4] PTO ¶¶ 47, 49, 118. At that point in his career, Poirier was the junior member of a team that reported to Fornell. *See* Poirier Dep. 34–35 (Poirier describing Fornell as "his boss," a "mentor," and a "friend"). Fornell played a significant role in Poirier's career. Fornell joined J.P. Morgan in 1999 to head up its Power and Pipelines Group. Poirier had recently moved to J.P. Morgan from Chase Manhattan Bank of Canada. He sought out Fornell, and Fornell invited him to transfer to his new group. Poirier became Group Head of Investment Banking Coverage, where he reported to Fornell from 1999 to 2007. After Fornell moved to Wells Fargo, he recruited Poirier in 2013 to serve as founding president

Fornell and Poirier visited Smith approximately a dozen times per year and built a rapport. Through their efforts, J.P. Morgan secured engagements from Smith.[5]

Fornell remained in touch with Smith when he went to NiSource. *See, e.g.*, JTX 24. After the Spinoff, Fornell continued the relationship. *See, e.g.*, JTX 121.

On September 16, 2015, Fornell visited Smith and told him that Poirier was with TransCanada. During a follow-up visit two weeks later, Fornell told Smith that TransCanada was interested in Columbia. On October 8, Fornell met with Smith a third time and again brought up Poirier. Smith said he was open to a call. Fornell immediately sent Poirier an email with the subject line, "Steve Smith" and the statement: "He will be happy to hear from you." PTO ¶ 185.

The next day, Poirier called Smith and scheduled an in-person meeting. Afterward, Poirier had his team update their analysis of a Columbia acquisition, first prepared two months earlier. The analysis described Columbia as "[c]urrently for sale." *Id.* ¶ 187. The circumstantial evidence supports a finding that Smith was the source of that information. The analysis noted that the management team consisted of the "individuals who were seen as 'ineffective' at NiSource" and calculated how much Skaggs, Smith, Kettering, and two other top executives would receive under their change-in-control agreements. JTX 245 at 8, 21. From those calculations, TransCanada knew that a sale would put millions of dollars

---

and Head of Investment Banking and Capital Markets for Wells Fargo Securities Canada, Ltd. In that role, Poirier again reported to Fornell. *See* PTO ¶¶ 44–45, 51.

[5] *See* PTO ¶¶ 49, 118; JTX 1270 at 2.

in their pockets. TransCanada never contemplated retaining the senior Columbia executives. Poirier Tr. 178–79, 182.

### 3.    The Two-Track Strategy

As the fall unfolded, energy markets continued to deteriorate. CPPL's unit price declined, undercutting Columbia's ability to use CPPL to raise capital.

In mid-October 2015, Skaggs sent the Board a memorandum in which he explained that Columbia needed either to raise capital or to find an acquirer with a strong balance sheet. Skaggs recommended a two-track approach. Along one track, Columbia would prepare for a stock offering. Along a second track, Columbia would "[e]xplore whether Dominion or a select group of blue chip strategic players (e.g. MidAmerican (Buffet), Sempra, Enbridge, TransCanada, and perhaps Spectra) would have a legitimate interest in CPG—at a price that's within CPG's intrinsic value range." PTO ¶ 195. During its next regular meeting, the Board approved the plan.

As part of the Board-approved strategy, Skaggs contacted Dominion's CEO on October 26, 2015. He explained that Columbia soon would be pursuing an equity offering and that if Dominion still had interest in a deal, then Dominion should move quickly. The next day, Skaggs met with his personal financial advisor to discuss his possible retirement by July 2016, if not sooner. *Id.* ¶ 205.

On the evening of October 26, 2015, Smith had dinner with Poirier. Smith has many virtues. He is detail-oriented and a team player. He is fully transparent. He lacks guile or artifice. Those traits are laudable in a CFO but undesirable for an M&A neophyte who became TransCanada's "primary contact" during the deal process. *Id.* ¶ 50.

20

During dinner, Poirier described TransCanada's interest in Columbia. After the meeting, Smith informed Skaggs, Kettering, and Robert Smith, Columbia's general counsel, about TransCanada's interest.

On October 29, 2015, the Board met telephonically. Skaggs reported on his discussion with Dominion's CEO, and Smith reported on TransCanada's approach. Management recommended engaging with Dominion on the theory that Dominion could pay a higher price. The Board instructed management to engage with TransCanada if Dominion did not make an attractive proposal. The Board decided Columbia would pursue an equity offering unless a potential buyer offered at least $28 per share. *Id.* ¶ 206.

### 4. The Launch Of The November Sale Process

On November 2, 2015, Skaggs met with Dominion's CEO and offered exclusivity in return for a transaction at $28 per share. Dominion's CEO countered by suggesting either an equity investment or a three-way merger-of-equals that would include NextEra.

The following day, Goldman prepared a list of key considerations for a sale process. Goldman sent them to Smith, who forwarded them to Skaggs. They included the following considerations:

- "Difficult environment for acquirers in this space. Big bet in the valuation on projects 'to come' when folks are having a hard time valuing hard assets with real counterparties/contracts due to anxieties about volumes, terminal values, counter party credit issues, etc etc etc."

- "Any sale process that is public (whether leaked or announced) puts pressure on board to 'take' best price at premium to market that is offered and absent competition may lead to any given bidder trying to push deal at a lower price."

- "Competition (real or perceived) is the best way to drive bidders to their point of indifference."

21

- "Maintaining sense of competition means maintaining speed towards the finish line."[6]

On November 6, 2015, Smith contacted Poirier and offered to enter into an NDA and provide non-public information. On November 9, they executed an NDA that contained a don't-ask-don't-waive standstill (the "Standstill"). The NDA designated Smith as the representative for TransCanada to contact regarding the sale process. PTO ¶ 211.

Christine Johnston, TransCanada's Vice President of Law and Corporate Secretary, negotiated the NDA for TransCanada. She reduced the length of the Standstill from eighteen months to twelve, demonstrating that TransCanada focused on the provision.

During a meeting on November 10, 2015, the TransCanada deal team discussed the Standstill. Meeting notes state: "standstill → 12 months can't make run at them." JTX 314 at 1. Poirier understood that the Standstill precluded TransCanada from pursuing a transaction with Columbia for twelve months absent prior written Board authorization. Poirier Tr. 198.

Columbia also entered into an NDA with NextEra and agreed that Dominion and NextEra could share information. Goldman contacted Berkshire, and Berkshire executed an NDA. The standstills that bound NextEra, Dominion, and Berkshire lasted eighteen

---

[6] JTX 290 at 1. Two of Goldman's points proved particularly prescient. First, a sense of competition would be key to extracting a bidder's highest price. Second, a leak would put pressure on the Board to take an offer at a premium to market. Through their solicitous interactions with TransCanada, Skaggs and Smith would eliminate any sense of competition and leave the Board vulnerable to pressure once the deal leaked.

months. During the same period, Spectra's CEO contacted Skaggs about strategic opportunities. Neither followed up. PTO ¶¶ 212–213.

TransCanada's outside counsel, Sullivan & Cromwell LLP, reviewed the NDA. No one informed the Board about the standstills or their implications. The Board did not learn about the standstills until March 4, 2016. Cornelius had never heard the term "don't-ask-don't-waive" until this litigation. Cornelius Tr. 787–98.

### 5. The Management Team Favors Berkshire And TransCanada.

Over the following weeks, Columbia provided due diligence to Dominion, NextEra, TransCanada, and Berkshire. Each bidder received a management presentation. TransCanada had its meeting with management on November 13, 2015. Smith and Kettering attended for Columbia. Poirier was joined by Alex Pourbaix, TransCanada's Chief Operating Officer, and Karl Johannson, TransCanada's President.

After the initial meetings, Skaggs reported to the Board that management had engaged in "'interesting' exploratory discussions with three of the four credible 'inbound' strategic players (Dominion, TransCanada, Spectra, and Berkshire Hathaway)." PTO ¶ 226. He also recommended that Columbia prepare for an equity offering during the week of November 30, 2015, assuming a sufficient bid had not been received by then.

On November 17, 2015, the Board met telephonically. Skaggs presented his recommendation, and the Board endorsed it.

On November 19, 2015, Skaggs invited Berkshire to make a bid by November 24 so that the Board could consider it during a meeting on November 25. Skaggs explained that if no one provided a satisfactory bid, then Columbia would move forward with an

23

equity offering. Skaggs and Smith gave a similar message to TransCanada. They also told TransCanada to focus on three criteria: an all-cash transaction, closing certainty, and price. *See* JTX 855. Skaggs and Smith did not contact NextEra, Dominion, or Spectra, so those bidders did not know about the deadline.

During meetings on November 19 and 20, 2015, TransCanada's board of directors (the "TransCanada Board") heard from Poirier about his interactions with Columbia management. Poirier reported that "[Columbia] management appears to prefer a sale of the company and have indicated to us that there will be no social issues." JTX 337 at 5. The TransCanada team had quantified the financial interest that Columbia management had in a deal, concluding that for a bid at a 20% premium, Skaggs, Smith, and Kettering would have "total value at risk" of $45,386,051, $13,128,063, and $6,767,111. JTX 350 at 22. TransCanada recognized that those "large change of control provisions" resulted in the executives being "motivated to sell." JTX 306 at 1.

Two days later, Poirier told Johnston and Wells Fargo that the Columbia management team had a "strong desire to conclude a transaction prior to late 2016 (to avoid equity issuance)." JTX 375 at 2. He noted that working backwards from late 2016 and using a six-month timetable for completing a deal meant that Columbia management "cannot afford for a sale process to fail in the near term." JTX 371 at 3–4.

On November 24, 2015, TransCanada's President and CEO Russ Girling contacted Skaggs to express interest in an all-cash acquisition at $25 to $26 per share. That same day, Berkshire's CEO expressed interest in an acquisition at $23.50 per share. Neither indicative offer met the $28 per share minimum set by the Board.

### 6. The End Of The November Sale Process

On November 25, 2015, the Board held a special telephonic meeting. Skaggs told the Board about TransCanada and Berkshire's proposals and said they had received no additional word from Dominion, NextEra, or Spectra. That was technically true, but misleading. Skaggs failed to mention that no one told Dominion, NextEra, or Spectra about the November 24 deadline, so none of them had any reason to act by that date. Skaggs was a good communicator, and the directors felt that he kept them well informed. But Skaggs also knew how to take advantage of their confidence by selectively omitting information or adding his own spin. This was another example.

During the meeting, the Board decided that the indications of interest were too low to pursue. The Board also discussed the risk that the window for raising capital would close. To avoid missing the window, the Board terminated the sale process and instructed management to proceed with the equity offering.

After the meeting, Skaggs contacted Berkshire's CEO, told him that the Board did not support a transaction at Berkshire's valuation, and said that Columbia would be moving forward with its planned equity offering. Berkshire's CEO had told Goldman the week before that if Columbia completed an equity offering, it would "kill our conversation." PTO ¶ 254. He could have meant it, but it also could have been a bluff, because for

25

Columbia to sell 20% of its equity at less than $20 per share would reduce stockholders' pricing expectations and result in a chunk of its investors having a lower basis.[7]

Skaggs called Girling and gave him the same message. Girling asked what would happen if TransCanada closed the gap between $26 and $28 per share and got the deal done by Christmas. After consulting with Cornelius, Skaggs told Girling that the Board did not want to take the risk. *See* PTO ¶¶ 249, 253.

That same day, Columbia sent "pencils down" letters to Dominion, NextEra, Berkshire, and TransCanada. *Id.* ¶ 250. The letter stated: "These and all other duties and obligations existing under the Confidentiality Agreement remain in full force and effect notwithstanding the return and/or destruction of the Evaluation Material in accordance with the terms of the Confidentiality Agreement." *Id.* ¶ 251. In other words, the standstills were in effect.

No one had told Dominion or NextEra about the November 24, 2015 deadline, and they were surprised by the notice. NextEra responded, "This was news to us—we were working on it." *Id.* ¶ 252.

---

[7] That is how TransCanada later analyzed the effect of the offering. The value of the underlying business did not change. The offering simply reallocated that value among a larger number of equity holders and enabled Columbia to reduce debt. With the value spread across more shares, a pre-issuance offer of $28 per share equated to a post-issuance offer of $25.75 per share. *See* JTX 530; JTX 531. Skaggs claimed that he viewed the equity issuance as a "poison pill" that would stop anyone from bidding. Skaggs Tr. 1083. That testimony was a litigation construct that made no financial sense.

## C. Poirier's November 25 Call With Smith

After Skaggs' call with Girling on November 25, 2015, Poirier called Smith for additional color. Because Skaggs had told Girling that Columbia had terminated the sale process, the Standstill was operative. That provision made clear that after Columbia had terminated discussions, TransCanada could not reinitiate them. The standstill component stated that TransCanada could not "seek . . . to influence . . . the management [or] board of directors . . . or affairs of the other Party, including by means of . . . contacting any person relating to any of the matters set forth in this Agreement." JTX 307 § 3(B). The don't-ask-don't-waive component meant that TransCanada was prohibited from "making a request to amend or waive this provision." *Id.*

Poirier's call to Smith breached the Standstill. But Smith did not object. He was happy to backchannel with Poirier.

Smith told Poirier that management "probably" would want to pick up merger talks again "in a few months."[8] The Board did not authorize Smith to convey that message to TransCanada, and Smith did not provide any other bidders with that information.

Smith also told Poirier that he presumed TransCanada did not want Columbia to raise additional capital through a drop-down transaction before TransCanada could buy it. Smith told Poirier that Columbia's "planned window for the next drop-down would be in

---

[8] JTX 392; *see* JTX 403 ("There is some expectation internally that [Columbia] may return to [TransCanada] in the new year for another kick at this."); JTX 395 (email with subject line: "Pencils down for now on [Columbia]") ("[T]here is some possibility that discussions could pick up again in the new year").

the March to June timeframe." JTX 409 at 2. The Board did not authorize Smith to suggest that time frame, and Smith did not share the information with anyone else.

Poirier reported to the TransCanada deal team that "Capricorn management would be supportive of a sale." *Id.* at 1. Poirier also reported that "[b]ased on the decision they made, I believe the board is not as wed to that path at the moment." *Id.* In other words, he "doubted whether Columbia's directors shared management's enthusiasm for a deal." *Appraisal Decision*, 2019 WL 3778370, at *8.

Poirier recommended that TransCanada plan on "reengaging in January, with an eye to concluding an agreement by March." JTX 411 at 3. He proposed to check in with Smith after the equity offering and that Girling follow up with Skaggs "just before the holidays." *Id.* In the meantime, TransCanada would continue working on deal scenarios. *Id.*

The Proxy Statement did not mention the call between Poirier and Smith on November 25, 2015. That call was one of many occasions when Poirier would extract information from Smith and attempt to draw inferences from his words and body language. Smith's demeanor on the stand suggested that he does not have much of a poker face. Whether communicating consciously or subconsciously, Smith gave Poirier lots of signals. Poirier did not always read them correctly, but through Smith, Poirier had exclusive source of insight into the sale process.

Thanks to Poirier's conversation with Smith, TransCanada possessed unique information about Columbia's continuing interest in a deal and the timeline for further negotiations. But TransCanada did not know for sure that it was receiving special

28

treatment. They suspected that other potential bidders could have engaged, and it was possible that Smith or other representatives had given similar messages to other bidders.

## D.    Girling's December 2 Call To Skaggs

On November 29, 2015, Poirier and Fornell exchanged a series of emails about how to pursue a transaction with Columbia. Poirier emphasized the need "to create some time pressure . . . to get [Columbia] to reengage in the near-term." *Id.* Fornell wanted to reengage but wondered about the Standstill. *Id.* at 1; *see* Fornell Tr. 26–27. He asked Poirier, "Have your legal guys talked to Capricorn's legal guys to see if they are OK with my calling Steve [Smith]?" JTX 418.

Poirier already knew that the Standstill prohibited any approaches to Columbia. Both he and Johnston had advised the TransCanada deal team that for twelve months, TransCanada "can't make a run at them [*i.e.*, Columbia]." JTX 314 at 1; *see* JTX 311. But Poirier was willing to push the limits.

As Poirier had recommended, TransCanada used Columbia's equity offering as an excuse for outreach. After the market closed on December 1, 2015, Columbia announced an underwritten public equity offering at $17.50 per share. The offering was oversubscribed and raised net proceeds of $1.4 billion. The underwriters exercised their greenshoe and purchased an additional 10.725 million shares. The high demand suggested that market participants saw Columbia's stock as undervalued. Skaggs told investors that the "successful" completion of the equity offering "eliminates the need for additional equity capital until 2017 and gives us the financial flexibility to be opportunistic in raising equity as we go forward and execute our business plan." PTO ¶ 264.

29

On the same day that the equity offering closed, Johnston emailed a summary of the Standstill to Poirier:

> For 12 months from November 9, 2015, TransCanada and its directors, officers and representatives cannot, unless Capricorn's board specifically requests in writing in advance:
>
> 1) Acquire, offer or agree to acquire ownership of equity securities or material assets
>
> 2) Seek to influence, advise, change or control its management or the board (including by soliciting proxies), or request amendment to the standstill provisions
>
> 3) Make any public disclosure or take actions that requires Capricorn to make public disclosure with respect to matters that are the subject of this agreement.

JTX 424. Poirier agreed with Johnston's summary. Poirier Tr. 197–98. He forwarded Johnston's email to Girling stating: "See below. We basically must get Capricorn's acquiescence to pursue this transaction, or even to seek to influence them. Under item 2, this extends to reaching out to board members without Bob's knowledge or consent. . . . This is a standard provision in my experience." JTX 424.

Despite knowing what the Standstill prohibited, Girling called Skaggs on December 2, 2015. That same day, Fornell called Smith twice. PTO ¶¶ 271–272. Fornell reported to his team that "CEOs had a good call this morning" and that there was "[n]othing to do at the moment." JTX 439. Later that day, Fornell provided Poirier with a proposed engagement letter for Wells Fargo to act as a financial advisor to TransCanada in its potential acquisition of Columbia. PTO ¶ 273.

The circumstances indicate that the calls at least touched on a potential transaction. Fornell's calls to Skaggs and Smith therefore breached the Standstill. Neither objected. The Proxy Statement did not mention those calls.

While Fornell was making those calls, TransCanada's management team was briefing the TransCanada Board on their interactions with Skaggs and Smith. The team reported that Columbia management "relayed its view that its board may wish to re-engage with TransCanada in 2016." JTX 450 at 12. TransCanada management described the Standstill, and the TransCanada Board instructed management "to review potential litigation exposure." *Id.* TransCanada plainly understood what the Standstill prohibited.

### E. Fornell's Interactions With Skaggs And Smith

Five days later, on December 7, 2015, Poirier emailed Fornell about Columbia and asked, "What are merits of re-engaging now vs. waiting till [sic] January?" JTX 468 at 2. Still concerned about the Standstill, Fornell asked, "Is it a question for counsel?" *Id.* Poirier replied: "First, what are the tactical merits. If we think it makes sense, second step would be to talk to counsel." *Id.* Poirier already knew that TransCanada could not reengage without violating the Standstill.

On December 8, 2015, Skaggs and Smith attended an energy conference organized by Wells Fargo. During the conference, Wells Fargo was scheduled to have a meeting with Skaggs, Smith, and Kettering.

Fornell used the meeting as an opportunity to follow up with the Columbia management team. Before the meeting, Fornell sent Poirier an email suggesting that the meeting was "[t]imely." PTO ¶ 275. After the meeting, Fornell emailed Poirier with the

31

subject line: "Are you reachable?" and the message "I had a nice talk with Steve Smith at the Energy Conference." *Id.* ¶ 277. Poirier responded, "Yes now is good." *Id.* After the call, Poirier texted Girling: "Hi Russ, more intel on Capricorn and KMI please call at your convenience." *Id.* ¶ 278. Fornell agreed that he was working on TransCanada's behalf. Fornell Tr. 30.

The circumstantial evidence indicates that the December 8, 2015, meeting touched on a potential transaction. That interaction breached the Standstill. The Proxy Statement did not mention the meeting.

### F. Poirier's December 17 Call To Smith

On December 17, 2015, Poirier called Smith to reiterate TransCanada's interest in a deal. *See* JTX 273 at 2. Poirier indicated that TransCanada would be willing to pay around $28 per share. *See* PTO ¶ 282. During the call, Poirier proposed that they meet during the first week of January. *See id.* ¶ 279. When Poirier made the call, he knew that he needed Columbia's consent before approaching Columbia about a transaction. JTX 1661 at 56.

Smith told Skaggs about Poirier's outreach, and Skaggs shared the information with Matt Gibson, the lead banker for Goldman. *See* PTO ¶ 282. The next day, Gibson reported to his team that TransCanada remained quite interested in a deal, that Smith would meet with TransCanada during the first week of January at TransCanada's request, and that TransCanada had indicated that they could pay $28 per share. *Id.* Gibson also reported that Skaggs had started "a series of 1x1 meetings with Directors" and that the "message is 'even though we raised equity, our plan still has a significant amount of execution risk (both

32

financial and operational). Need to continue to consider strategic alternatives[.]'" *Id.* (alteration in original).

Poirier's mid-December 2015 call to Smith breached the Standstill. No one informed the Board about the call or that Smith had agreed to a January meeting. Cornelius Tr. 799–801; *see Appraisal Decision*, 2019 WL 3778370, at *8, *32. The Proxy Statement did not mention the mid-December call.

## G. Skaggs Primes The Directors For A Deal.

During the second half of December 2015, Columbia's top officers and Goldman began planning for a possible deal with TransCanada in early 2016. On December 17, Skaggs circulated to Smith, Kettering, and Goldman a "rough cut" of a presentation that he planned to give to the Board one month later, on January 28, 2016. JTX 492. Skaggs anticipated a deal price of $28 per share—the same price Poirier had suggested to Smith— and he outlined a "Deal Analytic Framework." *Id.* at 4. A key slide showed "What You Have To Believe" about Columbia's prospects to reject a deal at $28 per share. *Id.*

Skaggs planned to recommend a deal. He asked Goldman for help preparing the deck. *See* JTX 514.

During the second half of December and through early January, Skaggs scheduled separate one-on-one meetings with individual Board members. There can be good reasons for a CEO to engage in one-on-one conversations with directors, but the practice invariably enhances the CEO's ability to curate the information each director receives and guide each director toward the CEO's preferred result. During one-on-one conversations, directors cannot benefit from hearing the questions that other directors ask, nor can they deliberate

33

and share ideas. While not invariably problematic, individual meetings are a sign of a CEO seeking to control a process.

Skaggs used his one-on-one meetings to prime the directors to support a sale. *Appraisal Decision*, 2019 WL 3778370, at *33. Goldman would later describe the meetings in exactly those terms. *See* JTX 575 ("Bob has spent the past week flying around meeting with his Directors 1x1 . . . he's priming them for a [TransCanada] bid.").

Skaggs also used the one-on-one meetings to remind the directors that he hoped to retire on July 1, 2016—just eight months away. *See* JTX 484. Without a sale, the Board would need to find a new CEO, and a CEO transition is a significant undertaking that always carries risk. Compared to finding, hiring, and working with a brand-new CEO— against the backdrop of a business plan that Skaggs was saying incorporated significant amounts of execution risk—a sale of Columbia would seem like an attractive option. That was precisely the reaction that Skaggs wanted the directors to have.

## H.     The Lead-Up To The January 7 Meeting

On January 4, 2016, Poirier called and texted with Smith in anticipation of an in-person meeting on January 7 (the "January 7 Meeting"). Poirier asked Smith to send him a package of confidential information so he could prepare for the January 7 Meeting. JTX 273 at 2–3. TransCanada had destroyed the confidential information it received in November 2015, and Poirier wanted an updated set.

Poirier noted that TransCanada would want access to an electronic data room as soon as possible. Smith, Robert Smith, and Sullivan & Cromwell began setting one up. *See* JTX 522; JTX 523, JTX 541; JTX 542.

Poirier's texts with and call to Smith on January 4, 2016, breached the Standstill. The Proxy Statement disclosed Poirier's contact with Smith but presented it in a misleading manner. According to the Proxy Statement, "In early January 2016, Mr. Poirier called Mr. S. Smith to request a meeting." JTX 1291 at 46. Poirier did not call to request a meeting. Smith and Poirier had already planned the January 7 Meeting by mid-December 2015. PTO ¶ 279. Poirier called to ask for an updated version of the package of information that Columbia had provided to the bidders in November 2015.

Poirier also wanted comfort on the Standstill. Johnston and Robert Smith discussed the issue, and the attorneys reasoned themselves into concluding that the January 7 Meeting could go forward, even though TransCanada was clearly seeking to acquire Columbia.

On January 5, 2016, Smith emailed 190 pages of confidential information to Poirier. *See* JTX 528 (the "January 5 Information"). The materials were largely a copy of what bidders had received in November 2015, but with updated financial projections. The January 5 Information included a sample counterparty agreement. TransCanada was particularly focused on Columbia's counterparty risk. *See* JTX 540. Smith did not obtain Board approval before sending this information to Poirier.

In preparation for the January 7 Meeting, Goldman drafted a one-page list of talking points for Smith to use. JTX 521. Skaggs approved them. *Id.* Skaggs was simultaneously sending emails to key directors updating them on topics for the upcoming meeting on January 28 and 29, 2016. He did not mention the January 7 Meeting. *E.g.*, JTX 538.

One of the talking points stated, "If your interest is real, I'd suggest that you have Russ meet with Bob and make a proposal well in advance of our Board meeting on January

35

28th." JTX 521 at 1. Recall that Skaggs began planning in mid-December 2015 to sell the Board on a transaction at the January 28 meeting. Smith's suggestion that Girling call Skaggs was part of management's effort to sell the company.

Another talking point stressed that the two principal factors would be "1) price; and 2) certainty." *Id*. On price, Smith was supposed to say:

- "I recall that [TransCanada] was at $26.00 and CPG was at $30.00, and you or Russ indicated you could be at $28.00 before our equity offering." *Id.*

- "I suggest that you lean in on price as much as possible ('don't get penny wise and pound foolish') as every dollar matters a lot to our Board." *Id.*

- "This is particularly true if you hope to avoid an auction process. Board needs to see price as 'pre-emptive.'" *Id.*

## I.    The January 7 Meeting

The January 7 Meeting took place as planned. The following day, Poirier briefed his team, and contemporaneous notes provide a persuasive account of what took place. *See* JTX 545 at 1–2; JTX 599 at 11. Their contents match up well with a set of notes from Robert Smith's files about a report he received on the meeting. *See* JTX 546 at 1.

Like Smith, Poirier brought talking points to the meeting, and he started by going through them. He explained that TransCanada wanted a U.S.-based asset but had many other targets. JTX 599 at 11. As a skilled negotiator, Poirier was suggesting that there would be competition for TransCanada's attention. *Cf.* JTX 162 at 2 (Lazard report on Dominion representative making same assertion).

Having set the stage, Poirier informed Smith that TransCanada nevertheless remained interested in acquiring Columbia and contemplated a cash offer that would be

36

fully financed with no outs. JTX 546 at 1; JTX 599 at 11. Poirier said that TransCanada's view of Columbia's fundamental value had not changed, implying that TransCanada still envisioned a deal price of around $28 per share. Poirier explained that TransCanada wanted to conduct due diligence for thirty to forty-five days in order to formulate a firm proposal. JTX 546 at 1; JTX 599 at 11. Poirier stressed the need for due diligence on Columbia's contracts with its shippers and counterparty risk. *See* JTX 545 at 2; JTX 546 at 1.

Then it was Smith's turn. He started going through his talking points, but after reading a few, he literally pushed the page across the table and gave it to Poirier. *See* Poirier Tr. 118. That is uncharacteristic behavior for an M&A negotiator, and so out of the ordinary that TransCanada's expert could not cite any precedent for it. Subramanian Tr. 1341–43. The best that TransCanada's expert could do was refer to his own practice when teaching of giving his students his slides after a lecture. JTX 1662 ¶ 46. That is obviously a very different context: A professor is not bargaining at arm's length with his students in a high-stakes negotiation where every step matters and is carefully choreographed. Poirier had not given his talking points to Smith. Poirier Tr. 177.

TransCanada has argued that there was nothing wrong with Smith handing over the talking points because nothing in them was problematic. Dkt. 429 at 50–51. The significance of handing over the talking points lay in the act itself. Patterns carry information, and departures from patterns provide signals. When an M&A negotiator does something that M&A negotiators do not do, the departure from the norm sends a signal. Whether intentionally or not, Smith signaled that he trusted Poirier and was open to a deal.

TransCanada's expert has argued that Smith could have decided to hand over the talking points to establish credibility and induce TransCanada to bid. Subramanian Tr. 1341–42. In theory, yes. But that was not why Smith did it. He testified plainly that he felt silly reading off the talking points and thought it was easier if he just handed them over. Smith Tr. 1176. Negotiators in M&A settings do not typically do that, so the act emphasized that Smith was a neophyte negotiator who was open to a deal.

During the conversation, Smith shared information freely. Poirier asked Smith if there was a gap between the Board and management about selling, as TransCanada suspected. Smith responded that there was not a unanimous view on a sale, but there was a consensus on selling at the right price.

Smith confirmed that Skaggs wanted a proposal from Girling before January 27, 2016, so that he would have something to take to the Board during their meeting on January 28 and 29. Smith proposed a call on January 22. Smith reported that Skaggs was meeting one on one with his directors in advance. Poirier proposed a call on January 25.

Poirier said that TransCanada would want thirty to forty-five days of exclusivity and would seek to sign a definitive agreement around March 1, 2016. Smith responded that TransCanada was unlikely to face competition. Smith Tr. 1141–42. He ticked through six major competitors and explained why each was "distracted." Poirier Tr. 207–08. In substance, Smith told Poirier that "Columbia had eliminated the competition." *Appraisal Decision*, 2019 WL 3778370, at *8. Although TransCanada has quibbled over whether Smith used those words, that was how Poirier understood it. JTX 545 at 2 (handwritten notes from Poirier's report on January 7 Meeting citing observation that each potential

competitor had its "own distractions"); JTX 599 at 11 (same; citing comment from Smith that competition for a deal had been "eliminated").

TransCanada has argued that Smith's statement about a lack of competition was immaterial because TransCanada already knew that other players in the industry were distracted. Dkt. 457 at 59. TransCanada had plainly discounted some bidders. *See* JTX 377. In the *Appraisal Decision*, this court found that TransCanada already knew about each of the company-specific problems that other bidders faced. 2019 WL 3778370, at *8–9.

Once again, the significance of Smith's statement lay not in its informational content, but what it said about the management team's desire for a deal. Poirier had opened the discussion by downplaying TransCanada's interest and stating that TransCanada had a range of possible targets. An experienced negotiator for Columbia would have discounted that assertion based on TransCanada's persistent approaches, but saying that was part of the code. When Poirier requested exclusivity, the standard choreography called for Smith to resist. An experienced negotiator for Columbia might have said any number of things, but reassuring Poirier that Columbia wanted to sell and that TransCanada would not face competition would not have made the list.[9] To the contrary, Goldman had advised Smith

---

[9] *See* JTX 119 at 4 (Goldman Sachs presentation identifying "Responses to Avoid" and noting "Do not say you / CPG / the Board are 'open' to a transaction / suggested alternative"); JTX 128 at 2 (identifying possible responses to approaches); *see also* JTX 283 at 2 (Lazard script for meeting with Dominion CEO in which Skaggs would say, "Lastly, we are aware that other parties are interested in engaging with us. My Board needs to consider our alternatives in that regard."); JTX 168 (Goldman draft of talking points for response to approach by Dominion); JTX 161 (Lazard draft of talking points for response to approach by Dominion).

that "[c]ompetition (real or perceived) is the best way to drive bidders to their point of indifference." JTX 290 at 1. By telling TransCanada "in substance that Columbia had 'eliminated' the competition, Smith contraven[ed] Goldman's advice." *Appraisal Decision*, 2019 WL 3778370, at *8–9. He undercut Columbia's negotiating leverage from the start.

TransCanada and its expert have argued that Smith's behavior benefited Columbia because it reassured TransCanada that it had a path to success and was not being used as a stalking horse. Had TransCanada been standoffish, then perhaps that could have been a reasonable strategy. Here, TransCanada was the persistent pursuer. By this point, TransCanada had violated the Standstill by reaching out to Columbia about a deal on eight separate occasions: Poirier's November 25 call to Smith; Girling's December 2 call to Skaggs; Fornell's December 2 call to Smith; Fornell's December 8 meeting with Smith; Poirier's mid-December call to Smith; Poirier's January 4 call to Smith; Johnston's January 4 call to Robert Smith; and the January 7 Meeting itself. As Skaggs would report to Cornelius and two other directors on January 11, 2016, TransCanada "certainly has keen interest in CPG." JTX 564 at 1. No one needed to encourage TransCanada to bid. Smith's reassurances sent a different message—that management wanted a deal and would not be seeking to drive up the price.

Poirier and Smith discussed valuation. The talking points that Smith handed over indicated that TransCanada had been at $26 per share and that Columbia wanted $30, but that Girling had suggested to Skaggs that TransCanada could get to $28. JTX 521 at 1.

40

Poirier understood from his meeting with Smith that Columbia would be pushing to get to a price of $28 per share. JTX 545 at 1.

The January 7 Meeting breached the Standstill. *Appraisal Decision*, 2019 WL 3778370, at *32. The Proxy Statement provided a misleading description of the January 7 Meeting. It portrayed the meeting as the first step in TransCanada's reengagement (it was not), and it portrayed the meeting as involving a balanced exchange of high-level information (it did not).

After the January 7 Meeting, TransCanada had free and regular access to information from Smith. Poirier and Smith scheduled a daily call, and between January 7 and January 13, 2016, they spoke almost every day. The Proxy Statement did not mention that fact.

## J. TransCanada Begins Due Diligence.

One day after the January 7 Meeting, Poirier sent a due diligence list to Smith. Smith was the most eager to sell, and he forwarded it to his colleagues with the note, "Doesn't appear too horrible." JTX 548. Skaggs was also eager to sell. He weighed in with "[t]edious . . . [b]ut, seems within fairway." *Id.* Robert Smith was more measured. He described it as "comprehensive to be sure" and indicated that there would be items that Columbia could not provide. *Id.* ("We'll try to be as accommodating as we can but will note what we can and can't do at this stage."). After consulting with Sullivan & Cromwell, Robert Smith advised Skaggs and Smith to reject many of the requests. JTX 555.

TransCanada identified twenty-nine people from its team who would need access to the data room. JTX 547. On January 9, 2016, two days after the January 7 Meeting,

41

Columbia gave the TransCanada personnel access, and TransCanada's team began conducting due diligence. PTO ¶ 293. Columbia management did not obtain approval from the Board before granting TransCanada access to the data room.

On January 11, 2016, Skaggs sent emails to Cornelius and two other directors with whom he had already met in one-on-one sessions. *See* JTX 565. His email purported to update them on management's engagement with TransCanada, and Skaggs stated that he would share the same information verbally with the other three directors when he had one-on-one conversations with them later that week. PTO ¶ 297.

Skaggs's email was misleading. He stated:

Since our recent discussions, TransCanada (TRP) sent a data request to Steve on Friday evening (1/08)—in contemplation of "developing a preliminary proposal" that apparently, TRP's CEO would communicate to me "early in the week of 1/25". [sic] The TRP request is a follow-up to its November '15 review of CPG's business plan, and we consider the request as more-or-less "routine" and "not overly burdensome". [sic] (FYI . . . Although we formally terminated discussions with TRP in early December, our NDA remains in effect.) TRP also wants to speak again with Glen to follow-up on CPG's commercial and construction activities; that conversation will likely occur later this week. (FYI . . . We continue to limit involvement/interactions to the CPG "Core Team". [sic]).

*Id.*

Skaggs did not mention the multiple interactions with Poirier, Girling, and Fornell. He did not mention the January 7 Meeting or describe the candid information that Smith had provided. He characterized TransCanada's request for due diligence as a "data request" that was "routine" and merely "a follow-up to its November [2015] review of [Columbia's] business plan." *Id.* It was actually a direct result of the January 7 Meeting. He also implied that TransCanada had set the timetable for a proposal, stating that "apparently, TRP's CEO

42

would communicate to me 'early in the week of 1/25.'" *Id.* Skaggs had given Girling that timeline by asking him to make a proposal that Skaggs could present to the Board at its meeting on January 28, 2016. Skaggs also referred to the NDA remaining in effect, while failing to mention the Standstill, TransCanada's repeated violations of that provision, or management's failure to report those violations to the Board and seek the Board's approval to proceed.

Skaggs's email was another example of his skill at manipulating the flow of information. This time Skaggs flatly misrepresented what he and Smith had been doing to engineer a sale.

During due diligence, TransCanada focused on the size of the change-in-control payments that management would receive. After calculating the total, a Wells Fargo banker wrote, "112MM? yikes." JTX 600; *see* JTX 608 (noting the $112 million "Change in Control Executive Compensation"). Another banker responded, "Nice little retirement plan." *Id.*

## K. The Debate Over A Request To Make A Proposal

Based on his repeated interactions with Skaggs and Smith, Poirier knew that Skaggs wanted an expression of interest before the Board's meeting on January 28 and 29, 2016. Smith and Poirier planned for the CEOs to speak on January 25.

The Standstill clearly prohibited an expression of interest without prior Board approval. It stated:

> Standstill. In consideration for being furnished with Evaluation Material by the other Party, each Party (each such Party in such context, the "Standstill Party") agrees that until the date that is twelve months after the date of this

43

Agreement, unless the other Party's board of directors otherwise so specifically requests in writing in advance, the Standstill Party shall not, and shall cause its Representatives not to . . . directly or indirectly,

(A) acquire or offer to acquire, or seek, propose or agree to acquire, by means of a purchase, tender or exchange offer, business combination or in any other manner, beneficial ownership . . . or constructive economic ownership . . . of the other Party . . .

(B) seek or propose to influence, advise, change or control the management, board of directors, governing instruments or policies or affairs of the other Party, including by means of . . . contacting any person relating to any of the matters set forth in this Agreement . . . or making a request to amend or waive this provision or any other provision of this Section 3 or of Section 1 or Section 2 or

(C) make any public disclosure, or take any action that could require the other Party to make any public disclosure, with respect to any of the matters that are the subject of this Agreement.

JTX 307 § 3.

An expression of interest fell within Section 3(A), under which TransCanada agreed not to "directly or indirectly" either "seek . . . to acquire" or "propose . . . to acquire" Columbia. *Id.* § 3(A). It also fell within Section 3(B), under which TransCanada agreed not to "directly or indirectly" either "seek or propose to influence . . . the management, board of directors . . . or policies or affairs" of Columbia, including by means of . . . contacting any person relating to any of the matters set forth in this Agreement." *Id.* § 3(B).

During TransCanada's repeated interactions with Columbia management, the Standstill had been raised only briefly, just before the January 7 Meeting. Columbia's in-house counsel quickly brushed the issue aside. No one asked whether Girling could make a proposal that included a price range until January 25, 2016, the day of the call, and it was TransCanada who flagged the point. *See* JTX 617. That morning, Johnston emailed Robert

44

Smith to seek confirmation that TransCanada would not breach the standstill "in the event a verbal or written offer or proposal is made by Taurus to the Capricorn CEO." JTX 620 at 1. She noted "specifically that the Capricorn board of directors is to 'specifically request in writing in advance' any of the matters covered in Section 3." *Id.*

Johnston's email was itself a breach of the Standstill. *Appraisal Decision*, 2019 WL 3778370, at *32 n.32. For her to seek assurance that an "offer or proposal" would not breach the Standstill was itself "a request to amend or waive" the Standstill, and the plain language of the Standstill prohibited TransCanada from "making a request to amend or waive this provision or any other provision of [the Standstill]." JTX 307 at 5.

Robert Smith forwarded Johnston's request to the lead Sullivan & Cromwell attorney advising Columbia. Smith wrote that he would "call [Johnston] back shortly acknowledging that an offer is not in contravention with the standstill agreement." JTX 620 at 1. Given the language of the Standstill, that was a bizarre statement to make. Absent prior written Board authorization, an "offer" obviously was "in contravention [of] the standstill agreement." Two minutes after receiving Robert Smith's email, the Sullivan & Cromwell partner emailed back one word: "Agree." *Id.*

Robert Smith replied to Johnston: "I confirm by this email that receipt of an offer to purchase our securities in this context would not violate or be in contravention with the terms of the NDA, including the standstill provision." JTX 623 at 1. He did not obtain Board approval, as required by the Standstill, before granting a waiver in response to a request that itself breached the Standstill.

Johnston knew that an offer to acquire Columbia would violate the Standstill without a written Board invitation and that an email from the general counsel was not enough. She wrote back: "[I]f we were to move forward, the words in the standstill that we agreed would <u>appear</u> to require more explicit Board direction for an offer (even if conditioned)." *Id*. That was a diplomatic way of telling Robert Smith that there was no possible way that "an offer to purchase" Columbia's securities "would not violate or be in contravention" of the Standstill.

Robert Smith again reached out to Sullivan & Cromwell. The lead partner replied: "I think a formal proposal they are right [sic], but what we're doing now is fine. Just emphasize that what we approve them doing is making a private, non-public indication for discussion of a negotiated transaction and discussion of whether aboard [sic] wants to initiate negotiations." JTX 621.

That response had no basis in the language of the Standstill. Its terms do not distinguish among "formal," "informal," or "binding" proposals and does not carve out "private, non-public indication[s]" of interest. At trial, the Sullivan & Cromwell partner agreed that submitting an expression of interest with a price range was "probably a breach" of the Standstill. Frumkin Tr. 689. He nevertheless argued that "some approaches are welcome and, therefore, not a breach" while "other approaches might be unwelcome and, therefore, a breach." *Id.* at 683–84.

Under the plain language of the Standstill, that is obviously wrong. The Standstill does not distinguish between "welcome" and "unwelcome" approaches. Any approach is a breach, just as any request to make an approach is a breach. At trial, the partner argued

46

that the plain language of the Standstill would make it "very difficult for anybody to . . . ever reach out to a company and make a proposal." *Id.* at 719–20. Exactly. That is the point of don't-ask-don't-waive language. If directors want anybody to be able to reach out and make a proposal, then counsel should not include don't-ask-don't-waive language in the company's standstills.

The partner's argument that some approaches may be welcome while others are not, makes an important distinction, but not one that operates at the level of breach. Whether an approach is welcome affects whether the target decides to waive the breach or otherwise not assert a claim. Any uninvited approach, including a welcome approach, is a breach, but Columbia might decide to waive the breach or not assert the breach. That, however, was not a call for management or the Sullivan & Cromwell partner to make. Only the Board could decide to waive the breach or otherwise not assert the claim.

Neither Columbia management nor Sullivan & Cromwell brought the December 2015 conversations, the January 7 Meeting, Johnston's inquiry about the Standstill, or management's desire to waive the Standstill to the attention of the Board. JTX 1642 at 70. Instead, Sullivan & Cromwell prepared a memorandum to provide to the Board during its meeting on January 28 and 29, 2016, that devoted eight of its ten pages to the directors' fiduciary duties when selling the company. *See* JTX 587 at 3–10. And Sullivan & Cromwell prepared a short slide deck to talk through a process of exploring strategic alternatives. *See* JTX 627. It is hard to square that conduct with the trial testimony that TransCanada's anticipated expression of interest—with a price term—was a non-event for purposes of the Standstill.

Johnston's request for confirmation that TransCanada's proposal would not breach the Standstill was itself a breach of the Standstill. The Proxy Statement did not mention it.

## L.     The January 25 Proposal

On January 25, 2016, Poirier called Smith and had a discussion about the valuation that Girling would offer Skaggs during a call later that day, so "there were no surprises." Poirier Tr. 125–26. Girling then contacted Skaggs and expressed interest in an all-cash acquisition in the range of $25 to $28 per share, subject to further due diligence. PTO ¶ 301. Girling started the call by stating that to avoid a violation of the Standstill, the proposal should not be viewed as an offer. *See* JTX 622 at 1. Under the Standstill, that did not make any difference, because the provision went well beyond a formal offer.

Girling reported that due diligence had gone well and had not revealed any issues. He stated that their view of Columbia's fundamental value remained in the range of $25 to $28 per share in cash, but that Columbia's trading price meant that the premium would seem excessive. *See* JTX 622 at 1; *see also* JTX 578 at 2 (Wells Fargo noting that "[t]he nearly 60% premium implied by the range discussed by the CEOs makes [TransCanada] look like it is overpaying"). Girling asked for another forty-five days of exclusivity for more due diligence, to let the market respond to TransCanada's earnings announcement in February 2016, and to engage with the rating agencies. *See* JTX 622 at 1. Girling said that TransCanada would not be willing to move forward without exclusivity. PTO ¶ 302.

Skaggs responded that Columbia would consider the proposal and that the Board would push for the top of the range. *See* JTX 622 at 1.

The next day, January 26, 2016, Skaggs emailed the directors and told them that TransCanada's CEO had called him with "a proposition to acquire CPG." JTX 628. Skaggs did not mention the Standstill, the backchanneling since November 30, 2015, the January 7 Meeting, or the due diligence that TransCanada had been conducting since January 9, 2016.

## M.     The End-Of-January Board Meeting

Since the middle of December 2015, Skaggs had planned to pitch the Board on a sale to TransCanada during its regular meeting scheduled on January 28 and 29, 2016. PTO ¶ 304. On December 17, 2015, Skaggs sent Goldman a handwritten outline of slides he wanted to use at the meeting. *See* JTX 492. That outline expressed "Management's POV" that a sale to an acquirer with scale and a strong balance sheet was the best path forward. *Id.* at 3. From Poirier's call with Smith, Skaggs expected a sale to TransCanada at $28 per share. He later sent Goldman a draft of his proposed slide titled "What You Have To Believe" to reject a deal at $28 per share. His points included:

- "Near-perfect execution."

- "Customers Stay the Course (Won't Flake)"

- "Balance Sheet Strength + Flexibility Are Overlooked"

- "Size and Scale Aren't An Imperative."

JTX 513 at 4. He also asked Goldman to prepare a slide showing the share prices and standalone valuations in future years that would equate to $28 per share today. *Id.* at 5.

Using Skaggs' outline, Goldman prepared a formal presentation for the meeting. JTX 590. The presentation included a slide with matrices of EBITDA multiples and

49

resulting share prices. *Id.* at 1. Skaggs circulated the presentation to Smith and Kettering and gave his opinion that "the slides make a statement." JTX 594 at 1.

During the two-day meeting, Skaggs gave a presentation that was designed to depict a deal with TransCanada as the obvious choice. Skaggs provided only a partial version of Goldman's metrics. He included the calculation that standalone would be more valuable if the stock price reached $30.11 per share by the end of 2017. JTX 641 at 6. He omitted the calculation that remaining independent would be more valuable if the stock price reached $27.95 per share by the end of 2016.

After Skaggs's report, the Board discussed contacting other parties. PTO ¶ 304(e). No one reported on the Standstill, TransCanada's breach, or the fact that more scrupulous counterparties might respect their contractual commitments.

The Columbia management team advised the Board that Girling's expression of interest in a range of $25 to $28 per share was sufficiently "firm" to grant TransCanada exclusivity. R. Smith Tr. 412. Inexplicably, Robert Smith testified at trial that TransCanada's offer was nonetheless insufficiently "firm" to violate the Standstill. *Id.* at 412–13. Such are the virtues of motivated reasoning.

The Board considered the risk of TransCanada terminating discussions without exclusivity. PTO ¶ 304(g). TransCanada had been pursuing Columbia since October and had repeatedly blown through the Standstill, providing a strong indication that TransCanada would not walk without exclusivity, but no one discussed those points. The Board authorized exclusivity through March 2, 2016. *Id.* ¶ 309.

During an executive session, Skaggs led a discussion of succession planning. The implicit message remained that a deal would avoid the challenges and risks associated with finding, hiring, transitioning, and working with a new CEO. *Cf.* JX 884 at 1 (Lazard noting internally that "the best succession planning will be a deal").

## N.    The Deal Process Moves Forward.

After the Board meeting, Skaggs contacted Girling and told him that the Board had agreed to exclusivity. At Sullivan & Cromwell's suggestion, Skaggs proposed an informal, unwritten exclusivity agreement. *See* JTX 646; JTX 652; JTX 659 at 2. The lead partner on the deal was "not a fan of exclusivity" because "it creates a thread for plaintiffs' lawyers to pull on." Frumkin Tr. 698–99, 748–49. He therefore recommended a "gentleman's agreement" regarding exclusivity with the intention of keeping it out of the Proxy Statement. *See* JTX 647. TransCanada rejected the idea and insisted on a written exclusivity agreement. Johnston Tr. 612.

On January 28, 2016, Columbia sent TransCanada a draft exclusivity agreement. TransCanada's competing first draft required TransCanada's consent before Columbia could "release any person from, or waive any provision of, any confidentiality or standstill agreement to which it is a party." JTX 643 at 3. That provision would have given TransCanada control over whether any potential competing bidder was released from a standstill. *See* Johnston Tr. 611–12. It showed that TransCanada was fully aware of how the Standstill worked.

Later that same day, Columbia and TransCanada executed an addendum to the NDA that permitted specified TransCanada personnel to review highly confidential information,

51

including 176 contracts between Columbia and its customer-producer counterparties. The counterparty agreements were critical to a bidder understanding how well Columbia could weather the commodities downturn. PTO ¶¶ 306–307; *see* JX 667; JX 672; JX 674 at 1.

On February 1, 2016, Columbia and TransCanada executed the exclusivity agreement, which provided for exclusivity until 5:00 p.m., Central Time, on March 2. PTO ¶ 309. TransCanada committed to notify Columbia if it was no longer interested in pursuing a transaction valued at $25 to $28 per share, at which point exclusivity would cease. *Id.* The addendum provided that while exclusivity was in effect, Columbia could not accept or facilitate an acquisition proposal from anyone but TransCanada,

> provided that in response to a bona fide written unsolicited Transaction Proposal that did not result from a breach of this letter agreement (an "Unsolicited Proposal") [Columbia] may, after providing notice to [TransCanada] as required by this letter agreement, (i) enter into or participate in any discussions, conversations, negotiations or other communications with the person making the Unsolicited Proposal regarding such Unsolicited Proposal, (2) furnish to the person making the Unsolicited Proposal any information in furtherance of such Unsolicited Proposal . . . or (3) approve, recommend, declare advisable or accept, or propose to approve, recommend, declare advisable or accept, or enter into an agreement with respect to, an Unsolicited Proposal or any subsequent Transaction Proposal made by such person as a result of the discussions, conversations and negotiations or other communications described in clause (1), if the Board of Directors of [Columbia] determines in good faith, after consultation with its outside legal counsel, that the failure to do so would reasonably be expected to be a breach of fiduciary duties under applicable law.

JTX 676 at 2–3 (the "Exclusivity Fiduciary Out"). Columbia committed to notify TransCanada "promptly (and in any case within 24 hours) if any Unsolicited Proposal or any substitute inquiry or contact with any person with respect thereto is made" and to

52

"indicate the material terms and conditions of such Unsolicited Proposal, inquiry, or contact." *Id.*

During this period, Skaggs and his management team were "very focused on getting [TransCanada]." JTX 659 at 3. In particular, Skaggs and Smith were "super focused on getting [TransCanada] done fast." JTX 678.

On February 3, 2016, the two management teams held a conference call to discuss preliminary considerations around structuring a merger. The management teams agreed to target a February 29 announcement date. On February 4, Columbia sent TransCanada a draft merger agreement.

On February 5, 2016, the Board held a telephonic meeting during which Skaggs gave an update on the process, including a summary of the draft merger agreement. Skaggs told the directors that the parties were targeting an announcement of the transaction on February 29. JTX 191 at 6.

### 1. The February 9 Meeting

On February 9, 2016, a meeting took place among Skaggs, Smith, and Fornell. It is undisputed that they discussed the potential acquisition. PTO ¶ 317. At trial, none of the meeting participants could recall the meeting. Skaggs Tr. 1049; Smith Tr. 1170; Fornell Tr. 41–42.

Smith contacted Fornell and asked for the meeting. *See* JTX 691. The purpose was for Skaggs and Smith to confirm that TransCanada could finance its bid. *See* JTX 707. Smith and Skaggs hoped to close as quickly as possible and wanted TransCanada to use a tender offer to shorten the path to closing. *See* JTX 698; JTX 693 at 3–4.

53

After hearing about the meeting request, Poirier asked Fornell and his colleague Hugh Babowal why Skaggs and Smith were behaving so strangely. Poirier relayed that "Steve [Smith] keeps telling me that despite their stock price, this is not a wasted effort [of] due diligence." JTX 708. Poirier had been "thinking hard about why he is saying that" and whether it signaled that "if we do not hit the bottom end of the range, they will run a competitive process, and that is the reason for his comments?" *Id.* Fornell had a different take. He thought Smith was "signaling that they would do a deal below their range." *Id.* Babowal agreed. He thought that Skaggs and Smith were acting as if "management and the board want an exit regardless of price and will reset expectations to a lower level if the market doesn't recover." JTX 709.

During the meeting, Skaggs probed about execution risk and whether TransCanada could finance its bid. Fornell responded that TransCanada had "lots of levers to pull," and Smith "backed him up." JTX 707. Smith thus supported TransCanada's position. Fornell came away thinking that Skaggs and Smith were very supportive of the deal. *See id.*

## 2. TransCanada Slows Down The Process.

After Fornell's meeting with Skaggs and Smith, TransCanada slowed down the process. Recall that Goldman had told Skaggs and Smith that "[m]aintaining sense of competition means maintaining speed towards the finish line." JTX 290 at 1. During February 2016, the process began to stall. The reason given was TransCanada's need for reassurance from the credit rating agencies. *See* PTO ¶ 318.

On February 10, 2016, Smith and Poirier spoke in advance of a scheduled call between Skaggs and Girling on February 12. *See* JTX 715 at 23. Smith's talking points

54

called for him to reiterate that Columbia was seeking a price between $25 and $28 per share. He was also supposed to stress that "[i]mportantly, and unusually for this industry, this opportunity is being presented to [TransCanada] in a way that is unburdened by the 'typical' social issues." *Id.* In other words, he was to emphasize that Columbia's senior management were happy to leave.

On February 12, 2016, Girling spoke to Skaggs. *See* JTX 724; JTX 726. Girling explained that while TransCanada's assessment of Columbia's value had not changed, it was difficult to justify the premium over Columbia's market price implied by that valuation. *See* JTX 722 at 2.

Skaggs reported on these developments during a Board meeting on February 12, 2016. JTX 191 at 6–7. When the directors met in an executive session, they raised for the first time whether management might have a financial interest in seeing a deal happen. The directors asked Sullivan & Cromwell to calculate how much the management team would receive at various price points.

Sullivan & Cromwell presented its analysis one week later. The following table summarizes the results.

| Executive | Deal at $28 + Termination on 6/1/2016 | No deal but stock trades at $28 per share + Retirement on 6/1/2016 | Gain From A Deal |
|---|---|---|---|
| Skaggs | $30,890,856 | $8,366,961 | $22,523,895 |
| Smith | $12,504,537 | $3,133,731 | $9,370,806 |
| Kettering | $9,685,479 | $2,135,593 | $7,549,886 |
| Robert Smith | $3,130,987 | $0 | $3,130,987 |

After receiving this information, the directors did not take any steps to exercise closer oversight over the management team.

The meeting on February 19, 2016, was the first time that the Board received information about Goldman's relationships with TransCanada and Lazard's relationships with TransCanada and Dominion. JTX 191 at 7. Both investment banks had been advising Columbia since before the Spinoff, yet they had never revealed their prior work for TransCanada.

### 3. TransCanada Lays The Groundwork For Dropping Its Price.

On February 19, 2016, the credit agencies informed TransCanada that under its proposed structure for financing the Merger, TransCanada's credit rating was likely to fall from A– with a stable outlook to BBB– with a negative outlook, the lowest investment grade rating. *See* PTO ¶ 323. Poirier told Smith that because of the rating assessment, TransCanada could not proceed with its existing financing plan for the acquisition. *Id.*

On February 24, 2016, Poirier had another call with Smith, this time in advance of a call Girling was scheduled to have with Skaggs later that day. During the call, Poirier "raised the spectre [sic] of a lower price in a roundabout way multiple times with Steve Smith and was met with 'crickets.'"[10] Smith's silence caused Poirier to sense an opportunity. He surmised that "management wants to get this done" and that if

---

[10] JTX 782 at 1; *see also* JTX 578 at 3 (Wells Fargo discussing alternative deal structures that included prices of $22 per share or $24 per share and recommending "Discuss Options 2-4 with [Columbia] CFO and see how he reacts").

TransCanada made an offer below its range, then "Skaggs and Smith will take a lower price to the board and dare them to turn it down." *Id.* Poirier and Wells Fargo also developed an alternative if Skaggs said, "[L]et's put our pencils down." JTX 773 at 5. They planned to bring in a large Canadian pension fund who would make an equity investment in the range that TransCanada had provided and that Columbia had expected. *Id.*

When Girling called Skaggs, he reported that TransCanada had substantially completed its due diligence, but needed more time to deal with the rating agencies and develop a financing plan for a deal priced between $25 to $28 per share. PTO ¶ 331; JTX 773. Girling also warned Skaggs that a deal might not be achievable within Columbia's range. *See* JTX 773 at 5. TransCanada was already considering lowering its bid to $23 per share. *See* JTX 782 at 1.

Skaggs did not terminate the discussions. He told Girling that the deal process was "becoming a distraction" and said, "let's get done with this in a week." *Id.*; *see also* JTX 760 at 3.

After the meeting, Skaggs sent a short update to the Board that accentuated the positive. He reported that TransCanada continued to see Columbia's value and was exploring alternative financing plans. He did not report that Girling had signaled that an offer might end up below Columbia's range. *See* JTX 775.

Two days later, Skaggs sent a more detailed update to the Board. JTX 783. This time he acknowledged that TransCanada had begun to emphasize the premium over market, suggesting that TransCanada might come in with an offer at or below the low end of its prior range. *Id.* at 3.

57

On February 28, 2016, Skaggs emailed Cornelius about TransCanada possibly offering a mixed consideration deal with less than $25 per share in cash. Cornelius responded that he did not have "much appetite for a cash component less than $25." JTX 791. Skaggs responded that if the cash component was below $25 per share, he would be "inclined not to even counter." *Id.*

### 4. Columbia Extends Exclusivity.

TransCanada's exclusivity agreement was scheduled to expire on March 1, 2016. On that date, Smith, Kettering, and Robert Smith met in person with the TransCanada team to wrap up the deal points. JTX 797. During the meeting, TransCanada worked hard to give the Columbia team the impression that they were planning to make a bid within Columbia's range. *Id.* Against that backdrop, TransCanada asked Columbia to extend the exclusivity agreement through March 14. *See* JTX 1732 at 3. Rather than using the expiration of exclusivity as an opportunity to reach out to other bidders (or threaten to do so), Columbia management recommended extending the exclusivity agreement through March 8. The Board approved the extension. PTO ¶ 338.

On March 2, 2016, Skaggs emailed the Board saying that he expected a proposal from Girling on March 5. *Id.* ¶ 339. Skaggs was so confident that he was about to strike a deal that he told the Board that there would be an in-person meeting on March 7 to consider the transaction, and he arranged for private jets to fly the directors to Houston. JTX 821.

On March 3, 2016, Robert Smith emailed Johnston about TransCanada's anticipated offer and asked if TransCanada still had any concerns about the Standstill. JTX 816 at 1. At trial, Johnston testified implausibly that an offer containing a price term would not

implicate the Standstill. Johnston Tr. 564. In real time, Johnston asked her outside counsel at Mayer Brown for advice about whether there was "anything we should do to ensure that we are not offside[?]" JTX 813 at 1. On Mayer Brown's advice, Johnston sent Robert Smith an email "asking him to confirm that the Board consents to the discussion." JTX 816. Asking for the Board's consent was itself a breach of the Standstill, although by this point, TransCanada could be confident that Columbia management was not concerned about it.

The Board met on March 4, 2016, to grant TransCanada permission to bid. That was the first time that the directors heard about the Standstill. *See* JTX 191 at 9. According to the minutes, a "representative from Sullivan & Cromwell explained that as a result of the 'standstill' provision in [its NDA], TransCanada was prohibited from making a proposal absent an invitation to do so from the Board." *Id.*

In reality, TransCanada was prohibited from making any effort, directly or indirectly, to "seek . . . to acquire" Columbia or "seek or propose to influence the management, board of directors . . . or . . . affairs" of Columbia, "including by means of . . . contacting any person relating to any of the matters set forth in this Agreement." JTX 307 § 3. TransCanada had never stopped seeking to acquire Columbia, and all of Girling, Poirier, and Fornell's contacts with Skaggs and Smith in December 2015, January 2016, and February 2016 had been part of an effort to "seek . . . to acquire" Columbia and to "seek . . . to influence the management [and] board of directors" of Columbia. No one had ever sought the Board's approval for any of those interactions.

To ensure that TransCanada's written proposal did not breach the Standstill, the Board formally authorized management to send a written request to TransCanada asking

59

for a merger proposal from TransCanada. PTO ¶ 346. Robert Smith sent out the written request by email that day. *Id.* ¶ 348.

The Board instructed Skaggs and Smith to waive the standstills in the NDAs with the other potential bidders as soon as exclusivity with TransCanada expired, before any merger agreement was signed. *Id.* ¶ 347. With exclusivity set to expire on March 8, 2016, that meant that the waivers for other potential bidders should go out on the morning of March 9. R. Smith Tr. 418.

### 5. TransCanada Drops Its Price.

The TransCanada Board met on March 5, 2016, to authorize a formal bid. *See* JTX 829 at 2. Management and Wells Fargo gave their reports. *See* JTX 869 at 2–3. Poirier and Fornell had previously remarked that Skaggs and Smith seemed so eager for a deal that they would support a price below Columbia's range. The minutes refer to "sensitivities around price with the credit rating advisory services." *Id.* at 4.

After discussion, the TransCanada Board "agreed that negotiations should commence at US$24 with a high range of approximately US$25.25." *Id.* TransCanada's formal offer was thus one dollar below its previous range of $25 to $28, and management's authority topped out just twenty-five cents above the bottom of its previous range.

The plan was for Girling to call Skaggs later that afternoon, with Poirier calling Smith before the call to preview what Girling would say. During his call with Smith, Poirier "floated the idea of an offer coming in at $24 a share." Poirier Tr. 133. According to Poirier, Smith "used colorful language" and accused Poirier of wasting his time. *Id.* at 133–34.

60

Smith was offended. He had interpreted TransCanada's expressions of interest as more serious and had not expected that his friend Poirier would backtrack.

After the call, Smith told Skaggs, "I think they're considering 24." Skaggs Tr. 1053. Girling then called Skaggs and formally offered to buy Columbia for $24 per share. PTO ¶ 350. The pre-trial order states that Skaggs "expressed disappointment in the offer." *Id.* Skaggs testified at trial that he "absolutely lost it" and called the offer "counterproductive." Skaggs Tr. 1053.

Later that day, Smith called Poirier and advised TransCanada to increase its offer before the Board met that evening. PTO ¶ 350. Smith told Poirier that TransCanada would need to get to the midpoint of Columbia's range—$26.50 per share—to get the Board's attention. Poirier Tr. 134. The Board did not authorize Smith to make what was effectively a counteroffer.

Girling subsequently called Skaggs and raised TransCanada's offer to $25.25 per share. That figure split the difference between TransCanada's opening bid of $24 and Smith's counter of $26.50. It was also the upper limit of the authority that Girling had asked for and received from the TransCanada Board. Girling characterized the offer as "best and final," which it wasn't. PTO ¶ 350. The TransCanada Board had never said it would not authorize a higher figure. Skaggs told Girling that he would take TransCanada's offer to the Board, but that management could not support it. *Id.*

After Girling's call with Skaggs, Poirier called Smith. Poirier told Smith that TransCanada did not have the ability to increase its offer. *Id.* ¶ 353. That was not true.

**6.      The Board Rejects TransCanada's Offer.**

The Board held a special meeting on the evening of March 5, 2016. Skaggs reported on Poirier floating the $24 per share offer and Smith's disappointment, followed by Girling making the $24 per share offer and Skaggs's disappointment. According to the minutes, Smith stated that "he had conveyed to his counterpart at TransCanada that . . . management viewed $26.50 as a more acceptable price and one management would feel comfortable recommending." JTX 191 at 10. After that exchange, Girling had raised TransCanada's offer to $25.25 per share and characterized its offer as "best and final." *Id.*

Skaggs recommended against accepting the offer. As the court found in the *Appraisal Decision*, Skaggs and Smith wanted to sell, and their desire to sell had undercut Columbia's negotiating position, but they were not willing to sell at just any price. They would not take a terrible deal, but they also would not push "for the final nickel or quarter." *Appraisal Decision*, 2019 WL 3778370, at *28.

The Board directed management to reject TransCanada's offer. PTO ¶ 351. After the meeting, Skaggs contacted Girling and delivered that message. Girling responded, "I guess that's it." JTX 863. After the call between Skaggs and Girling, Poirier called Smith to try to convince him that TransCanada could not increase its offer. PTO ¶ 353.

Skaggs emailed the Board about these developments. He reported that management had stopped work on the deal. *Id.* ¶ 354.

**O.      The Process Resumes.**

The negotiations were not really over. On March 6, 2016, Wells Fargo contacted Goldman. Fornell said that if Columbia's management could support a price below $26.50

per share, then TransCanada might increase its price above $25.25 per share. Fornell told Goldman that without a counter, the deal was dead. *See* JTX 877; JX 895; JX 900.

After hearing from Goldman, Skaggs gathered with Smith and Kettering, and they agreed to support a deal at $26 per share. PTO ¶ 358. Skaggs spoke with Cornelius. Based on the call with Cornelius, Skaggs, Smith, and Kettering instructed Goldman to tell Wells Fargo that (i) "management had reached out to Board—and it was important they understand this answer is the Board's answer," and (ii) "[b]ottom line, they'll do 26. Not a penny less. Straight from Board." JTX 885.

Smith separately called Poirier. PTO ¶ 359. Muddying the waters, Smith asked Poirier to consider making a bid of $26 per share, noting that the Board had not approved that price. *Id.* That was honest, but it conflicted with Goldman's message to Wells Fargo. Later that day, Girling told Skaggs that TransCanada's management would consider whether it could support a bid of $26 per share. *Id.* ¶ 360.

Still later on March 6, 2016, Skaggs reported to the Board. *See* JTX 887. Some of the directors were willing to support a deal at $26 per share. Others thought it was too low. *See* PTO ¶ 361; JTX 889.

On March 7, 2016, Poirier called Smith and asked him a series of questions to feel out how committed Columbia was to $26 per share. He told Smith that the TransCanada Board could not meet until March 9, 2016, at the earliest. JTX 909.

### 1. The *Wall Street Journal* Leak

On March 8, 2016, Smith heard from two investment banks that "credible rumors were 'on the street' that [TransCanada] was in advanced discussions with Columbia." JTX 908. One of the bankers reported that the *Wall Street Journal* was preparing a story. *Id.*

The record does not disclose the source of the leak. Columbia was one possibility, because a leak can help a seller by opening the door to potential interlopers. TransCanada was a more likely source, because the news of a bid can cause arbitrageurs to enter the target company's stock, which puts pressure on the target board to take a deal. Goldman had advised Skaggs and Smith about that risk early in the process, warning that "[a]ny sale process that is public (whether leaked or announced) puts pressure on board to 'take' best price at premium to market that is offered and absent competition may lead to any given bidder trying to push deal at a lower price." JTX 290 at 1. Skaggs and Smith had not done anything to develop competition or to make TransCanada think it faced competition.

The first news of the leak came from bankers. Poirier was a former investment banker, and he had played an aggressive game throughout the deal process. He spoke with Smith on March 7, 2016, and was scheduled to meet with the TransCanada Board on March 9. The leak happened on March 8. That was auspicious timing for Poirier, and it might not have been a coincidence. Poirier could have made a few well-placed calls or suggested that

Wells Fargo do so. Poirier regularly breached other aspects of the NDA, so engineering a leak would not have been out of the question.[11]

On March 9, 2016, the TransCanada Board met to consider how to respond to Columbia's request for $26 per share. Johnston's contemporaneous notes reflect strong support for the transaction. JTX 913 at 3. The TransCanada Board considered financing an all-cash bid at $26 per share by selling a TransCanada asset, which TransCanada's current CFO testified was achievable. Hunter Tr. 1130; *see* JTX 925. Wells Fargo's valuation presentation put a $26 per share bid in the lower half of a discounted cash flow valuation range. JTX 915 at 6. Wells Fargo confirmed that it could render a fairness opinion at $26 per share. JTX 913 at 1. Wells Fargo had prepared another discounted cash flow valuation pegging the midpoint value of Columbia at $27 per share in its "growth" case and $26.76 per share in its "base" case, exclusive of synergies. JTX 962 at 3–4. The TransCanada Board discussed that exclusivity had "expired yesterday" but that "[i]nterloper risk is low." *Id.* at 3. The TransCanada Board also discussed that a "potential media leak" was coming that could impact each party's share price. *Id.*

At the conclusion of the meeting, the TransCanada Board authorized an offer at $26 per share, consisting of 90% cash and 10% TransCanada stock. JTX 944 at 2. TransCanada's directors unanimously supported the bid. *Id.*

---

[11] In addition to repeatedly breaching the Standstill, Poirier violated the NDA by speaking privately about the Columbia deal with the head of a major Canadian pension fund. *See* JTX 982.

## 2. The $26 Deal

After the TransCanada Board meeting adjourned, Poirier called Smith and relayed TransCanada's $26 per share offer, with 90% of the consideration in cash and 10% in TransCanada stock (the "$26 Offer"). He told Smith that there were three things that could jeopardize it. One was if the rating agencies did not view the transaction favorably. The second was if TransCanada's stock fell below $49 per share Canadian. The third was if TransCanada's underwriters supported a "bought deal" on the equity issuance. JTX 953.

After hearing from TransCanada, Skaggs gathered the management team, joined by Goldman and Sullivan & Cromwell. They decided they needed to know how the exchange ratio would be set. PTO ¶ 372.

Smith called Poirier to ask about the exchange ratio. Poirier told him that TransCanada needed to fix the exchange ratio before the announcement. *Id.* Smith tried several times to get Poirier to agree that the exchange ratio would be fixed at closing, but Poirier firmly disagreed. *See* JTX 943; JTX 953.

Although TransCanada vigorously denied it, a preponderance of the evidence supports a finding that at the conclusion of his call with Poirier, Smith orally accepted the $26 Offer. From that point on, both sides acted as if they had an agreement in principle (the "$26 Deal").

At least three strands of circumstantial evidence point to the existence of the $26 Deal. First, that was what Wells Fargo understood. In an internal email sent on March 10, 2016, Babowal told the Wells Fargo team that "they accepted $26 with 10% stock but are trying to negotiate down the break fee." JTX 956 at 1. When the Wells Fargo Fairness

66

Opinion Committee later convened to provide a fairness opinion for the final deal, their materials stated on the first page that "[t]he Taurus Board . . . approved the submission of a verbal offer of $26.00 per share, consisting of 90% cash and 10% stock," and "[t]he Capricorn board accepted this preliminary offer on the morning of March 10, 2016." JTX 1120 at 1. A bullet point under the heading "**Background Information**" said the same thing: "Taurus submitted a revised verbal offer of $26.00 per share (90% cash, 10% stock) on 3/9/16, which Capricorn accepted." *Id.* at 6. And the "Transaction Timeline" stated that on March 9 and 10, 2016, "Taurus submitted a revised verbal offer of $26.00 per share (90% cash, 10% stock) to Capricorn, which Capricorn accepted." *Id.* at 8.

Second, two senior TransCanada executives exchanged texts on March 9 and 10, 2016, in which they described TransCanada as having a "done deal." JTX 1779. Along similar lines, Skaggs sent the Columbia deal team a note that treated the price term as settled, identified the only remaining major issues as "negotiation of the break fee and fixed share conversion ratio," and contemplated a "MA signing/deal announcement" of "March 29th or 30th." JTX 947. For the Columbia management team to have accepted the $26 Offer was not surprising, because they had already decided to support an offer at $26 per share and they had prepared the Board for that price. *See* PTO ¶ 359.

Third, TransCanada's exclusivity expired at midnight on March 8, 2016. The Board had instructed management to release the other bidders from their standstills as soon as exclusivity expired, which meant on March 9. Yet on March 9, management did not waive them. Why? Because they thought they had a deal.

**3.    The Board Is "Freaking Out" And Wants A Deal "Whatever It Takes."**

After management verbally agreed to the $26 Deal, Skaggs scheduled a meeting of the Board for the morning of March 10, 2016. In advance of the Board meeting, Skaggs circulated an agenda. He reported that TransCanada was trying to meet Columbia's primary deal requirements: "(a) $26.00/share of value; (b) predominantly a cash transaction; and (c) certainty of close." *Id.* ¶ 376.

Before the Board could meet, the *Wall Street Journal* broke the story on discussions between TransCanada and Columbia. The New York Stock Exchange ("NYSE") halted trading in Columbia's common stock, and both the NYSE and the Toronto Stock Exchange halted trading in TransCanada's common stock. Later that day, TransCanada announced that it was in discussions regarding a potential transaction with a third party but did not identify the company. *Id.* ¶ 375.

During the Board meeting, Skaggs described the $26 Offer and recommended that the Board accept it. *Id.* ¶ 377. He explained that the offer equated to $23.40 in cash plus shares of TransCanada stock with a value of $2.60. JTX 191 at 13

Skaggs noted that the exclusivity period had expired just before midnight on March 8, 2016, and that TransCanada had not asked for an extension. PTO ¶¶ 376, 378. The Board previously had instructed the management team to waive the other bidders' standstills as soon as exclusivity expired, but because the management team thought they had a deal with TransCanada, they had not yet done so.

After the Board meeting, Smith called Poirier. During the call, Poirier asked that Columbia give TransCanada two weeks of exclusivity. *Id.* ¶ 380. Smith told him that

68

because of the leak,"[t]he [Columbia] board is freaking out and told the management team to get a deal done with [TransCanada] 'whatever it takes.'" JTX 952 at 1.

Cornelius testified credibly that the Board was not "freaking out." Cornelius Tr. 807. He testified credibly that the Board had not given an instruction to the management team to get a deal done "whatever it takes," and that the Board had not authorized Smith to convey that information to TransCanada. *Id.* at 808.

Smith's statement struck Fornell as bizarre. After hearing about Smith's statement, Fornell wrote to his team: "Oddly, the Capricorn team has relayed this info to Taurus." JTX 952 at 1. One of the team members responded, "Turmoil provides opportunity. Taurus would appear to be well positioned." *Id.* Fornell emailed back: "Yes." *Id.*

TransCanada has contended that Smith never made the statement that Poirier and Fornell attributed to him. After taking into account Smith's candor and his belief that he and Poirier were working together to get a deal done, I credit that when Poirier asked for an extension of the exclusivity agreement, Smith responded that it would not be a problem because "[t]he [Columbia] board is freaking out" and had told the management team "to get a deal done." *Id.* The directors and Skaggs had shown some frustration with the pace that TransCanada was moving, and there undoubtedly had been more frustration about TransCanada's rejected offer of $25.25 per share. It is easy to imagine that after hearing about the $26 Offer, someone on the Board said, in substance, "Let's get this done." For his own part, Smith wanted to get a deal done so he could retire with his change-in-control benefits, and he likely was freaking out because he had been cast in the part of front-line

negotiator for a deal that would affect him personally in a material way. Regardless of the actual words that Smith used, he conveyed the message that Poirier heard.

For TransCanada, Smith's message and the news leak created an opening to lower its price. Pourbaix, TransCanada's Chief Operating Officer, and Johannson, TransCanada's President, had the following text exchange on March 10, 2016:

> Johannson: "Are you in today? How is Russ doing with the offer."
>
> Pourbaix: "Just landing in Toronto. **We had a deal as offered** but now it is all [expletive] with the leak that we are in discussions. What a cluster[expletive]."
>
> Johannson: "It is. What a disappointment."
>
> Pourbaix: "Russ just got off the phone with the CEO. **They really want to do the deal still which makes sense.** This is more their problem than our problem."
>
> Pourbaix: "He [Russ] actually had come full circle to wanting to do it. We need to see where this shakes out. **On the good side it may be an opp[ortunity] to go back to [Columbia] with a lower price**."
>
> Johannson: "**I agree. Maybe we will benefit through this.** It is nice to see Russ was on board. I was getting worried."

JTX 1779 (emphasis added). The next day, one of TransCanada's directors texted Girling: "I think the leak may be the best development for us." JTX 1782. That was true, as TransCanada used the leak as an opening to re-trade the $26 Deal.

### 4. The Renewed Exclusivity Agreement

On March 11, 2016, Spectra emailed Skaggs to start merger talks. Spectra's CEO wrote that, "[g]iven the news of recent days . . . , I wanted to be sure that you knew that we believe we could offer your shareholders a premium to [Columbia]'s recent trading value

70

and, by offering [Spectra] shares in exchange, the resulting dividend could be approximately double what your shareholders currently receive." PTO ¶ 383. Spectra's CEO asked Skaggs to let him know "as soon as possible when we may speak or get our teams together to determine how best to realize these potential opportunities for our shareholders." *Id.* Spectra also contacted Goldman. *See* JTX 1014.

Skaggs had scheduled a Board meeting for later that day to discuss TransCanada's request for two weeks of exclusivity. Before the Board meeting, Poirier called Smith again and reiterated TransCanada's desire for exclusivity. JTX 981. Poirier also sent Smith a timeline that contemplated extending exclusivity through March 28, 2016. JTX 984.

During the Board meeting, Skaggs recommended granting TransCanada's request, conditioned on "a tight Critical Path to [merger agreement] signing." PTO ¶ 382. Skaggs proposed releasing the other bidders from their standstills before the new exclusivity agreement was signed.

Skaggs also reported on Spectra's inquiry. The Columbia management team had never been interested in a deal with Spectra and had little interest in engaging. *See* JTX 1013. They told Goldman to handle any interactions. *See* JTX 1014. When speaking to the directors, Skaggs downplayed the seriousness of Spectra's approach. PTO ¶ 385.

The Board approved one additional week of exclusivity, not two. *Id.* ¶ 387. The Board had already instructed Columbia management to release the other bidders from their standstills, and that action should have been taken on the morning of March 9, 2016. Instead, the letters went out to the other bidders on the evening of March 11. *Id.* ¶ 388.

71

Skaggs's next steps confirm his belief that he had a handshake deal with TransCanada based on the $26 Offer and was on a "tight critical path" to a signed merger agreement. Before the renewed exclusivity agreement was executed, rather than reaching out to other bidders, Skaggs worked with his advisors to develop a script to use with Spectra and in response to any other inbound overtures. In full, the script stated: "We will not comment on market speculation or rumors. With respect to indications of interest in pursuing a transaction, we will not respond to anything other than serious written proposals." JTX 1025 at 1.

By insisting on a "serious written proposal," the script imposed a requirement that a third-party bidder could not meet. TransCanada itself had yet to make a serious written proposal, and TransCanada had received extensive due diligence, including the opportunity to review highly sensitive counterparty agreements. *See* Smith Tr. 1146. TransCanada had made the rejected $25.25 offer orally, and TransCanada had made the accepted $26 Offer orally. Skaggs and Smith thus knew that it was highly unlikely that any other bidder could make a "serious written proposal" without receiving due diligence, and a competing bidder would not be able to receive due diligence once a new exclusivity agreement was signed.

When the script was prepared, Columbia was not bound by an exclusivity agreement, had received an inbound inquiry from Spectra, and could reasonably expect other inbound inquiries after the leak. The plaintiffs argue that by agreeing to the script under those circumstances, Columbia management demonstrated their favoritism toward TransCanada. That is true. But the reason that Columbia's management team supported the script was because they believed they had an agreement in principle based on the $26 Offer,

72

and they acted in the spirit of that agreement. They also had approval from the Board to enter into a new agreement with TransCanada providing for one week of exclusivity. The script anticipated the Exclusivity Fiduciary Out that would appear in the renewed agreement. Columbia management thought the script would "minimize[] claims that [Columbia] has committed [or will commit] a 'solicitation foot fault.'" JTX 971. The script simply said what they thought the renewed exclusivity agreement would require. *See* JTX 990.

### 5. Columbia Declines To Engage With Spectra.

Skaggs and Smith told Goldman to use the script with Spectra. The banker who took Spectra's call had found Spectra's assurance regarding a bid to be credible, but Skaggs and Smith were not interested. *Appraisal Decision*, 2019 WL 3778370, at *13. They wanted Goldman on the front lines so that Spectra could not talk with them directly. PTO ¶¶ 390, 394. On March 12, 2016, Spectra's CFO and head of M&A called Goldman, and Goldman read the script. *Id.* ¶ 395. Spectra's CFO responded that Spectra had run the numbers, but that public information was limited and that Spectra could not be more specific without due diligence. *Id.* Spectra specifically noted that it needed "a solid understanding of the contracts, customers and timelines for projects" and could "not get a good feel for this with public data." JTX 1117 at 5. That was precisely the information that TransCanada had insisted on reviewing.

The script, however, did not contemplate access to due diligence. One Goldman banker asked internally, "Does [Spectra] 'get it' that they aren't going to get diligence

73

without a written proposal?" PTO ¶ 400. And that was the Catch-22: No one, including TransCanada, would submit a written proposal without diligence.

Goldman informed Skaggs and Smith that Spectra's Chief Development Officer had become involved, which meant that Spectra was "get[ting] serious." *Id.* ¶ 401. Goldman advised Skaggs and Smith that Spectra's contact "can be interpreted as a sign that they are doing real work over there." *Id.* On March 12, 2016, Spectra's CFO made a follow-up call and told Goldman to "expect something formal, absent a 'major bust' in the 'next few days.'" *Id.* Evidencing its seriousness, Spectra engaged Morgan Stanley & Co. LLC as its financial advisor. *Id.* ¶¶ 395, 402; JTX 1119 at 2.

The Board met on March 12, 2016, to consider whether to engage with Spectra. Skaggs reported that Goldman had responded to Spectra using the script. Skaggs recommended against engaging with Spectra on the theory that (i) Spectra was unlikely to be able to pay more than TransCanada and (ii) management's resources should be devoted to buttoning down the $26 Deal. The directors formally approved the script, both retroactively and going forward. PTO ¶¶ 396–398.

### 6. TransCanada Signs Off On The Script.

After the Board meeting, Robert Smith sent an email to Johnston to explain that Columbia would agree to one week of exclusivity and wanted to use the script to respond to incoming calls. *See* JTX 1025. Expecting to sign a new exclusivity agreement comparable to the expired one, he asked for TransCanada's agreement "that this scripted response would not violate the terms of the EA (both in terms of the inbound received in the EA's gap period and going forward until signing, which unfortunately, given the leak,

74

there is a potential that we will receive additional such inquiries).” JTX 1025. The possibility of inbound inquiries was only unfortunate for a management team that wanted a deal with TransCanada. It would not have been unfortunate for a management team that wanted the best transaction reasonably available.

After receiving the script, Poirier forwarded it to Wells Fargo *See* JTX 1029. Babowal questioned the phrase “serious written proposal” because “‘serious’ is in the eye of the beholder.” *Id.* at 1. Picking two unreasonable extremes, he asked, “Does that mean a financed bud [sic] subject only to confirmatory DD? Or can someone write a per share price on a cocktail napkin.” *Id.* He then wrote, “If they are giving us a moral commitment that it is the former I would be ok with this. Think we need to talk with them.” *Id.*

To find out what Columbia meant and “sniff out any issues,” Poirier called Smith. JTX 1778 at 7. After the call, Smith texted Skaggs with a real-time report:

> I think we are done. [Poirier] wanted to know the rationale – I explained it and pointed out how important the Fiduciary protections were for our Board. Told him we wanted to get this deal done with them and this would help us achieve that goal. They were circling the wagons one last time and [Poirier] said he would have Chris [Johnston] reach out to Bob [Skaggs] to get it signed up once their meeting was concluded.

*Id.* at 8. TransCanada has argued that Smith never offered them a “moral commitment,” but regardless of the words he used, Smith gave Poirier the assurance he wanted. In his own words, Smith “[t]old him we wanted to get this deal done with them and this would help us achieve that goal.” *Id.* The reference to “this deal” did not mean some general, undefined deal with TransCanada. It meant the $26 Deal. Poirier understood that Smith had made a “commitment to do a deal with TransCanada.” Poirier Tr. 257; *see* Fornell Tr.

75

74–75. After his call with Smith, he instructed TransCanada's counsel to sign off on the script.[12]

Smith was so convinced that everything was "done" that he went on vacation with his family. He left Kettering as the new point man with TransCanada. *See* JTX 1777 at 2.

The combination of Columbia's decision to extend exclusivity combined with management's commitment to a deal with TransCanada stunned Wells Fargo. After hearing about the extension of exclusivity, one of the Wells Fargo bankers wrote to a colleague, "Sounds like we are back in the game." JTX 1065. His colleague responded: "Sounds like it. I'm just not sure that the other side is playing the same one! Can't for the

---

[12] PTO ¶ 405; JTX 1053. The evidence of Smith's consistent candor with Poirier reinforces the likelihood that he gave Poirier a high level of reassurance. Before his deposition in the Appraisal Proceeding, no one had coached Smith on what a "serious written proposal" meant, and during his deposition, Smith gave his untutored understanding: "A bona fide proposal that says I will pay you X for your company. Hard and fast. No outs. No anything. . . . You're going to pay whatever you're going to pay per share and we're going to sign that agreement and we're done." Smith Tr. 1155–57. Smith was not an experienced M&A negotiator, and he likely had the same understanding when he spoke with Poirier. That response would have resembled what Poirier said during the January 7 Meeting, when he told Smith that TransCanada wanted to do a "deal in US dollars" with a "fully locked in financing package without outs." JTX 546 at 1. Smith could easily have thought that a "serious proposal" meant a fully financed, committed deal.

At trial, a parade of Columbia's witnesses (including a now-educated Smith) lined up to say that "serious written proposal" did not mean what Smith had described in his deposition. That well-prepared and coordinated trial testimony is unpersuasive. The evidence supports a finding that Smith telegraphed to Poirier that Columbia management was committed to the $26 Offer that they had orally accepted, wanted to get that transaction done, and would not be drumming up competition.

life of me figure out why they would keep us exclusive . . . ." *Id.* The reason is that Skaggs,

Smith, and Kettering wanted a deal.

On March 13, 2016, a large stockholder responded to the leak by suggesting that

Columbia test the market to create competition. PTO ¶ 407. The stockholder wrote:

> We feel strongly that given the bid from TransCanada you should start a
> strategic review and test the market. We are on the same page that the
> company is worth more than the current stock price but at a minimum we
> should see if the long-term value of the firm can be realized more rapidly.
> Further given the likely rebound in the market we are not averse to owning
> stock in [TransCanada], [Enbridge], [Spectra], [NextEra], etc. We are large
> shareholders of those firms as a group already.

*Id.* Kettering emailed Skaggs and Smith and suggested that "[a]t some point, we may want

to let [Poirier] know a large holder is suggesting a process." *Id.* ¶ 408. Doing so might have

put some competitive pressure on TransCanada, but no one passed the message along. That

was because Columbia management believed they had agreed to the $26 Deal.

### 7.      The $25.50 Offer

The next day—March 14, 2016—was eventful. The TransCanada Board met that

morning. The first question they addressed was whether TransCanada's underwriters

would support the $26 Deal. The underwriters "stood by their commitment to execute on

the underwritten offering in light of their comfort with the contemplated acquisition." JTX

1092 at 2; *see* Poirier Tr. 264, 296; Johnston Tr. 648–49. The management team advised

the Board that "the market appeared to view the acquisition positively" and would support

the underwritten offering. JTX 1092 at 2

Despite the underwriters' commitment and positive market reaction, Poirier and his

colleagues saw an opportunity to lower TransCanada's bid. Girling told the directors that

77

he "would engage in discussions with [Columbia]'s management regarding an all-cash offer at US$25.50 per common share." *Id.* (the "$25.50 Offer").

After the meeting, Poirier texted Smith to ask if he could "do a call around 12-12:30pm MT today?" JTX 1777 at 2. When Smith asked what it was about, Poirier said cryptically, "We want to give you a thorough update of where we are." *Id.* Smith was on vacation and scheduled to be on the golf course. *See* JTX 1685 at 1. Expecting that the call would be a non-event, he lateraled the call to Kettering. *Id.*

Poirier was joined on the call by Pourbaix, who viewed Columbia's reaction to the leak as an "opp[ortunity] to go back to [Columbia] with a lower price." Poirier Tr. 246. Poirier and Pourbaix proceeded to do just that.

First, Poirier told Kettering that TransCanada's underwriters "thought including stock as consideration was going to make the transaction challenging." JTX 1493 at 419. That was not true. TransCanada's underwriters had remained committed to and comfortable with the transaction. JTX 1902 at 2.

Next, Poirier cited TransCanada's trading price, which he claimed had dropped below the $49 Canadian price point that TransCanada had identified. That at least was temporarily true, because on Friday, March 11, 2016, TransCanada's share price had dipped below $49 Canadian to $47 Canadian, and on Monday, March 14, the stock traded around $47 Canadian. The stock would begin recovering the next day, and it crested $49 Canadian on March 16. In fairness, no one knew that on March 14.

After identifying those issues, Poirier sprung the $25.50 Offer on Kettering. *See* Kettering Tr. 858–60; Poirier Tr. 267. Poirier pointedly did not tell Kettering that the

78

$25.50 Offer was best and final, nor that the $26 Deal was off the table. Poirier Tr. 274. During the trial in the Appraisal Proceeding, Poirier acknowledged that he and Pourbaix "did not formally say no" to the $26 Deal. JTX 1493 at 420. He also acknowledged that if Columbia "had said no to 25.50 all cash, we would have reconsidered being prepared to take the risk of issuing stock as consideration along with the cash component of the transaction." *Id.* at 421. But, as a skilled negotiator, Poirier did not say so. *Id.* at 422.

Poirier put a seventy-hour fuse on the $25.50 Offer. He told Kettering: "[I]f Columbia were not to accept the [$25.50] offer, TransCanada planned to issue a press release within the next few days indicating its acquisition discussions had been terminated." PTO ¶ 412. Poirier admitted that he referred to the issuance of the press release to create a sense of urgency for Columbia to accept the $25.50 Offer. JTX 1493 at 426–27.

The parties have debated whether or not the statement about disclosing the termination of negotiations was a threat or simply an accurate statement about TransCanada's obligations under Canada's securities laws. The plaintiffs cast it as a threat, because the NDA prohibited TransCanada from using a threat of disclosure to increase its bargaining leverage in deal negotiations.[13] TransCanada casts it as a description of TransCanada's disclosure obligations, because the NDA contained an exception that permitted TransCanada to disclose "the fact that discussions or negotiations . . . are taking

---

[13] Poirier Tr. 188–89; *see* Johnston Tr. 573. Mayer Brown had advised TransCanada specifically against making threats, and Johnston relayed that advice to Poirier and the TransCanada deal team. JTX 517 at 1; JTX 819 at 7.

place or have taken place concerning a Transaction" if TransCanada "received the written advice of its outside counsel that it [was] required to make such disclosure in order to avoid violating applicable securities laws or stock exchange rules" and provided Columbia "with the text of the intended disclosure at least 24 hours prior to making the disclosure[.]" JTX 304 at 4–5. Johnston had added the reference to "stock exchange rules" when negotiating the NDA. JTX 299 at 1, 4. At trial, a series of TransCanada witnesses testified that the Toronto Stock Exchange rules would require a disclosure regarding the termination of negotiations.

Whatever the reason, a public announcement by TransCanada would not have been a good thing for Columbia. It could suggest that TransCanada had uncovered problems, turning Columbia into damaged goods and hurting the Board's ability to secure an alternative transaction. On November 3, 2016, at the beginning of the November sale process, Goldman had warned Skaggs and Smith that "[a]ny sale process that is public (whether leaked or announced) puts pressure on board to 'take' best price at premium to market that is offered and absent competition may lead to any given bidder trying to push deal at a lower price." JTX 290 at 1. That was the pressure that Poirier sought to create.

Had the $25.50 Offer been a best-and-final offer such that TransCanada intended to break off negotiations if Columbia rejected it, then Poirier's statement would have been accurate, and the exception would have applied. But as Poirier admitted, TransCanada had not committed to break off negotiations if Columbia rejected the $25.50 Offer. Poirier agreed that TransCanada would have considered other bids, including the $26 Offer. Under the circumstances, Poirier's statement was a threat intended to pressure Columbia into

80

accepting the $25.50 Offer. It was another example of TransCanada disregarding its contractual commitments.

In the interim, Columbia and TransCanada had executed the new exclusivity agreement. The agreement provided that it would terminate automatically if TransCanada made an offer less favorable than the $26 Offer. Once Poirier made the $25.50 Offer, Columbia was free to contact other bidders.

### 8. Columbia Accepts The $25.50 Offer.

After Poirier's bombshell, Skaggs, Smith, and Kettering caucused about what to do. They focused on TransCanada's stock price and discussed whether to counter at $25.75, reflecting roughly another $100 million in merger consideration.[14]

The Board met on the evening of March 14, 2016, and Skaggs reported on the day's developments. According to the minutes, Skaggs told the Board that "TransCanada's final proposal was to acquire the Company at a price of $25.50 per share in cash." JTX 191 at 16. In light of Poirier's clear testimony about not saying that the $25.50 Offer was best and final, either the minutes are wrong or Skaggs misinformed the Board.

The minutes for the meeting on March 14, 2016, note that TransCanada had cited "concerns over execution risk on TransCanada's proposed subscription receipts offering and the deterioration of TransCanada's stock price" as the reasons for the lowered offer. *Id.* at 17. The minutes do not reflect any analysis of those reasons. The minutes do not

---

[14] JTX 1685 at 2; JTX 1686; Kettering Tr. 863–67; Skaggs Tr. 974–76.

reflect any discussion of the fact that exclusivity terminated when TransCanada lowered its offer. The minutes do not reflect discussion of a possible counter at $25.75 per share. The minutes do not reflect any effort by management to come clean about Smith's conversations with Poirier—such as his statement after the leak that the Board was "freaking out" and wanted to get a deal done with TransCanada "whatever it takes," his oral agreement to the $26 Deal, or his call with Poirier about the script in which he expressed management's commitment to the $26 Deal. Because no one mentioned those exchanges, no one discussed how they could have undercut Columbia's negotiating leverage and encouraged TransCanada to lower its bid. Skaggs, Smith, and Kettering kept quiet on these points because they wanted to take the $25.50 Offer and retire. If Board had known about that back-and-forth, then the directors might have both disabused TransCanada about the Board's eagerness to sell and made a counteroffer.

The minutes *do* reflect that the Board discussed Spectra's statement on March 12, 2016, that it could "make a formal proposal to the Company in the next few days," as well as the risk that singing a merger agreement with TransCanada might preempt that offer. *Id.* The minutes do not reflect discussion of the fact that TransCanada had given Columbia seventy hours to respond and that with exclusivity having terminated, Columbia could contact Spectra and explain the timetable. Instead, according to the lawyerly language of the minutes, the Board decided that Spectra would be able to compete as long as the merger agreement with TransCanada provided for "a sufficiently low termination fee, ideally not greater than 3% of the equity value of the transaction." *Id.*

The meeting concluded with the Board deciding to defer formally responding to TransCanada until the directors could meet in person on March 16, 2016, and receive full presentations and fairness opinions from their financial advisors. Until the meeting on March 16, the Board "authorized management and the Company's advisors to continue working with TransCanada in the interim." *Id.* In the language of an M&A negotiation, that meant the Board was prepared to accept the deal. That was how Poirier interpreted it. *See* JTX 1094.

After the meeting, Skaggs and Smith chartered NetJets flights to bring each director to Houston for a meeting on March 16, 2016. Skaggs Tr. 976.

On March 15, 2016, Skaggs, Smith, and Kettering exchanged text messages about the performance of TransCanada's stock, which traded above $48 per share. Kettering suggested raising the issue with Poirier and asking for another $0.25 per share. Skaggs waved him off. Kettering also texted Smith about the stock price, and Smith texted Skaggs. *Id.* Skaggs again dismissed the idea of pushing Poirier for a higher price. Of the three, Kettering was the most willing to work beyond 2016. It makes sense that Skaggs and Smith, both of whom wanted to complete a transaction and retire in 2016, were averse to pushing back on Poirier and jeopardizing the deal. *See* JTX 1686.

Poirier and Fornell also noticed that TransCanada's stock was performing well. On March 16, 2016, Fornell emailed Poirier, stating: "Your stock is hanging in nicely." Poirier replied, "Agreed!" JX 1110. Kettering texted Skaggs and Smith again about the stock price and used a pejorative epithet to describe Poirier and the TransCanada deal team. *See* JTX 1656 at 211; JTX 1654. Skaggs still did not push for a higher price.

83

## P.     The Merger Agreement

The Board met on March 16, 2016, to consider the proposed merger agreement. JTX 1107. After receiving fairness opinions from Goldman and Lazard, the Board approved it. PTO ¶ 425. Skaggs called Girling, then reported to Smith and Kettering that there was "an agreement in principle." JTX 1686.

On March 17, 2016, the TransCanada Board met to give its formal approval. Wells Fargo presented a discounted cash flow analysis using Columbia management's projections, as adjusted by TransCanada, that valued Columbia's standalone business at $26.51 per share. PTO ¶ 427(c). Management projected $150 million in annual cost and revenue synergies by 2018, which Wells Fargo valued at an additional $1.93 per share. *Id.* ¶ 427(b), (e). From TransCanada's standpoint, they were buying an asset valued at $28.45 per share. With TransCanada management having secured a price of $25.50 per share, the TransCanada Board had no trouble approving the deal.

The parties executed an agreement and plan of merger (the "Merger Agreement") later that day and issued a press release announcing the transaction. Smith received a congratulatory email from his financial advisor. Still focused on retirement, Smith responded, "Thanks Rick, do you think I can retire now?" JTX 1138.

With the signing of the Merger Agreement, the sale process entered its final phase. That phase was uneventful.

The Merger Agreement contained a no-shop provision that prohibited contacting, engaging with, or providing confidential diligence materials to a competing bidder except in response to a "Superior Proposal." JTX 1123 ("MA") § 4.02. Before sharing confidential

84

information in response to a Superior Proposal, the Board had to determine that failing to engage with the bidder would be reasonably expected to breach its fiduciary duties. *Id.* The Merger Agreement provided TransCanada with a four-day, unlimited right to match any Superior Proposal. *See id.* §§ 4.02(c)–(d). If Columbia terminated the Merger Agreement, then TransCanada was entitled to a termination fee of $309 million, plus expense reimbursement of up to $40 million. *Id.* § 7.02(b)(iii). The termination fee amounted to three percent of the Merger's equity value, or seventy-seven cents per share. The expense reimbursement added another 0.39% of equity value, or ten cents per share. TransCanada had incurred over $130 million in transaction fees, so there would be no issue about triggering the full expense reimbursement. *See* JTX 1244 at 256.

Because TransCanada could match any competing bidder, an overbid could succeed only by driving the bidding beyond TransCanada's reserve price. Otherwise, a bidder could cause TransCanada to pay more, but would not have a path to success. Anticipating this outcome and reasoning backward, a competing bidder that did not believe it could outbid TransCanada would not engage. And because TransCanada had conducted extensive due diligence, any competing bidder faced the threat that it would suffer the "winner's curse" and could prevail only by overpaying.

Despite strong deal protection measures in the Merger Agreement, TransCanada prepared for an overbid. Taking into account the termination fee, TransCanada calculated that an interloper would have to offer at least $26.27 per share to top the Merger Agreement. PTO ¶ 430. With the expense reimbursement, the actual figure was $26.37.

85

On April 5, 2016, Poirier informed TransCanada's management that he "received credible information" indicating that Enbridge was considering a bid. JTX 1184 at 1. Poirier wanted to put pressure on the banks who worked with TransCanada so that they would not support the Enbridge bid, telling his team: "Those of you who deal with banks[] should obviously be sending the message of long term repercussions to the relationship if they support a competing bid in any way." *Id.* He gave Fornell the same message. *Id.* After hearing about this effort, Johnston qualified what the team could say, telling them "be careful not to make overt threats but instead stress the importance of loyalty in the relationship." *Id.* She later cautioned that all of the discussions should be "verbal (not written)." *Id.* Fornell considered the message a threat. Fornell Dep. 247–48.

At a two-day meeting of the TransCanada Board on April 28 and 29, 2016, TransCanada management presented detailed interloper strategy. JTX 1244 at 242. The presentation reported that there was a "positive market reaction to [the] acquisition" and that "TransCanada can afford to increase its offer." *Id.* at 243. TransCanada's materials analyzed financing strategies for paying up to $28 per share. *Id.* at 253. Ultimately, no other bidders emerged to challenge TransCanada. PTO ¶ 441.

## Q. The Proxy Statement

On May 17, 2016, Columbia issued the Proxy Statement and recommended that stockholders approve the Merger. JTX 1291. Skaggs signed the Proxy Statement, attesting to its accuracy. Skaggs received, reviewed, and commented on it at least ten times. JTX 1583 at 10. Smith received, reviewed, and commented on it at least fifteen times. JTX 1584 at 9–10.

Under the Merger Agreement, TransCanada had the right to participate in drafting the Proxy Statement and review its contents before it was disseminated. TransCanada committed to "furnish all information concerning themselves and their Affiliates that is required to be included in the Proxy Statement." MA § 5.01(a). TransCanada committed that none of the information it supplied

> for inclusion or incorporation by reference in the Proxy Statement will, at the date of mailing to stockholders of the Company or at the time of the Stockholders Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

*Id.* TransCanada also agreed to inform Columbia if there was any issue in the Proxy Statement that needed to be addressed

> so that the Proxy Statement or the other filings shall not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

*Id.* § 5.01(b).

TransCanada management, including Poirier, Johnston, and Girling, had the opportunity to review and comment on the Proxy before it was disseminated to Columbia public stockholders. PTO ¶ 432; JTX 1172; JTX 1183; JTX 1189; JTX 1196; JTX 1202; JTX 1214; JTX 1281. Poirier promised to read the background section "carefully." JTX 1276 at 1. At Johnston's request, Poirier and Girling focused specifically on the "Background to the Merger" and the description of their interactions with Smith and Skaggs. *See* JTX 1183; JTX 1185; JTX 1187. Attorneys from Mayer Brown also reviewed and commented on the Proxy Statement. JTX 1585 at 16; JTX 1179; JTX 1207.

After reviewing the draft, Poirier provided Johnston with comments, including about the communications that he and Girling had with Smith and Skaggs. *See* JTX 1204; JTX 1205. Poirier and Johnston consulted with Girling, who was not concerned about the language of the Proxy Statement. In his words, "I am not that worried about it, it is their document." JTX 1210.

The Proxy Statement disclosed that Columbia had entered into NDAs in November 2015 with three other bidders (Parties B, C, and D) but did not mention the don't-ask-don't waive feature of the standstills. Instead, the Proxy Statement disclosed that "none of Party A, Party B, Party C or Party D would be subject to standstill obligations that would prohibit them from making an unsolicited proposal to the Board" after the announcement of the Merger. JTX 1291 at 60. After reviewing that disclosure, a Mayer Brown attorney wanted to know whether there were any standstill obligations that bound the bidders and proposed calling Robert Smith to ask. *See* JTX 1201. That information was obviously significant to him.

The failure to disclose the true nature of the other bidders' standstill obligations was materially false and misleading. *Appraisal Decision*, 2019 WL 3778370, at *36. The Proxy Statement also disclosed misleadingly that "[u]nlike TransCanada, none of Party B, Party C or Party D sought to re-engage in discussions with [Columbia] after discussions were terminated in November 2015," without providing the additional disclosure that all four parties were subject to standstills, that TransCanada breached its standstill, and that Columbia opted to ignore TransCanada's breach. JTX 1291 at 46. The Proxy Statement created the misleading impression that Parties B, C, and D did not bid because they were

88

not interested. A reasonable stockholder would have found it significant that TransCanada and Parties B, C, and D were bound by standstills in fall 2015 and that TransCanada was permitted to breach its standstill to pursue the Merger. *Appraisal Decision*, 2019 WL 3778370, at *36.

The Proxy Statement failed to disclose that Skaggs and Smith were planning to retire in 2016. This was a material omission of fact. *Id.*

The Proxy Statement failed to disclose a series of interactions between Columbia and TransCanada. It did not disclose Smith's discussion with Poirier on November 25, 2015. It did not disclose Fornell's calls to Smith on December 2. It did not disclose Fornell's discussions with Smith about a potential deal on December 8. It did not disclose Poirier's call to Smith on December 19, during which he expressed TransCanada's ongoing interest in a transaction and suggested a price. It did not provide a fair description of the leadup to the January 7 Meeting or the discussions between Smith and Poirier during the January 7 Meeting. It did not disclose that after that meeting, Poirier and Smith spoke almost every day. It did not disclose Smith's call to Poirier on March 10, 2016, when he stated that the board was "freaking out" and had told the management team to get a deal done "whatever it takes." *See* JTX 952. It did not describe accurately the agreement in principle on the $26 Deal. It did not disclose that on March 12, Smith told Poirier that Columbia management "wanted to get this deal done with TransCanada" and that the inbound script would help to "achieve that goal." JTX 1761. It did not accurately disclose TransCanada's ability to proceed with the $26 Deal.

After preparing and filing the preliminary Proxy Statement, Robert Smith worked with Sullivan & Cromwell to draft the minutes for the various board meetings that took place during the sale process. *See* JTX 1237; JTX 1246; JTX 1265. The minutes were not prepared contemporaneously. They were prepared retrospectively after the outcome of the sale process was known. That fact undercuts their evidentiary value.

In advance of the meeting of stockholders, a handful of stockholder plaintiffs sought additional disclosure. Columbia and TransCanada added language to the Proxy Statement to moot their claims. *See* JTX 1271; JTX 1274. Poirier, Johnston, and the TransCanada team reviewed and commented on the revised Proxy Statement. *See* JTX 1276; JTX 1278. This time, Poirier did not have any comments. JTX 1285. Mayer Brown also reviewed and commented on the revised Proxy Statement. *See* JTX 1284; JTX 1286; JTX 1287.

Columbia filed its definitive Proxy Statement on May 17, 2016. On June 22, Columbia held a special meeting of stockholders to vote on the Merger Agreement. Holders of 73.9% of the outstanding shares voted in favor of the deal.

The Merger closed on July 1, 2016. Skaggs, Smith, and Kettering retired days later. Based on the deal price of $25.50 per share, Skaggs received retirement benefits of $26.84 million—$17.9 million more than he would have received without a transaction. Smith received $10.89 million—$7.5 million more than he would have received otherwise. Kettering received $8.38 million—$5.58 million more than otherwise.

TransCanada reaped its own windfall by acquiring Columbia "at a low point in the cycle." PTO ¶ 343. In May 2016, Smith texted Skaggs that Columbia's "stock would be

$28 by now if we weren't capped with the merger." JTX 1745. Between signing and closing, TransCanada's stock price increased by approximately 18%. JTX 1664 at Ex. 3.

Poirier viewed the deal as a "strong success" for TransCanada. Poirier Tr. 285. In an after-action review of the deal process conducted in July 2019, TransCanada management noted that "[t]he acquisition analysis and subsequent negotiations were significantly enhanced by previous strong relationships between TransCanada and Columbia management," namely through Poirier's relationship with Smith. JTX 1522 at 3; *see* Poirier Tr. 286.

The same presentation recommended that TransCanada management cultivate similar relationships that could be exploited in future transactions. JTX 1553 at 28 ("Develop [a] short list of targeted acquisitions and create relationships within those entities to smooth [future] transaction[s.]"). TransCanada thus recognized internally how Poirier took advantage of Smith.

The presentation cautioned, however, that in future deals, TransCanada's representatives should try not to create a similar paper trail documenting their tactics. *Id.* at 28 The presentation advised that "to mitigate litigation risk. . . [c]are should be taken with respect to various forms of communication across the organization." *Id.* The presentation recommended that deal participants "[m]inimize email conversations; note taking should be limited to deliverables and action items." *Id.* at 35. TransCanada planned to use the same playbook again, but without generating the same amount of evidence.

From a financial standpoint, the review observed that "project executions came in within expectations and generally on-time" and that the financing and cost synergies that

91

TransCanada expected to achieve through the Merger were achieved on schedule. *Id.* at 3, 7. The growth in Columbia's underlying business turned the transaction into a huge success, making up for flat or moderate growth in other TransCanada business units. Stan Chapman, the head of TransCanada's U.S. Natural Gas Pipeline Operations, praised the acquisition in an October 2017 email to Poirier, noting: "Our financial forecast would look very different w/o CPG's billion $EBITDA contribution over the next 2 years. I certainly hope your forethought and execution in getting the deal done was properly rewarded. You deserve a pot of gold, my friend!" JTX 1398 at 1. Poirier replied: "Would I be a good negotiator if I ever said I was satisfied with my comp :)?" *Id.*

TransCanada valued the Columbia business unit at $26.616 billion as of September 30, 2021. JTX 1664 ¶ 214. The Merger valued Columbia's business at just over $10 billion, albeit as of March 16, 2016. *See* PTO ¶ 214. TransCanada enjoyed a compound annual growth rate on its investment of 20%.

Poirier was rewarded. In November 2019, he applied to be CEO, and he took on that role in January 2021.

## R. The Deal-Related Litigation

The Merger gave rise to a procession of litigation, including the Appraisal Proceeding. As that proceeding was moving toward trial, the current stockholder plaintiffs brought this proceeding.

### 1. The Appraisal Proceeding

In September 2017, investors holding 963,478 shares, worth $203 million at the deal price, petitioned for appraisal. The case proceeded to a five-day trial in October 2018. As

the post-Merger owner of the Company, TransCanada was the real party in interest in the Appraisal Proceeding.

On August 12, 2019, the court issued the *Appraisal Decision*, which found that the fair value of Columbia's stock at the time of the Merger was equal to the deal price of $25.50 per share. 2019 WL 3778370, at *1. The *Appraisal Decision* found that "the Proxy contained material misstatements and omissions." *Id.* at *36.

### 2. This Lawsuit

While the Appraisal Proceeding was pending, one of the plaintiffs in this action filed a complaint alleging that Skaggs, Smith, and all of the former members of the Board had breached their fiduciary duties in connection with the Merger, including by disseminating a Proxy Statement that they knew was false and misleading, and contending that TransCanada was jointly and severally liable as an aider and abettor. Dkt. 1. The plaintiff sought to consolidate its action with the Appraisal Proceeding for a single trial. TransCanada opposed that motion, and the court denied it. Dkt. 16.

After that ruling, the fiduciary litigation largely remained dormant until after the issuance of the *Appraisal Decision*. Once that proceeding concluded, this litigation resumed. The plaintiff filed an amended complaint in which it dropped its claims against the directors other than Skaggs. A second stockholder filed a lawsuit asserting fundamentally the same claims, and the two cases were consolidated. Dkt. 36.

The remaining defendants—Skaggs, Smith, and TransCanada—moved to dismiss the complaint for failing to state a claim on which relief could be granted. Dkt. 33. The plaintiffs cross-moved for partial summary judgment. Dkt. 35. The court denied the

93

defendants' motion to dismiss. *In re Columbia Pipeline Gp., Inc.* (*Dismissal Decision*), 2021 WL 772562, at \*59 (Del. Ch. Mar. 1, 2021). The court partially granted the motion for partial summary judgment. Dkt. 59.

During discovery, the plaintiffs settled with Skaggs and Smith. Dkt. 323. Under the terms of that settlement, Skaggs and Smith agreed to pay $79 million to resolve the claims against them. The court approved the partial settlement on June 1, 2022. Dkt. 396. The case proceeded to trial against TransCanada.

## II.    LEGAL ANALYSIS

The plaintiffs sought to hold TransCanada liable for aiding and abetting breaches of fiduciary duty by Skaggs, Smith, and the outside directors on the Board. A claim for aiding and abetting a breach of fiduciary duty has four elements: (i) the existence of a fiduciary relationship giving rise to a duty to the plaintiff, (ii) a breach of that duty by the fiduciary, (iii) knowing participation in the breach by the defendant, and (iv) damages proximately caused by the breach. *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001). The plaintiffs asserted two distinct claims for aiding and abetting. The first is based on breaches of duty during the sale process (the "Sale Process Claim"). The second is based on breaches of the duty of disclosure (the "Disclosure Claim").

### A.    The Sale Process Claim

The plaintiffs proved that Skaggs and Smith breached their fiduciary duties as officers during the sale process because they pursued a transaction that would enable them to retire in 2016 with their full change-in-control benefits and, under the influence of that conflict of interest, took actions that fell outside the range of reasonableness. The plaintiffs

94

proved that the outside directors on the Board breached their duty of care by failing to exercise sufficient oversight over Skaggs and Smith. Most importantly for an aiding and abetting claim, the plaintiffs proved that TransCanada knowingly participated in the breaches of duty. For purposes of the dimension of knowledge, they proved that TransCanada had, at a minimum, constructive knowledge that Skaggs and Smith were breaching their duty of loyalty and that the Board was not exercising sufficient oversight over their activities. For purposes of the dimension of participation, they proved that TransCanada exploited the sell-side breaches of duty when TransCanada reneged on the $26 Deal, substituted the $25.50 Offer, and backed it up with a coercive threat that TransCanada had committed not to make. TransCanada was only able to make that exploitive move with confidence because Poirier had co-opted Smith, knew management wanted to sell, had repeatedly taken actions that violated the Standstill while encountering no resistance from Columbia management, and had concluded with Wells Fargo that whatever game Skaggs and Smith might be playing, it was not one in which skilled M&A professionals were maneuvering for the best price. It was rather one in which M&A newbies were going to be happy as long as they got a deal done at a decent price that triggered their change-in-control benefits and allowed them to retire. By exploiting this scenario, TransCanada was able to buy Columbia for $25.50 per share rather than proceeding with the $26 Deal.

### 1. The Fiduciary Relationship For The Sale Process Claim

The first element of a claim for aiding and abetting a breach of fiduciary duty is "the existence of a fiduciary relationship." *Malpiede*, 780 A.2d at 1096 (internal quotation marks omitted). That element is easily satisfied.

For over two centuries, American courts have treated corporate directors as fiduciaries.[15] Today, the proposition is axiomatic.[16] Skaggs and the other members of the Board were fiduciaries as directors.

---

[15] The seminal American decision is *Attorney General v. Utica Insurance Co.*, 2 Johns Ch. 371 (N.Y. Ch. 1818), an opinion by Chancellor James Kent, the renowned Chancellor of New York and author of *Commentaries on American Law* (1826). The first Delaware decisions appear some seventy years later. *See Walker's Adm'x v. Farmers' Bank*, 14 A. 819, 831 (Del. 1888); *Diamond State Iron Co. v. Todd*, 14 A. 27, 30 (Del. Ch. 1888), *aff'd*, 13 Del. (8 Houst.) 372 (Del. Jan. 16, 1889). Chancellor Charles M. Curtis, who served from 1909 to 1921, provided Delaware's first meaningful consideration of the duties of corporate fiduciaries in decisions like *Martin v. D.B. Martin*, 88 A. 612 (Del. Ch. 1913), and *Cahall v. Lofland*, 114 A. 224 (Del. Ch. 1921), *aff'd*, 118 A. 1 (Del. 1922). His successor, Chancellor Josiah O. Wolcott, served from 1921 until 1938 and was one of Delaware's great jurists. Among Chancellor Wolcott's contributions are several decisions addressing the role of directors as fiduciaries for the stockholders. *See, e.g.*, *Harden v. E. States Pub. Serv. Co.*, 122 A. 705 (Del. Ch. 1923); *Roberts v. Kennedy*, 116 A. 253 (Del. Ch. 1922). Both Chancellors presided during the period after New Jersey adopted the Seven Sisters Acts, which opened the door for an envious upstart (as Delaware then was) to compete for the chartering business. *See* Charles M. Yablon, *The Historical Race Competition for Corporate Charters and the Rise and Decline of New Jersey: 1880-1910*, 32 J. Corp. L. 323, 359–67 (2007) (discussing the so-called charter-mongering states that sought to emulate New Jersey and garner out-of-state incorporations, including Delaware, Maine, West Virginia, and South Dakota); Joel Seligman, *A Brief History of Delaware's General Corporation Law of 1899*, 1 Del. J. Corp. L. 249, 270 (1976) (discussing the Seven Sisters Acts). Both Chancellors played major—and today underappreciated—roles in establishing this court's reputation as a venue for corporate cases.

[16] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) ("The existence and exercise of [the board's authority under Section 141(a)] carries with it certain fundamental fiduciary

For just as long, American courts have treated corporate officers as fiduciaries.[17]

Today, that proposition is axiomatic as well. *Gantler v. Stephens*, 965 A.2d 695, 708–09

(Del. 2009). Skaggs and Smith were fiduciaries as officers.

Although pointing to a fiduciary relationship is technically sufficient to satisfy the

first element of an aiding and abetting claim, it does little to advance the analysis. As Justice

Felix Frankfurter famously observed:

> To say that a man is a fiduciary only begins analysis; it gives direction to
> further inquiry. To whom is he a fiduciary? What obligations does he owe as
> a fiduciary? In what respect has he failed to discharge these obligations? And
> what are the consequences of his deviation from duty?

*Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 85–86 (1943). For a claim for aiding

and abetting, the fourth question is not pertinent, but the first three are.

The answers to Justice Frankfurter's questions depend on the facts of each case.

Fiduciary duties under Delaware law are "unremitting," meaning that they are always

---

obligations to the corporation and its shareholders."). In *Brehm v Eisner*, the Delaware
Supreme Court overruled seven decisions, including *Aronson*, to the extent those
precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of
discretion standard or otherwise suggested deferential appellate review. 746 A.2d 244, 253
n.13 (Del. 2000). The *Brehm* Court held that going forward, appellate review of a Rule
23.1 determination would be *de novo* and plenary. *Id.* at 254. More recently, the Delaware
Supreme Court overruled *Aronson*'s test for demand futility and incorporated it into a new,
unified test. *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-
State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021). Despite *Aronson*'s
fraught subsequent history, which this case omits, the case stands for other propositions
that remain foundational to Delaware law.

[17] *See Diamond State*, 14 A. at 30; *accord Dawson v. Nat'l Life Ins. Co. of U.S.*, 157
N.W. 929, 931 (Iowa 1916); *O'Neile v. Ternes*, 73 P. 692, 696–97 (Wash. 1903); *Deadrick
v. Wilson*, 67 Tenn. 108, 114–15 (Tenn. 1874).

operative, but their application is context-dependent, meaning that "the exact course of conduct that must be charted to properly discharge that responsibility will change in the specific context of the action the [fiduciary] is taking . . . ." *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998). That means that the framework of fiduciary duties can respond to new challenges and changing circumstances, but directors and officers are not without guidance. The Delaware courts have sought to provide officers and directors "with clear signal beacons and brightly lined-channel markers as they navigate with due care, good faith, and loyalty on behalf of a Delaware corporation and its shareholders." *Id.*

When determining whether corporate fiduciaries have breached their duties when pursuing a transaction, Delaware law distinguishes between the standard of conduct and the standard of review. Although Delaware traditionally did not acknowledge that distinction,[18] Delaware jurists now do so openly to explain the divergence between the normative framing of what fiduciary duties require and their practical application to the facts of a case.[19]

---

[18] *See* David Kershaw, *The Foundations of Anglo-American Corporate Fiduciary Law* 185, 221–22 (2018). Despite the lack of open acknowledgement, the divergence could be seen in earlier cases, such as decisions distinguishing between the articulated duty of directors to exercise reasonable care and the liability standard of gross negligence. *See, e.g.*, *Aronson*, 473 A.2d at 812; *In re Walt Disney Deriv. Litig.* (*Disney I*), 907 A.2d 693, 749–50 (Del. Ch 2005), *aff'd* 906 A.2d 27 (Del. 2006). Professor Kershaw notes that New York cases maintained a similar distinction from the late nineteenth century until the codification of the fiduciary standard of care in 1961. *See* Kershaw, *supra*, at 185–86.

[19] *See, e.g.*, *Manti Hldgs., LLC v. Carlyle Gp. Inc.*, 2022 WL 1815759, at *7 (Del. Ch. June 3, 2022) (Glasscock, V.C.); *Totta v. CCSB Fin. Corp.*, 2022 WL 1751741, at *15 (Del. Ch. May 31, 2022) (McCormick, C.); *In re MultiPlan Corp. S'holders Litig.*, 268

With the distinction acknowledged, the standard of conduct describes what corporate fiduciaries are expected to do and is defined by the content of the duties of loyalty and care. *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 36 (Del. Ch. 2013). The standard of conduct thus answers Justice Frankfurter's first two questions: To whom does the fiduciary owe obligations, and what obligations are owed? *See Chenery*, 318 U.S. at 85–86. The standard of review is the test that a court applies to the facts of the case to determine whether the directors have met the standard of conduct. *Trados II*, 73 A.3d at 35–36. It answers Justice Frankfurter's third question: How has the fiduciary failed to discharge these obligations? *Chenery*, 318 U.S. at 85–86.

## a. The Standard Of Conduct During The Sale Process

Corporate directors and officers owe fiduciary duties of care and loyalty to the corporation and its stockholders. *Gantler*, 965 A.2d at 708–09. To act loyally, a director or officer must act in good faith. *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

---

A.3d 784, 809 (Del. Ch. 2022) (Will, V.C.); *In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *30 (Del. Ch. May 6, 2021) (Zurn, V.C.); *Cumming v. Edens*, 2018 WL 992877, at *18 (Del. Ch. Feb. 20, 2018) (Slights, V.C.); *In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655, at *27 n.202 (Del. Ch. July 24, 2014) (Noble, V.C.); *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457–59 (Del. Ch. 2011) (Laster, V.C.); *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1112 (2008) (Parsons, V.C.); *see also Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1275 n.102 (Del. 2018) (Strine, C.J.).

For corporate fiduciaries, to act loyally means "to promote the value of the corporation for the benefit of its stockholders."[20] As a practical matter, that means to promote the value of the corporation for the benefit of the common stockholders in the aggregate. *See Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *21 (Del. Ch. Apr. 14, 2017) (collecting authorities). That simplification holds because when stockholders enjoy special rights, powers, or preferences, those rights are contractual, and corporate fiduciaries do not have a fiduciary duty to maximize the value of contract rights.[21]

---

[20] *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 34 (Del. Ch. 2010); *accord N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 ("The directors of Delaware corporations have the legal responsibility to manage the business of a corporation for the benefit of its shareholder owners." (cleaned up)); *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 182 (Del. 1986) ("A board may have regard for various constituencies in discharging its responsibilities, provided there are rationally related benefits accruing to the stockholders."); *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985) ("[O]ur analysis begins with the basic principle that corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders."); *see also* Leo E. Strine Jr., *The Soviet Constitution Problem in Comparative Corporate Law: Testing the Proposition that European Corporate Law is More Stockholder Focused than U.S. Corporate Law*, 89 S. Cal. L. Rev. 1239, 1249 (2016); ("[U]nder Delaware law . . . directors are required to focus on promoting stockholder welfare."); Leo E. Strine, Jr. et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 634 (2010) ("[I]t is essential that directors take their responsibilities seriously by actually trying to manage the corporation in a manner advantageous to the stockholders.").

[21] *Id.* (collecting authorities). Even when a subset of the stockholders enjoys special rights, powers, and preferences, there will be decisions that do not implicate those contractual rights. *Id.* at *21–22 (collecting authorities). In those cases, the directors must seek to promote the value of the corporation for the benefit of all of its stockholders. *Id.* at *17. A more technically correct framing of the duty of loyalty is that the directors must seek to maximize the value of the corporation for the ultimate benefit of "the undifferentiated equity as a collective, without regard to any special rights." *Id.*

When corporate fiduciaries are considering whether to sell the corporation, the standard of conduct obligates them "to seek the transaction offering the best value reasonably available to the stockholders." *Paramount Commc'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 43 (Del. 1993). "The best transaction reasonably available is not always a sale; it may mean remaining independent and not engaging in a transaction at all." *In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *29 (Del. Ch. Oct. 16, 2018), *aff'd*, 211 A.3d 137 (Del. 2019) (TABLE). Consequently, when considering whether to pursue a strategic alternative that would end the stockholders' ongoing investment in the corporation or fundamentally alter it, the fiduciary principle requires that directors and officers "seek an alternative that would yield value exceeding what the corporation otherwise would generate for stockholders over the long-term." *In re Rural Metro Corp. S'holder Litig.* (*Rural Liability*), 88 A.3d 54, 81 (Del. Ch. 2014) (cleaned up), *aff'd sub nom. RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015). The framing uses the verb "to seek" intentionally: "Time-bound mortals cannot foresee the future." *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 830 (Del. Ch. 2011). The test therefore cannot be whether, in hindsight, the fiduciaries actually achieved the best price. *Id.* "Rather, the duty can only be to try in good faith, in such a setting, to get the best available transaction for the shareholders." *Citron v. Fairchild Camera and Instrument Corp.*, 1988 WL 53322, at *16 n.17 (Del. Ch. May 19, 1988) (Allen, C.).

Acting loyally requires acting in good faith, and acting in good faith requires that the fiduciary subjectively believe that the course of action is in the best interests of the corporation and its stockholders. *See United Food & Com. Workers Union v. Zuckerberg*,

101

250 A.3d 862, 895 (Del. Ch. 2020), *aff'd*, 262 A.3d 1034 (Del. 2021). Stated conversely, a corporate fiduciary acts in bad faith when the fiduciary "intentionally acts with a purpose other than that of advancing the best interests of the corporation." *Stone*, 911 A.2d at 369 (quoting *In re Walt Disney Co. Deriv. Litig.* (*Disney II*), 906 A.2d 27, 67 (Del. 2006)). "It makes no difference the reason why the director intentionally fails to pursue the best interests of the corporation." *Disney I*, 907 A.2d at 754. Bad faith can be the result of "any emotion [that] may cause a director to [intentionally] place his own interests, preferences or appetites before the welfare of the corporation," including greed, "hatred, lust, envy, revenge, . . . shame or pride."[22] A corporate fiduciary can be liable for action in bad faith if "shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests."[23]

In an observation that remains as apt today as in the Victorian era, the nineteenth-century English judge Charles Bowen remarked, "The state of a man's mind is as much a fact as the state of his digestion." *Edgington v. Fitzmaurice*, 29 Ch. D. 459, 483 (C.A.

---

[22] *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (Allen, C.); *see Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) (Strine, V.C.) ("The reason for the disloyalty (the faithlessness) is irrelevant, the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious action not in the corporation's best interest does not make it faithful, as opposed to faithless.").

[23] *RJR Nabisco*, 1989 WL 7036, at *15; *see Nagy v. Bistricer*, 770 A.2d 43, 48 n.2 (Del. Ch. 2000) ("[R]egardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes," even if for a reason "other than personal pecuniary interest.").

1885). Expressed less pithily, a mental state like bad faith is a question of fact. When making a factual finding about mental state, a fact finder only has access to observable indicia. "Despite their expertise, the members of the Court of Chancery cannot peer into the hearts and souls of directors." *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 106 (Del. 2013) (internal quotation marks omitted). "Without the ability to read minds, a trial judge only can infer a party's subjective intent from external indications. Objective facts remain logically and legally relevant to the extent they permit an inference that a defendant lacked the necessary subjective belief." *Allen v. El Paso Pipeline GP Co., L.L.C.*, 2014 WL 2819005, at *7 (Del. Ch. June 20, 2014).

Humans rarely act for only one purpose. Groups of humans, even less so. *See Coster v. UIP Cos., Inc.*, 2022 WL 1299127, at *10 (Del. Ch. May 2, 2022) (identifying multiple purposes behind board action). One of a trial court's most difficult jobs is to assess the mental states of fiduciaries who act for multiple purposes. After carefully considering the evidence, a trial judge may conclude that a fiduciary was sufficiently motivated by an inequitable purpose to warrant a finding of bad faith, or a court may reach the opposite conclusion. The answer depends on the facts and circumstances, credibility assessments, and how the fact finder weighs the evidence.

### b. The Standard Of Review For The Sale Process

When litigation arises, corporate fiduciaries are not judged by the standard of conduct but rather using a standard of review. *Trados II*, 73 A.3d at 35–36. "In each manifestation, the standard of review is more forgiving of directors and more onerous for stockholder plaintiffs than the standard of conduct." *Chen v. Howard-Anderson*, 87 A.3d

103

648, 667 (Del. Ch. 2014). "Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness." *Reis* 28 A.3d at 457.

"Enhanced scrutiny is Delaware's intermediate standard of review." *Trados II*, 73 A.3d at 43. Delaware courts deploy enhanced scrutiny in specific, recurring situations marked by two features. First, there is an identifiable decision-making context where the realities of the situation "can subtly undermine the decisions of even independent and disinterested directors." *Id.* "Inherent in these situations are subtle structural and situational conflicts that do not rise to a level sufficient to trigger entire fairness review, but also do not comfortably permit expansive judicial deference [under the business judgment rule]." *Rural Liability*, 88 A.3d at 82. Second, the decision under review involves the fiduciary intruding into a space where stockholders possess rights of their own. The fiduciary's exercise of corporate power therefore raises questions about the allocation of authority within the entity and, from a theoretical perspective, implicates the principal-agent problem.[24] The resulting situation calls for an intermediate standard of review that

---

[24] To be clear, directors and officers are not agents of the stockholders, nor are the stockholders their principals. "A board of directors, in fulfilling its fiduciary duty, controls the corporation, not *vice versa*. It would be an analytical anomaly, therefore, to treat corporate directors as *agents* of the corporation when they are acting as *fiduciaries* of the stockholders in managing the business and affairs of the corporation." *Arnold v. Soc'y for Sav. Bancorp., Inc.*, 678 A.2d 533, 540 (Del. 1996) (footnote omitted); *see also Firefighters' Pension Sys. of Kans. City, Mo. Tr. v. Presidio, Inc.*, 251 A.3d 212, 286 (Del. Ch. 2021) ("Rather than treating directors as agents of the stockholders, Delaware law has long treated directors as analogous to trustees for the stockholders."). The principal-agent problem uses the language of economic theory, not the language of legal relationships.

104

examines "the reasonableness of the end that the directors chose to pursue, the path that they took to get there, and the fit between the means and the end." *Obeid v. Hogan*, 2016 WL 3356851, at *13 (Del. Ch. June 10, 2016).

Enhanced scrutiny integrates different judicial lineaments from the 1980s, when distinct standards of review seemed to proliferate. The Delaware Supreme Court first openly recognized an intermediate standard of review in *Unocal*. In response to an unsolicited tender offer, the board implemented a discriminatory debt-for-equity exchange offer. *Unocal*, 493 A.2d at 956. The situational conflict was the "omnipresent specter" that the directors could have been influenced by and have acted to further their own interests or those of incumbent management, "rather than those of the corporation and its shareholders." *Id.* at 954. The encroachment on stockholder rights involved the stockholders' ability to tender their shares. The resulting intermediate standard of review called for the directors to show that (i) they had acted in good faith to identify and respond to "a danger to corporate policy and effectiveness" (*i.e.*, they pursued a legitimate end), and (ii) they had implemented a response that was "reasonable in relation to the threat posed" (*i.e.*, they selected a reasonable means). *Id.* at 955.

Next, in *Revlon*, the Delaware Supreme Court expressly stated that it was applying the new *Unocal* standard of review to the sale of a corporation for cash. 506 A.2d at 182, 184 n.16. But the high court also stated that when the board of directors decided to sell the corporation, the directors' role changed "from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company." *Id.* at 182. That powerful metaphor suggested a set of affirmative obligations

105

(such as a duty to auction) that the Delaware courts would enforce. Thirty-six years later, we understand that *Revlon* was an enhanced scrutiny case. A situational conflict arose because "the potential sale of a corporation has enormous implications for corporate managers and advisors, and a range of human motivations, including but by no means limited to greed, can inspire fiduciaries and their advisors to be less than faithful."[25] The encroachment on stockholder rights implicated the stockholders' right to vote on (and potentially reject) the board's preferred transaction, free of unreasonable interference from their fiduciaries, and the Revlon board had interfered with that right by agreeing to a crown-jewel asset lockup and a no-shop provision. *See Revlon*, 506 A.2d at 182–84. As

---

[25] *In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 439 (Del. Ch. 2012); *see Dollar Thrifty*, 14 A.3d at 597 ("The heightened scrutiny that applies in the *Revlon* (and *Unocal*) contexts [is], in large measure, rooted in a concern that the board might harbor personal motivations in the sale context that differ from what is best for the corporation and its stockholders."). Conflicts of interest are particularly powerful when a corporation is being sold because a negotiated acquisition is a paradigmatic example of a final period problem. *See generally* J. Travis Laster, Omnicare'*s Silver Lining*, 38 J. Corp. L. 795, 804–11 (2013) (discussing final period problem and resulting situational conflicts as justification for the Delaware Supreme Court's otherwise difficult-to-rationalize and much maligned ruling in *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914 (Del. 2003)); J. Travis Laster, Revlon *Is A Standard of Review: Why It's True and What It Means*, 19 Fordham J. Corp. & Fin. L. 5, 8–18 (2013) (discussing final period problem and implications of situational conflicts for *Revlon* as a standard of review). Delaware decisions have acknowledged that "a final-stage transaction for all shareholders" is one that warrants application of enhanced scrutiny. *McMullin v. Beran*, 765 A.2d 910, 918 (Del. 2000); *see Lonergan v. EPE Hldgs. LLC*, 5 A.3d 1008, 1019 (Del. Ch. 2010) ("In a final stage transaction—be it a cash sale, a break-up, or a transaction like a change of control that fundamentally alters ownership rights—there are sufficient dangers to merit employing enhanced scrutiny . . . ."); *Mendel v. Carroll*, 651 A.2d 297, 306 (Del. Ch. 1994) (Allen, C.) ("[I]f the board were to approve a proposed cash-out merger, it would have to bear in mind that the transaction is a final-stage transaction for the public shareholders. Thus, the time frame for analysis, insofar as those shareholders are concerned, is immediate value maximization.").

subsequently clarified by the Delaware Supreme Court in *QVC*, the resulting intermediate standard of review called for the directors to show that (i) they sought to obtain the best transaction reasonably available, (*i.e.*, they pursued a legitimate end), and (ii) they followed a process that fell within a range of reasonableness (*i.e.*, they selected a reasonable means). *See QVC*, 637 A.2d at 45.

Chancellor Allen's decision in *Blasius Industries, Inc. v. Atlas Corp.*, 564 A.2d 651 (Del. Ch. 1988), likewise introduced what seemed like another new standard of review. Chancellor Allen framed *Blasius* as if it differed from *Unocal* and *Revlon* by spotlighting the question of the directors' power to act and positing that such an issue could not be left to the directors' own judgment. *Id.* at 660. But the directors in *Blasius* possessed the corporate power under the Delaware General Corporation Law and the corporation's constitutive documents to take the challenged actions. The case did not implicate the directors' technical legal authority but rather the dynamics of the principal-agent problem. *See id.* at 658–59 ("The question thus posed is not one of intentional wrong (or even negligence), but one of authority *as between the fiduciary and the beneficiary* (not simply legal authority, *i.e.*, as between the fiduciary and the world at large).").

The *Blasius* case involved a consent solicitation by a 9% stockholder who wanted to elect a new board majority that would implement a leveraged recapitalization. In the face of the consent solicitation, the incumbent directors expanded the size of the board and filled the resulting vacancies so that the insurgency could not elect a new board majority. The situational conflict involved the incumbent directors' ability to retain their positions as directors and their concomitant control over the company. *Id.* at 661. The encroachment

107

on stockholder rights involved the stockholders' right to vote. *Id.* at 662–63. The standard of review that Chancellor Allen articulated called for the directors to make to showings. First, the directors had to show that their reason for interfering with the voting process was the good faith pursuit of a legitimate end (Chancellor Allen found that they had because the board sought "to protect its incumbency, not selfishly, but in order to thwart implementation of the recapitalization that it feared, reasonably, would cause great injury to the Company"). *Id.* at 658. Second, the directors had to show that they deployed a means that had a sufficiently compelling justification (Chancellor Allen found that the means they chose fell short because it precluded the stockholders from electing a new board majority). *Id.* at 658, 662–63.

Like *Unocal* and *Revlon*, the *Blasius* test fundamentally asked whether the directors (i) acted in good faith for the purpose of maintaining or enhancing the integrity of the voting process (or in response to a reasonably perceived threat to that process), and (ii) chose an appropriately calibrated response that was supported by a compelling justification. The standard for measuring the means-ends fit thus shifted from the "range of reasonableness" to the tighter metric of a "compelling justification" in recognition that "[t]he shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests." *Id.* at 659. The justification for action that intruded into an election of directors or touches on matters of corporate control had to not simply be reasonable but rather compelling. *MM Cos., Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1129–30 (Del. 2003); *Pell v. Kill*, 135 A.3d 764, 787 (Del. Ch. 2016). And there was one justification that corporate fiduciaries could not use when the vote involved the election of directors:

108

"[T]hey cannot argue that without their intervention, the stockholders would vote erroneously out of ignorance or mistaken belief about what course of action is in their own interests." *Pell*, 135 A.3d at 788; *accord In re Williams Cos. S'holder Litig.*, 2021 WL 754593, at \*30 (Del. Ch. Feb. 26, 2021), *aff'd sub nom. The Williams Cos., Inc. v. Wolosky*, 264 A.3d 641 (Del. 2021) (TABLE).

The *Blasius* test was thus another form of enhanced scrutiny, albeit one that required a tighter fit between means and ends and with one possible justification ruled out. Recently, the Delaware Supreme Court said so explicitly, holding that *Blasius* review is just that: a version of the enhanced judicial scrutiny first recognized in *Unocal*. *Coster v. UIP Cos., Inc.*, --- A.3d ----, 2023 WL 4239581, at \*8 (Del. June 28, 2023). The high court took the additional step of retiring the compelling justification concept. Instead, in the context of a corporate election or a stockholder vote involving corporate control, the board must identify a legitimate threat and then "tailor its response to only what is necessary to counter the threat." *Id.* at \*12. Moreover, the board's response "cannot deprive the stockholders of a vote or coerce the stockholder to vote a particular way." *Id.* What results is enhanced scrutiny applied with a special sensitivity to the stockholder franchise. *Id.* at \*13.

Finally, even the test from *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981), for judicial review of a decision by a special litigation committee can now be understood as a nascent form of enhanced scrutiny.[26] The situational conflict was the difficult dynamic

---

[26] *See In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at \*27 (Del. Ch. Jan. 25, 2016) (describing *Zapata* as having adopted "a test which marked

of directors deciding whether to cause the corporation to sue their fellow directors.[27] The

encroachment on stockholder rights involved a stockholder plaintiff's ability to pursue a

derivative claim when demand was excused. The resulting standard of review put the

burden on the special litigation committee to show (i) "the independence and good faith of

the committee and the bases supporting its conclusions," (*i.e.*, whether the members of the

special litigation committee acted in the good faith pursuit of a legitimate end), and (ii) a

second step in which the court "determine[s], applying its own independent business

---

the Delaware Supreme Court's first deployment of something akin to the two-step standard of review that later emerged as enhanced scrutiny"); *La. Mun. Police Emps. Ret. Sys. v. Morgan Stanley & Co., Inc.*, 2011 WL 773316, at *7 (Del. Ch. Mar. 4, 2011) ("An SLC's decision to dismiss a post-demand-excusal derivative claim is reviewed under *Zapata's* two-step standard, which effectively amounts to reasonableness review and a context-specific application of enhanced scrutiny."); Julian Velasco, *Structural Bias and the Need for Substantive Review*, 82 Wash. U. L.Q. 821, 849 (2004) (explaining that *Zapata* "is quite similar to *Unocal*"); Gregory V. Varallo et al., *From* Kahn *to* Carlton: *Recent Developments in Special Committee Practice*, 53 Bus. Law. 397, 423 n.121 (1998) ("The [*Zapata*] standard is also reminiscent of the enhanced scrutiny courts use to examine the actions of directors engaged in a sale of a corporation or other like transactions. . . . Perhaps the similarity . . . is best explained by the fact that in all of these situations courts would like to defer to the business judgment of a board, but because the scenarios in which these cases arise create a potential conflict of interest for board members, the court is only willing to do so if a board first demonstrates it is capable of making an independent business judgment and the judgment seems at least to make some rational sense.").

[27] *Zapata*, 430 A.2d at 787 ("[N]otwithstanding our conviction that Delaware law entrusts the corporate power to a properly authorized committee, we must be mindful that directors are passing judgment on fellow directors in the same corporation and fellow directors, in this instance, who designated them to serve both as directors and committee members. The question naturally arises whether a 'there but for the grace of God go I' empathy might not play a role.").

judgment, whether the motion should be granted" (*i.e.*, whether the members of the special litigation committee selected a reasonable means of addressing the litigation). *Id.* at 788.

Enhanced scrutiny is thus an intermediate standard of review that calls for the fiduciaries to establish that they (i) acted for a proper purpose and (ii) selected an appropriate means of achieving that purpose. Returning to the M&A setting, enhanced scrutiny first asks whether the fiduciaries acted for the proper purpose of seeking the best transaction reasonably available. *See QVC*, 637 A.2d at 45. It then asks whether the fiduciaries followed a process that fell within a range of reasonableness. *Id.* If the fiduciaries "selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt" on the decision. *Id.*

When applying enhanced scrutiny, a court evaluates the sale process as a whole, not just the final decision to sell or the decisions that the directors formally made. Officers invariably play a large role in a sale process and take the actions that most directly shape its outcome. Not surprisingly, "the paradigmatic context for a good *Revlon* claim . . . is when a supine board under the sway of an overweening CEO bent on a certain direction[] tilts the sales process for reasons inimical to the stockholders' desire for the best price." *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1002 (Del. Ch. 2005).

Here, the transactional context elevates the standard of review from the business judgment rule to enhanced scrutiny. Skaggs and Smith negotiated, and the Board approved, a sale of Columbia to TransCanada for $25.50 per share in cash. The Merger ended the stockholders' ongoing investment in Columbia, making it a final-stage transaction. Never

again would the stockholders have an opportunity to obtain a return from their investment in Columbia. Nor would there be any ongoing relationships among the directors, officers, and stockholders. The period leading up to the Merger was a time when the hydraulic pressures of the last period of play could and did cause the interests of the corporate fiduciaries and their beneficiaries to diverge. Enhanced scrutiny therefore provides the operative standard of review.[28]

### 2. The Breaches Of Duty In The Sale Process

The second element of a claim for aiding and abetting is "a breach of the fiduciary's duty." *Malpiede*, 780 A.2d at 1096 (internal quotation marks omitted). The plaintiffs proved that Skaggs and Smith breached their duty of loyalty as corporate officers because (i) they were motivated by self-interest tied to their change-in-control agreements and their desire to retire in 2016, and (ii) their conflict of interest led them to take steps that fell outside the range of reasonableness. The plaintiffs proved that the Board breached its duty of care by failing to provide sufficiently active and direct oversight of the sale process.

---

[28] The Merger was a third-party sale, and the Company does not have a controlling stockholder, so a fully informed, non-coerced vote could reduce the standard of review from enhanced scrutiny to an irrebuttable version of the business judgment rule. *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 312–13 (Del. 2015). "[O]ne violation is sufficient to prevent application of *Corwin*." *van der Fluit v. Yates*, 2017 WL 5953514, at *8 n.115 (Del. Ch. Nov. 30, 2017). The *Appraisal Decision* held that the Proxy Statement contained three materially misleading disclosures and omissions. *See* 2019 WL 3778370, at *35–36. This decision identifies more. The *Corwin* doctrine is therefore inapplicable, and TransCanada did not argue in its post-trial brief that *Corwin* reduced the standard of review.

### a. Skaggs And Smith's Bad Faith Motivation

The plaintiffs proved that Skaggs and Smith wanted to retire in 2016, with their full change-in-control benefits. The plaintiffs proved that Skaggs and Smith pursued a deal with TransCanada with that goal in mind.

The record shows plainly that Skaggs and Smith wanted to retire in 2016.

- Skaggs had served as CEO of NiSource since 2005, and he believed that a CEO had a shelf-life of about ten years. Skaggs hit ten years of service in 2015.

- Skaggs's personal financial advisor used March 31, 2016, as Skaggs's anticipated retirement date.

- Smith had been thinking about retirement all his life and had set fifty-five as his magical age to retire. Smith would turn fifty-five in 2016.

The record also shows that Skaggs and Smith were motivated by their desire to trigger their change-in-control benefits before retiring. As described in more detail in the Factual Background, Skaggs's personal financial advisor told him that the single greatest risk to his retirement plan was his NiSource equity. As CEO, Skaggs could not liquidate his NiSource stock without casting doubt on its prospects, and he continued to face that problem as CEO of Columbia. As CFO, Smith confronted a similar dynamic. Writing as a member of this court, Chief Justice Strine referred to this type of dilemma as a "fiduciary quandary" that can incentivize an officer to seek a deal at a defensible price, even if the deal was not the best transaction reasonably available. *See In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 116 (Del. Ch. 2007). In *Mindbody*, a similar conflict led to liability for a CEO who was tired of selling small blocks of stock into the market under a Rule 10b5-1 plan

113

and wanted to obtain near-term liquidity by selling the company as a whole. *See* 2023 WL 2518149, at *5.

While at NiSource, Skaggs and Smith pushed for the Spinoff, then asked to join Columbia knowing that it would be an attractive takeover target and expecting it to be sold.

- In a June 2015 memorandum, Skaggs's personal financial advisor wrote, "I think they are already working on getting themselves sold before they even split. This was the intention all along. [Skaggs] sees himself only staying on through July of 2016." JTX 114 at 1.

- In discussions with TransCanada in November 2015, Columbia management signaled that they "prefer a sale of the company" and indicated "that there will be no social issues." JTX 337 at 5.

- In a call with Poirier on February 10, 2016, Smith's talking points called for him to reiterate again to TransCanada that there would be no social issues. JTX 715 at 23.

- Immediately after the deal was announced, Smith responded to a congratulatory email from his financial advisor with "[t]hanks Rick, do you think I can retire now?" JTX 1138.

- Immediately after the deal closed, Skaggs and Smith retired.

Skaggs and Smith had personally significant amounts of money riding on a deal that would trigger their change-in-control benefits. TransCanada calculated in November 2015 that Skaggs and Smith would receive an incremental $45,386,051 and $13,128,063, respectively, if Columbia was sold at a 20% premium over market.

In addition to this direct evidence of intent, Skaggs and Smith acted like executives who were thirsty for a sale. They engaged with bidders immediately after the Spinoff and sought to line up a transaction by the end of November 2015. When that failed and the Board shut down the sale process, they continued to engage with TransCanada. They told TransCanada that management wanted to sell, and they did not mention the Standstill. As

114

the sale process unfolded, Skaggs and Smith acted so solicitously toward TransCanada that Poirier and the Wells Fargo team wondered what message they were sending and what game they might be playing.

Importantly, the plaintiffs did not argue simplistically that Skaggs and Smith were so desperate for a sale that they would take any deal. Clearly, that was not the case. As the *Appraisal Decision* found, "Skaggs and Smith also had countervailing incentives to pursue the best deal possible," and their change-in-control agreements "included significant equity components that appreciated with a higher deal price." 2019 WL 3778370, at *28. The issue in the *Appraisal Decision* was whether Skaggs and Smith were so eager to sell that they would accept a fire-sale bid below fair value, and the court rejected that argument: "Although Skaggs and Smith wanted to retire, they were professionals who took pride in their jobs and wanted to do the right thing. They were not going to arrange a fire sale for below Columbia's standalone value, and the Board would not have let them." *Id.*

The different trial record presented in this case demonstrates that although Skaggs and Smith *wanted* to do the right thing when selling the company, they *also* wanted to trigger their change-in-control benefits and retire. Skaggs and Smith faced a conflict of interest that pulled them from the path of propriety and undermined their ability to achieve the best value reasonably available for the stockholders. *In re RJR Nabisco, Inc. S'holders Litig.*, No. CIV.A. 10389, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) ("Greed is not the only human emotion that can pull one from the path of propriety; so might hatred, lust, envy, revenge, or, as is here alleged, shame or pride. Indeed any human emotion may cause a director to place his own interests, preferences or appetites before the welfare of the

corporation."). Skaggs and Smith asserted that they only wanted to obtain the best price, but the law, "sensitive to the ever-present inclination to rationalize as right that which is merely beneficial, will accord scant weight to the subjective judgment of an interested [fiduciary]." *Merritt v. Colonial Foods, Inc.*, 505 A.2d 757, 765 (Del. Ch. 1986) (Allen, C.).

The plaintiffs did not seek to prove that Skaggs and Smith were so conflicted that they would sell at any price. The plaintiffs sought to prove and succeeded in proving that because of their desire for a deal, Skaggs and Smith behaved in ways that undercut Columbia's negotiating leverage, led to lower offers from TransCanada, and resulted in TransCanada reneging on the $26 Deal and ambushing the Columbia management team with the $25.50 Offer. The plaintiffs also proved that Skaggs and Smith's desire for a deal caused them not to risk a deal at $25.50 by pushing TransCanada for another quarter. The *Appraisal Decision* foreshadowed that possibility by noting that there was reason to think that "different negotiators could have done better." *Id.* at *29; *see Dismissal Decision*, 2021 WL 772562, at *43–49 (reviewing court's findings and rulings in *Appraisal Decision* and explaining possibility of a different outcome in a breach of fiduciary duty case).

TransCanada has argued that Skaggs and Smith could not have been affected by a desire to trigger their change-in-control benefits and retire because they (i) rejected TransCanada's proposal to try to sign a deal in November 2015 and pursued the December equity offering, and (ii) rejected TransCanada's $24 per share proposal on March 4, 2016, then recommended against TransCanada's supposedly best-and-final proposal at $25.25 per share later that day.

116

The rejection of TransCanada's proposal to sign a deal in lieu of an equity offering does not suggest that Skaggs and Smith were unaffected by a conflict of interest. TransCanada was setting a trap. If Columbia had agreed and then ran low on capital, TransCanada would have had all the leverage. Yet even with that obvious risk, Skaggs was tempted to the point where he took the concept to Cornelius. It was Cornelius who vetoed the idea and insisted that Skaggs say no.

Skaggs and Smith's reaction to TransCanada's proposal of $24 per share and their subsequent recommendation against a bid of $25.25 per share does not evidence their loyalty either. It rather confirms that they were not willing to take just any deal, including an offensive one. In a series of communications with TransCanada that breached the Standstill, Skaggs and Smith had pushed for a transaction in the range of $26 to $28 per share, and TransCanada had repeatedly indicated that it could pay up to $28 per share. As a result of these interactions, Skaggs and Smith had anchored on a price of $28 per share, expected not to have to go any lower than $26 per share, and relied on Girling and Poirier's indications that TransCanada was prepared to pay in that range.

When Girling offered $24 per share, Skaggs and Smith were offended. That figure was a full dollar below the low end of the range that Girling had proposed to gain exclusivity ($25 to $28 per share) and four dollars below the $28 per share figure that Skaggs and Smith wanted. Even with their ambitions for a change-in-control-fueled retirement, they could not stomach a low-ball offer like that, and they reacted emotionally. TransCanada's immediate raise to $25.25 per share came across as a second insult, because it made clear that TransCanada could have bid within its proposed range in the first place.

117

The immediate jump reinforced the impression that TransCanada was trying to take advantage of Skaggs and Smith.

The conflict of interest that Skaggs and Smith faced did not mean that they would accept an insulting price, and their rejection of the extreme did not mean that they fulfilled their duties. It was their conflicted behavior that gave Girling and Poirier the confidence to offer $24 per share in the first place, and later to renege on the $26 Deal. When Poirier proposed the $25.50 Offer, Skaggs was unwilling to push for another quarter.[29]

Skaggs and Smith fell victim to a conflict of interest. They did not act in good faith for the proper purpose of securing the best transaction for the benefit of the stockholders. They acted for mixed reasons, including their personal interest in achieving a transaction that would trigger their change-in-control benefits and facilitate their retirements in 2016.

---

[29] In this respect, the conflict of interest that Skaggs and Smith faced is the same conflict that confronts contingently compensated professions, like investment banks. "The contingently compensated agent has a greater incentive to get the deal done rather than push for the last quarter, particularly if pushing too hard might jeopardize the deal and if the terms on offer are already defensible." *Rural Liability*, 88 A.3d at 94. As TransCanada's expert explained, Skaggs and Smith were net sellers in any transaction, and so their interests were generally aligned with those of the stockholders, but they had a greater incentive to get a deal done to lock in their change-of-control benefits and enable them to retire in 2016. There are interesting questions of economic theory about what Skaggs and Smith's point of indifference rationally should have been, and answering them would require making assumptions about the relative utility that Skaggs or Smith attributed to near-term retirement and the security of a bird in the hand compared to the benefits of a higher price. Depending on those estimates, reasonable minds could debate how Skaggs and Smith should have acted. In this case, ample contemporaneous evidence shows how Skaggs and Smith actually acted. Whatever an economic model fueled by particular assumptions might say, they actually wanted to secure a deal so they could trigger their change-in-control benefits and retire in 2016.

Their desire for a curtain call in 2016 sufficiently influenced their actions to result in this court's factual finding that they acted in bad faith.

### b. Actions That Fell Outside The Range Of Reasonableness

Having a conflict of interest is not a strict liability offense. The conflict must have a real-world effect. In a sale process, that means conduct that falls outside the range of reasonableness. The plaintiffs proved that Skaggs and Smith acted outside the range.

Columbia's sale process had three distinct phases. The first phase involved multiple bidders, began shortly after the Spinoff, and ended on November 25, 2015, when the Board instructed management to pursue the equity offering and send return-or-destroy letters to the participants. The second phase only involved TransCanada. It began immediately after the first phase ended and witnessed TransCanada's persistent and unsolicited efforts, notwithstanding the Standstill, to acquire Columbia. The second phase ended with the signing of the Merger Agreement. The third phase began after signing and ended when the Merger closed. The second phase was when the breaches of duty occurred.

During the first phase, Skaggs and Smith showed favoritism toward particular bidders that foreshadowed how they would treat TransCanada during the second phase. They demonstrated their wiliness to play favorites when Dominion and Spectra each contacted Skaggs. The approaches were virtually identical, yet Skaggs and Smith preferred Dominion, so they gave Spectra the cold shoulder. Later in the first phase, Skaggs and Smith favored TransCanada and Berkshire by giving only them the bid deadline of November 24, 2015. Not surprisingly, only they bid.

The first phase also marked the start of Smith's indiscrete communications with Poirier. In September and early October 2015, Fornell connected them. Immediately after their first call on October 9, Poirier had his team prepare an updated analysis which noted that Columbia was "[c]urrently for sale." PTO ¶ 186. Later that month, on October 26, Poirier had a private dinner with Smith. Then, on November 13, the TransCanada team received a management presentation from Smith and Kettering. Poirier came away from those interactions believing that Columbia management wanted to sell, that there would be no social issues, and that Columbia management wanted to complete a transaction by mid-2016. *See* JTX 337; JTX 371; JTX 375.

When neither TransCanada nor Berkshire hit the Board's bogey of $28 per share, the Board instructed management to terminate the sale process. With the sending of the return-or-destroy letters, the first phase ended. TransCanada immediately started the second phase, during which TransCanada persistently pursued Columbia.

Throughout the second phase, Skaggs and Smith showed extraordinary solicitude toward TransCanada. That solicitude began immediately after the return-or-destroy letters went out. Poirier promptly called Smith. Rather than declining the call because the Board had terminated the sale process, Smith told Poirier that Columbia "probably" would want to pick up merger talks again "in a few months." *See* JTX 392; JTX 395; JTX 403. He also reiterated that management wanted a deal by mid-2016. *See* JTX 409 at 2. The Board did not authorize Smith to provide that information, and Smith did not give it to anyone else.

Poirier's call on November 25, 2015, technically violated the Standstill because it post-dated the termination of the November sale process, but it was a foot fault. What

120

followed, however, was a series of contacts during December 2015 and early January 2016 that blatantly breached the Standstill. During this period, Skaggs and Smith never pushed back and never mentioned the Standstill. They were happy to open the gates.

The limited discussions about the Standstill that took place show that the management team was focused on a sale. Just before the January 7 Meeting, Poirier raised the Standstill and suggested that in-house counsel confer. At the time, TransCanada was obviously pursuing an acquisition of Columbia and seeking to influence management. The Standstill prohibited both.

- On December 19, 2015, Poirier had told Smith that TransCanada remained interested in acquiring Columbia and suggested that TransCanada could pay up to $28 per share.

- The December 19, 2015 call prompted Skaggs and Goldman to start preparing materials evaluating an offer at $28 per share for use at a Board meeting in January 2016.

- On January 4, 2016, Poirier called Smith, asked for an updated version of the package of information *that Columbia had provided to bidders during the November 2015 process*, and told him that TransCanada would want prompt access to a data room to start conducting due diligence.

- On January 5, 2016, Smith provided Poirier with an updated version of the package of information *that Columbia had provided to bidders*.

Yet Columbia's in-house counsel told his TransCanada counterpart that the January 7 Meeting did not implicate the Standstill.

During the January 7 Meeting, Smith was an open book. He literally handed over his talking points to Poirier. He told Poirier that management wanted to sell, and that while the Board was split, there was a consensus on selling for the right price. He told Poirier

121

that Skaggs was meeting one-on-one with his directors. He said, in substance, that TransCanada would not face any competition.

TransCanada has argued that the actions that Skaggs and Smith took in December 2015 and during the January 7 Meeting did not matter to the sale process. That is plainly wrong. Skaggs and Smith provided TransCanada with critical information affecting the rest of the sale process. After the January 7 Meeting, TransCanada knew all of the following facts:

- Both Skaggs and Smith would engage freely with TransCanada.

- Columbia management did not care about the Standstill.

- Smith was a neophyte negotiator and a reliable source of information.

- Skaggs wanted a proposal to bring to the Board on January 28, 2016.

- Columbia management wanted an all-cash deal that closed by mid-2016.

- Columbia management inferably wanted a transaction signed by March 2016.

- There would be no social issues.

- Columbia management would receive multi-million-dollar change-in-control payments.

- There was a Board-level consensus on selling at the right price.

- Columbia management did not expect TransCanada to face any meaningful competition from other bidders.

The Board did not authorize Skaggs and Smith to provide this information to TransCanada. One of the directors testified that the Board never would have authorized Smith to tell a potential bidder that Columbia had eliminated the competition, which he thought was counterintuitive. *Appraisal Decision*, 2019 WL 3778370, at *33, n.35. In fact,

122

the Board had not authorized *any* communications with TransCanada, much less the January 7 Meeting. *Id.* at \*33. At best, the directors knew from Skaggs's one-on-one meetings that TransCanada remained interested in a deal. They did not know and had not approved Skaggs and Smith's active pursuit of a deal. They certainly had not authorized Smith to portray Columbia as eager for a bid or to reassure TransCanada that it would not face competition. Skaggs and Smith never gave the Board a candid report on the January 7 Meeting, and they never reported to the Board on what Smith said to Poirier. Cornelius Dep. 141.

After the January 7 Meeting, the solicitude that Skaggs and Smith showed toward TransCanada continued. Smith and Poirier scheduled a daily call, and TransCanada began conducting due diligence. TransCanada's initial list of due diligence was lengthy, but Skaggs and Smith were prepared to sign off on it. After consulting with Sullivan & Cromwell, Columbia's in-house counsel advised Skaggs and Smith to reject many of the requests. Demonstrating its seriousness, TransCanada obtained credentials for nearly thirty people to access the electronic data room.

During the preparations for the call when Girling would provide Skaggs with an expression of interest, Columbia management again put out the welcome mat for TransCanada. Columbia's in-house counsel bizarrely took the position that even "an offer to purchase our securities" would not be a violation of the Standstill, JTX 623, even though that was exactly what the Standstill prohibited. The Board was free to waive the restriction or ratify a breach after the fact, but those are different issues than the question of breach itself.

123

Skaggs and Smith's ardor for a transaction was again on display in early February 2016. Smith's behavior during that period seemed so accommodating that Poirier was puzzled and found himself pondering what Smith might be trying to do. The Wells Fargo bankers thought Smith and Skaggs were "signaling that they would do a deal below their range," JTX 708, and that they wanted "an exit regardless of price." JTX 709. Smith's solicitous behavior continued during the meeting on February 9 with Fornell. When Skaggs asked about the execution risk that TransCanada faced, Smith did not support Skaggs by adding tough questions of his own. Instead, when Fornell responded that TransCanada had many levers to pull, *Smith backed up Fornell*. JTX 707. Fornell came away believing that Skaggs and Smith truly wanted to sell.

Those actions were not reasonable, and the eagerness that Skaggs and Smith showed for a deal led Poirier and the TransCanada team to contemplate a bid below their original range. During mid-February 2016, Poirier began fishing for signals from Smith about whether Columbia management would react negatively to a bid below TransCanada's indicative range. Smith gave none, and Poirier later reported to Wells Fargo that he had "raised the spectre [sic] of a lower price in a roundabout way multiple times with Steve Smith and was met with 'crickets.'" JTX 782 at 1. Smith's silence caused Poirier to sense opportunity.

In his next call with Skaggs, Girling foreshadowed that TransCanada might not bid within Columbia's indicative range. Internally, TransCanada was considering bids as low as $23 per share. Skaggs got the message, but did not draw a line in the sand.

As discussed in the Factual Background, the discussions about a deal broke down for twenty-four hours after TransCanada made a bid so low that Skaggs and Smith reacted emotionally and rejected it. The next day, Wells Fargo reengaged by asking Goldman for a counteroffer. Skaggs, Smith, and Kettering decided to counter at $26 per share. After consulting with Cornelius, they instructed Goldman to tell Wells Fargo that (i) "management had reached out to [the] Board—and it was important they understand this answer is the Board's answer," and (ii) "[b]ottom line, they'll do 26. Not a penny less. Straight from [the] Board." JTX 885. Making that counteroffer without the Board's involvement fell outside the range of reasonableness, and Smith then went further out of bounds. In a back-channel call with Poirier, he asked Poirier to consider a bid of $26 per share and cautioned that the Board had not approved that price. PTO ¶ 359. That softer framing undercut Goldman's message of "not a penny less," and by disclaiming the Board's involvement, Smith made it seem like Goldman was bluffing.

TransCanada responded with the $26 Offer, which Columbia management accepted. *See* Part I.O.2, *supra*. When Smith called Poirier and said yes to the $26 Offer, Poirier asked for another two weeks of exclusivity. In another blunder, Smith told him that extending exclusivity would not be a problem, because "[t]he [Columbia] board is freaking out" and had told the management team to get a deal done, "whatever it takes." JTX 952 at 1. Wells Fargo was stunned. After hearing about Smith's statement, Fornell wrote to his team: "Oddly, the [Columbia] team has relayed this info to [TransCanada]." JTX 952 at 1. One of the team members responded, "Turmoil provides opportunity. [TransCanada] would appear to be well positioned." *Id.* Fornell emailed back: "Yes." *Id.*

Skaggs then revealed his own commitment to the deal by providing TransCanada with a script that Columbia used with inbound inquiries, before any agreement extending exclusivity had been executed. When Poirier called Smith to ask about the script, Smith gave the store away again. This time Smith told Poirier that the management team "wanted to get this deal done with them and this would help us achieve that goal." JTX 1778 at 8. Again, Wells Fargo was stunned. When one banker noted that they were "back in the game" on exclusivity, another noted: "I'm just not sure that the other side is playing the same one! Can't for the life of me figure out why they would keep us exclusive . . . ." JTX 1065.

TransCanada took advantage of the situation by reneging on the $26 Deal and substituting the $25.50 Offer. This time, Skaggs, Smith, and Kettering caucused about whether to counter at $25.75 per share, reflecting roughly another $100 million in merger consideration. They recognized that TransCanada's stock price had recovered from a short-term dip, eliminating that justification for a lower price. But Skaggs decided not to risk the deal in hand, and the management team recommended that the Board accept it. The Merger Agreement memorialized the terms of the $25.50 Offer.

During the three-and-a-half months that ran from the termination of the first phase of the sale process on November 25, 2015, through Columbia's formal approval of the Merger Agreement on March 16, 2016, Smith and Skaggs acted unreasonably. They repeatedly showed a level of solicitude toward TransCanada that Poirier and Wells Fargo found incomprehensible.

Maybe there could be a time when obtaining the best transaction reasonably available requires telling the buyer you are eager to sell, reassuring the buyer that there is

unlikely to be any competition, never mentioning a standstill, eagerly providing due diligence, appearing receptive to a price below the range you had asked for, revealing to the buyer that your side is "freaking out" and wants to get a deal done, extending exclusivity after a public leak about the deal talks and an inbound inquiry from a second bidder, and then not countering a last-minute price drop. This is not that case. Due to Skaggs and Smith's conflicted actions, the sale process in this case fell outside the range of reasonableness.

c.      The Board's Inadvertent Breach Of Its Duty Of Care

During a sale process, directors must be particularly vigilant. "[A] board of directors . . . may not avoid its active and direct duty of oversight in a matter as significant as the sale of [a corporation.]" *Macmillan*, 559 A.2d at 1281; *accord Citron*, 569 A.2d at 66. One of the Delaware Supreme Court's clearest teachings is that "directors cannot be passive instrumentalities during merger proceedings." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 368 (Del. 1993). Directors must maintain "an active and direct role in the context of a sale of a company from beginning to end." *Id.* Providing active oversight includes "identifying and responding to actual or potential conflicts of interest." *RBC*, 129 A.3d at 855.

In the context of a sale, directors can breach their duty of care by failing to obtain information that they should have obtained, even when the information was withheld by others. *See Rural Liability*, 88 A.3d at 93–96. That principle recognizes that "the buck stops with the Board." *Del Monte*, 25 A.3d at 835. It also enables Delaware law to reach aiders

127

and abettors that cause the directors to breach their duty of care. For several reasons, that doctrinal approach does not expose the directors themselves to a risk of liability.

First, a Delaware corporation typically has an exculpatory provision in its certificate of incorporation. *See* 8 *Del. C.* § 102(b)(7). Such a provision eliminates any monetary liability for a breach of the duty of care. That is the case here, and the Board members other than Skaggs could not be liable.

Second, a director is "fully protected" when relying "in good faith" on "such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees . . . or by any other person as to matters the [director] reasonably believes are within such person's professional or expert competence and who has been selected with reasonable care." 8 *Del. C.* § 141(e). That is also the case here, and the directors would be fully protected from any consequences of breach.

Third, the Delaware Supreme Court has appended a separate standard of liability to the analysis of the duty of care when a plaintiff sues outside directors. To reiterate, Delaware law starts with the standard of conduct, which establishes the level of care that corporate fiduciaries are expected to use. The standard of conduct contemplates the exercise of reasonable care. *Aronson*, 473 A.2d at 812. To determine the outcome of litigation, a court applying Delaware law uses a standard of review, which establishes the level of carelessness that will result in a breach of duty. The level of care varies depending on which standard of review applies.

- When the business judgment rule applies, the level of carelessness is gross negligence. *Id.*

128

- When enhanced scrutiny applies, the level of carelessness is action that falls outside a range of reasonableness.[30]

- When entire fairness applies, the level of carelessness is action resulting in a decisionmaking process that fails to satisfy the fair dealing dimension of the unitary entire fairness test.[31]

Finally, assuming a court has found that the directors breached their duty of care and that other defenses do not apply, the Delaware Supreme Court has held that a plaintiff must satisfy a standard of liability: "When disinterested directors themselves face liability, the law, for policy reasons, requires that they be deemed to have acted with gross negligence in order to sustain a monetary judgment against them." *RBC*, 129 A.3d at 857. That is true

---

[30] *E.g.*, *QVC*, 637 A.2d at 36 (rejecting sale process that "was not reasonable as to process or result"); *id.* at 45 (identifying as a key feature of enhanced scrutiny "the adequacy of the decisonmaking process employed by the directors, including the information on which the directors based their decision"); *id.* (noting that the directors bore "the burden of proving that they were reasonably informed"); *Unocal*, 493 A.2d at 949, 955, 958 (requiring a "reasonable investigation")

[31] *E.g.*, *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1244 (Del. 2012) (affirming trial court's finding that "the process by which the Merger was negotiated and approved was not fair" and produced an unfair price); *Disney II*, 906 A.2d at 52 (explaining that the business judgment rule can be rebutted by establishing that "the directors breached their fiduciary duty of care" and that "[i]f that is shown, the burden then shifts to the director defendants to demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders"); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983) (explaining that the fair dealing dimension of the entire fairness test includes "how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors . . . were obtained").

"even if the transaction was a change-of-control transaction."[32] The directors in this case acted unreasonably, but they were not grossly negligent.

In this case, the sale process fell outside the range of reasonableness. That happened because the directors did not engage in sufficient monitoring of Skaggs and Smith. The directors started falling short in December 2015, when Skaggs told three of the directors during his one-on-one meetings that TransCanada remained interested in a transaction. That disclosure should have caused each of the directors to perk up and ask questions. Had any of the directors done so, they would have learned that Poirier called Smith on December 19, during which, Poirier confirmed TransCanada's continuing interest in a transaction and implied that TransCanada was still interested in a deal at $28 per share. At that point, warning lights should have flashed, and the directors should have called a meeting and taken control of the process. Instead, they let Skaggs sweettalk them individually, and the Board did not receive any meaningful information about what Skaggs and Smith were doing until their next regularly scheduled meeting on January 28 and 29, 2016, when Skaggs reported Girling's expression of interest in a transaction in the range

---

[32] *Singh v. Attenborough*, 137 A.3d 151, 151 (Del. 2016) (ORDER) ("Absent a stockholder vote and absent an exculpatory charter provision, the damages liability standard for an independent director or other disinterested fiduciary for breach of the duty of care is gross negligence, even if the transaction was a change-of-control transaction."); *accord McMillan v. Intercargo Corp.*, 768 A.2d 492, 505 n.56 (Del. Ch. 2000) (asserting that whenever a plaintiff pursues a post-closing damages claim for breach of fiduciary duty, "[i]n the absence of the exculpatory charter provision, the plaintiffs would still have been required to plead facts supporting an inference of gross negligence in order to state a damages claim").

of $25 to $28 per share. Even then, the directors only heard what the management team wanted them to know.

After the end-of-January meeting, the Board should have engaged. The directors should have asked about the origins of the offer, the early contacts with TransCanada, and whether Skaggs and Smith faced conflicts of interest. Had they asked probing questions, they would have learned about the series of communications in December 2015 and uncovered the details of the January 7 Meeting. Skaggs was simultaneously talking with the directors about CEO succession, and with more information, the directors could have put two and two together on the conflict front. They would have realized that Skaggs and Smith were not the right people to lead the sale process, and they could have shifted Goldman or Lazard into that role. If nothing else, the directors could have stopped the free flow of information from Smith to Poirier.

Had the directors dug into the details, they also would have uncovered the connection to the terminated sale process from November 2015. They could have asked why management was only engaging with one of the four bidders from November, which would have led to an explanation of the don't-ask-don't-waive standstills. A standstill of that type is a powerful tool that can skew a sale process, and the directors should have known about those provisions from the get-go.

The directors did not ask these questions. Nor did the Company's sophisticated outside counsel help the directors identify those issues and navigate through them.

If the directors had engaged earlier and more thoroughly, then they might well have waived the Standstill to enable TransCanada to approach. After doing so, they would have

131

been in a position to take control of the sale process. Instead, Skaggs and Smith continued to lead the charge, and the process suffered for it. The directors thus breached their duty of care. But there is no circumstance in which any of the outside directors could be liable. They would be entitled to exculpation, fully protected in relying in good faith on Skaggs, Smith, and their advisors, and only guilty of a care breach under the enhanced scrutiny standard of review. They did not act with gross negligence sufficient to support a finding of liability. It is no wonder that the plaintiffs did not sue them.

### 3.      Knowing Participation In The Sale Process Breaches

The most critical element for an aiding-and-abetting claim is the defendant's knowing participation in the breach. The element of knowing participation has two dimensions: knowledge and culpable participation. The plaintiffs proved both.

### a.      The Standard For Knowing Participation

The *Restatement (Second) of Torts* explains that a defendant can be secondarily liable for "harm resulting . . . from the tortious conduct of another" if the defendant

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

*Restatement (Second) of Torts* § 876 (Am. L. Inst. 1979), Westlaw (database updated May 2023). To the same end, the Delaware Supreme Court has held that a defendant can be

132

liable for aiding and abetting if the defendant has "participated in the board's decisions, conspired with [the] board, or otherwise caused the board to make the decisions at issue." *Malpiede*, 780 A.2d at 1098. Liability thus requires that "the accessory actor's conduct be informed by knowledge of the primary duty or its breach and that [the accessory actor] make a causally significant contribution to the wrong suffered by the party to whom the primary actor owes a duty." Deborah A. DeMott, *Culpable participation in fiduciary breach*, *in Research Handbook on Fiduciary Law* 219 (D. Gordon Smith & Andrew S. Gold, eds. 2018).

For the dimension of knowledge, the accessory actor must have had "actual or constructive knowledge that their conduct was legally improper." *RBC*, 129 A.3d at 862 (cleaned up). In other words, the plaintiff must demonstrate that the aider and abettor acted "knowingly, intentionally, or with reckless indifference." *Id.* (cleaned up). "[T]he question of whether a defendant acted with scienter is a factual determination." *Id.*

The dimension of participation is harder to pin down, because culpable participation "may take many forms." DeMott, *supra*, at 220. The accessory may engage in conduct "that induces or instigates a breach of fiduciary duty" or may assist in the breach "through agreement with the fiduciary." *Id.* In either scenario, the accessory conduct "occurs prior to—or almost simultaneously with—the fiduciary's decision to breach the duty." *Id.* In the absence of a duty to act, some level of volitional conduct is always required; culpable participation "cannot be premised on simple inaction." *Id.* at 229. Where there is a duty to act, culpable participation can result from a conscious refusal to fulfill that duty.

133

In M&A settings, Delaware decisions have examined claims for aiding and abetting against different deal participants, ranging from affiliates involved in the transaction, to sell-side advisors like investment banks or law firms, to buy-side counterparties. Proving knowing participation can be easier or harder depending on the defendant's role.

When the defendant is an affiliate involved in the transaction, the path to proving knowing participation is relatively straightforward. By definition, the affiliate is already participating in the transaction, and principles of imputation permit the knowledge of a duty-breaching fiduciary to be attributed to the affiliate. Holding the accessory affiliate jointly and severally liable with the primary duty-breaching fiduciary follows from the fiduciary's act.[33]

When the defendant is a sell-side deal advisor, the path requires proof that the advisor consciously assisted the fiduciaries in committing a breach or caused the breach to

[33] *See, e.g.*, *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *39 (Del. Ch. Aug. 27, 2015) (holding after trial that affiliated entities that controller used to effectuate an unfair transaction knowingly participated in the breach of duty and were jointly and severally liable with controller for aiding and abetting the breach); *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *38 (Del. Ch. May 3, 2004) (same); *Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *15–16 (Del. Ch. Nov. 21, 1995) (Allen, C.) (denying a motion to dismiss aiding and abetting claims against controlling stockholder and his affiliates where the complaint alleged "overarching control" by the stockholder such that the court could "infer[ ] 'knowing' participation" by his affiliates); *see also MultiPlan*, 268 A.3d at 818 (inferring at pleading stage that affiliate of interested controller who acted as financial advisor for transaction aided and abetted breach of duty by controller); *La. Mun. Police Empls.' Ret. Sys. v. Fertita*, 2009 WL 2263406, at *7 n.27 (Del. Ch. July 28, 2009) (inferring at pleading stage that affiliated entities that controller used to effectuate an interested transaction knowingly participated in the breach and were subject to viable claim for aiding and abetting). *See generally* DeMott, *supra*, at 222–23.

occur by manipulating the fiduciaries. A sell-side deal advisor typically works closely with its fiduciary clients, provides them with information and analysis, and assists them in making and carrying out their decisions. A third-party advisor thus may be involved directly in the breach, or it can induce a fiduciary's breach by providing misleading information or "creating an informational vacuum." *RBC*, 129 A.3d at 862.

By contrast, proving that an arm's-length buyer knowingly participated in a sell-side breach is a difficult task. As a general rule, "arm's-length bargaining is privileged and does not, absent actual collusion and facilitation of fiduciary wrongdoing, constitute aiding and abetting." *Morgan v. Cash*, 2010 WL 2803746, at *8 (Del. Ch. July 16, 2010). A third-party bidder who negotiates at arm's length therefore "rarely faces a viable claim for aiding and abetting." *Del Monte*, 25 A.3d at 837. A high burden for proving that a third-party acquirer has aided and abetted a fiduciary breach "aids target stockholders by ensuring that potential acquirors [sic] are not deterred from making bids by the potential for suffering litigation costs and risks on top of the considerable risk that already accompanies [a transaction]." *Morgan*, 2010 WL 2803746, at *8. "Under this standard, a bidder's attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting." *Malpiede*, 780 A.2d at 1097.

The high burden for an aiding and abetting claim against a third-party buyer is not insurmountable, and a potential acquirer's right "to seek the lowest possible price through arms' length negotiations with the target board" is not unlimited. *Del Monte*, 25 A.3d at 837.

> [A] bidder may be liable to the target's stockholders if the bidder attempts to create or exploit conflicts of interest in the board. Similarly, a bidder may be liable to a target's stockholders for aiding and abetting a fiduciary breach by the target's board where the bidder and the board conspire in or agree to the fiduciary breach.

*Malpiede*, 780 A.2d at 1097–98. The buyer "may not knowingly participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders." *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1058 (Del. Ch. 1984), *aff'd*, 575 A.2d 1131 (Del. 1990). "Creating or exploiting a fiduciary breach . . . is an impermissible intrusion into the relationship between the fiduciary and beneficiary." *Del Monte*, A.3d at 837.

The cases in which plaintiffs have succeeded in pleading or proving a claim for aiding and abetting against a third-party bidder have often involved a buyer who obtained privileged access to a disloyal sell-side actor, then used the resulting relationship to ignore guardrails or violate boundaries that the sell-side board established. The seminal Delaware Supreme Court decisions are *Revlon* and *Mills Acquisition*. In each case, the Delaware Supreme Court issued a targeted preliminary injunction that barred the buyer from enforcing its contract rights under a merger agreement. *Revlon*, 506 A.2d at 184; *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1288 (Del. 1989). The Delaware Supreme Court has made clear that this form of relief is only available against a bidder that has engaged in aiding and abetting. *See C & J Energy Servs., Inc. v. Mia. Gen. Empls.' Ret. Tr.*, 107 A.3d 1049, 1072 (Del. 2014). The facts that supported the issuance of that type of relief in *Revlon* and *Mills Acquisition* therefore provide insight into what is sufficient for that claim.

136

In *Revlon*, the directors of Revlon, Inc. initially responded to a hostile bid by Ronald Perelman by offering to exchange 10 million Revlon shares for senior subordinated notes. 506 A.2d at 177. The offering was oversubscribed, and 10 million shares were purchased on a pro rata basis. When Perelman continued to pursue the company, the directors negotiated with Forstmann Little & Co. over a leveraged buyout. The directors eventually agreed to sell the company to Forstmann for $57.25 per share plus a contractual commitment to support the par value of the notes. The merger agreement contained a crown-jewel asset lockup, a no-shop clause, and a termination fee. *Id.*

Perelman topped Forstmann's bid and sought a preliminary injunction against the deal protection devices. Ruling on the application, the Delaware Supreme Court found that the directors "breached their primary duty of loyalty" by making "support of the Notes an integral part of the company's dealings with Forstmann, even though their primary responsibility . . . was to the equity owners." *Id.* at 182. The high court explained that the noteholders' rights were fixed by contract, that the directors had no obligation to protect the noteholders, and that the directors engaged in "unreasonable" conduct by bargaining to support the value of the notes. *Id.* at 183. Although the Delaware Supreme Court did not expressly state that Forstmann was culpable for aiding and abetting, the high court noted that Forstmann (i) received preferential treatment throughout the sale process in the form of cooperation from management, access to private financial information, and an exclusive opportunity to present merger proposals directly to the board, and (ii) ultimately committed contractually to support the notes, which was the source of the board's loyalty breach. *Id.* at 184. As a remedy, the high court issued a preliminary injunction barring Forstmann from

137

enforcing the crown-jewel asset lockup, the no-shop provision, and the termination fee, indicating that Forstmann had engaged in aiding and abetting. *See C&J Energy*, 107 A.3d at 1072. With the benefit of hindsight, Forstmann's knowing participation appears to have resulted from the preferential treatment he received and his agreement to the contractual provision that most clearly resulted from the directors' breach of duty.[34]

Similar albeit stronger indicia of knowing participation appear in *Mills Acquisition*. There, a special committee of the board of directors of Macmillan, Inc. ran a sale process in which the participants were whittled down to two bidders. *See Mills Acq.*, 559 A.2d at 1272. KKR had joined with Macmillan's chairman and CEO, Edward P. Evans, and its president and COO, William F. Reilly, to propose a management buyout. *Id.* The competing bidder, a firm controlled by Robert Maxwell, was a strategic buyer that did not need management. *Id.* at 1273. Before the final round of bidding, Evans and Reilly tipped KKR that Maxwell's bid was "$89, all cash." *Id.* at 1275. The special committee's investment banker, whom Evans and Reilly had originally hired as their own financial

---

[34] The Delaware Supreme Court's decision in *QVC* has similar features. The high court affirmed the issuance of a preliminary injunction that barred an acquirer from enforcing a stock option lockup, a no-shop provision, and a termination fee. *See* 637 A.2d at 36–37. The bidder had received preferential treatment in the form of a single-bidder negotiation and had worked hand-in-hand with the sell-side fiduciaries to incorporate onerous defensive measures into the original merger agreement, which the parties declared would make their agreement impregnable. After a topping bid emerged, the bidder again worked hand-in-hand with the sell-side fiduciaries to make the defensive measures even more onerous. *See id.* at 49–51. As in *Revlon*, the case involved both preferential treatment and unreasonable contractual provisions. The more detailed factual account in the excellent trial-level decision provides more of this flavor. *See QVC Network, Inc. v. Paramount Commc'ns Inc.*, 635 A.2d 1245 (Del. Ch. 1993), *aff'd*, 637 A.2d 828 (Del. 1993).

advisor, then proceeded to deliver different messages to KKR and Maxwell. For KKR, the banker read a "long script" that provided specific guidance about increasing its price. *Id.* For Maxwell, the banker provided a short and ambiguous message which suggested that Maxwell was already the high bidder. *Id.* KKR increased its bid, conditioned on a package of deal protection measures that included a crown-jewel asset lockup. Maxwell stood pat. The directors accepted the KKR offer. *Id.* at 1277–78.

Maxwell topped KKR's bid and sought a preliminary injunction against the deal protection devices. Ruling on Maxwell's application, the Delaware Supreme Court found that Evans and Reilly, had acted as "self-interested corporate fiduciaries" and breached their duty of loyalty, while the Macmillan board had breached its duty of care by failing to provide oversight. *Id.* at 1279. Although the Delaware Supreme Court did not expressly state that KKR was culpable for aiding and abetting, the high court stressed that both the Evans-Reilly tip and the long script constituted improper favoritism toward management's preferred bidder. *Id.* at 1283–84 n.33. As a remedy, the Delaware Supreme Court issued a targeted preliminary injunction that barred KKR from enforcing a crown-jewel asset lockup and a no-shop provision, indicating that KKR had engaged in aiding and abetting. *See C&J Energy*, 107 A.3d at 1072. With the benefit of hindsight, KKR's knowing participation appears to have resulted from favorable treatment that violated the procedures for conducting the sale process, together with the contractual provisions that resulted from the breach.

In addition to the Delaware Supreme Court cases, Chancery decisions shed light on when a bidder engages in knowing participation. In *Del Monte*, this court issued a targeted

139

preliminary injunction blocking the enforcement of deal protection measures in a merger agreement with KKR. 25 A.3d at 818. Barclays Capital, the longtime financial advisor to Del Monte, had put the company in play by approaching private equity funds where Barclays had strong relationships and pitching them on buying the company. Barclays hoped to earn advisory fees from representing Del Monte, plus even larger financing fees by leading the debt syndicate for the successful bidder. *Id.* at 820–21. To participate in the sale process, KKR entered into an NDA that prevented KKR from teaming with any other bidder without the Del Monte board's consent. But with assistance from Barclays, KKR secretly teamed up with another bidder. *Id.* at 823. Then, before price negotiations were complete, KKR agreed that Barclays could be one of its lead banks for the financing. *Id.* at 826. The court found preliminarily that both Barclays and KKR had aided and abetted the Del Monte directors in breaching their duties. The key facts on the issue of knowing participation included KKR's violation of the no-teaming provision, its efforts to keep the club bid hidden from the board, and its agreement to include Barclays in its financing syndicate. *Id.* at 837.

Most recently, in *Mindbody*, a private equity firm named Vista Equity Partners served as the catalyst for a fiduciary breach by a sell-side founder and CEO. Vista invited the CEO to its CXO Summit, an annual gathering of executives from Vista's portfolio companies. Vista choreographed the summit to show CEOs how they could generate great wealth by selling to Vista, operating their companies under Vista's umbrella, and taking a second helping when Vista sold their companies to new owners. *Mindbody*, 2023 WL 2518149, at *13, *35–36. Vista had also honed its ability to move rapidly to an actionable

140

bid. After seducing a CEO, Vista could make a blitzkrieg dash to the finish line, thereby preventing a board from developing transactional alternatives. *Id.* at \*38. Through the CXO Summit and other interactions, the CEO became "uniquely smitten" with Vista and fixated on a sale to Vista as "his solution." *Id.* at \*36. When the board commenced a sale process, Vista communicated surreptitiously with the CEO, made its sprint, and ultimately extracted a lower bid than what disinterested negotiators could have achieved. *Id.* at \*37–39. Chancellor McCormick did not expressly hold that Vista aided and abetted the sell-side CEO's breach of duty because the plaintiffs did not properly assert the claim, but the facts illustrate how a third-party buyer can participate knowingly in a sell-side breach.

Decisions at the motion to dismiss phase include *Presidio*, where this court denied a motion to dismiss an aiding and abetting claim against a private equity firm, BC Partners Advisors, L.P ("BCP"), that had prevailed in a sale process for Presidio, Inc. *See* 251 A.3d at 281. Presidio's management team and its financial advisor, LionTree, initially reached out to two private equity firms. BCP was a financial buyer that planned to retain existing management to run the company. Clayton Dubilier & Rice LLC ("CD&R") planned to combine Presidio with a portfolio company in the same industry, which meant that CD&R could pay a price supported by synergies but did not need to retain management. Acting on LionTree's advice, the Presidio board negotiated only with BCP and entered into a merger agreement that included a go-shop. During the go-shop, CD&R topped BCP's deal and secured "Excluded Party" status, which meant that Presidio would owe BCP a lower termination fee (which any topping bidder would effectively fund). CD&R also insisted on the terms of its offer remaining confidential, except for the disclosure of its identity as a

141

bidder, which the merger agreement mandated. Unbeknownst to Presidio's board, LionTree tipped BCP about CD&R's price. BCP immediately made an exploding offer at just $0.10 above CD&R's bid and insisted on an increased termination fee, which deprived CD&R of the principal benefit of Excluded Party status. *Id.* at 243–44 Oblivious to the tip, the board capitulated, resulting in a deal price below what the board otherwise could have achieved. *Id.* at 244–46. Citing LionTree's tip, BCP's eager response, and their joint efforts to keep the tip secret until discovery in litigation, the court held that the plaintiff had stated a claim against BCP for aiding and abetting. *Id.* at 281–82; *see Chester Cnty. Empls.' Ret. Fund v. KCG Hldgs., Inc.*, 2019 WL 2564093, at *19 (Del. Ch. June 21, 2019) (sustaining aiding and abetting claim against acquirer who obtained confidential information from a sell-side financial advisor and exploited management's conflict of interest).

In contrast to these decisions, there are numerous Delaware cases that have dismissed aiding and abetting claims against bidders at the pleading stage. In those decisions, the plaintiffs failed to allege any action by the sell-side fiduciaries that fell outside the range of reasonableness (hence the lack of any underlying breach) or any action by the bidder other than hard-nosed bargaining (hence the lack of knowing participation).[35]

---

[35] *E.g., Jacobs v. Meghji*, 2020 WL 5951410, at *8 (Del. Ch. Oct. 8, 2020); *In re Xura, Inc. S'holder Litig.*, 2019 WL 3063599, at *3 (Del. Ch. July 12, 2019); *In re Hansen Med., Inc. S'holders Litig.*, 2018 WL 3025525, at *12 (Del. Ch. June 18, 2018)

### b. Knowledge

The knowledge dimension of an aiding and abetting claim requires that the third-party bidder either actually know that the sell-side fiduciaries were breaching their duties or have constructive knowledge under a recklessness standard. *RBC*, 129 A.3d at 862. The plaintiffs proved that TransCanada knew that Skaggs and Smith were engaging in a breach of the duty of loyalty and that the Board was failing to provide meaningful oversight. At a minimum, TransCanada had constructive knowledge of those breaches of duty.

At the time of the sale process, Poirier had nearly twenty years' experience working as an investment banker, plus two years working as TransCanada's head of acquisitions. PTO ¶¶ 44–45. He knew the moves that sellers usually make, understood their meaning, and was on the lookout for departures from the standard patterns. Skaggs and Smith broadcasted a series of signals that told Poirier they were focused on selling at a defensible price and retiring with their change-in-control benefits, rather than seeking the best transaction reasonably available.

The signals that Skaggs and Smith sent included:

- Their message that there would be no social issues in the deal.

- Their lack of interest in enforcing the Standstill when Girling, Poirier, and Fornell made repeated approaches during December 2015.

- Smith's behavior during the January 7 Meeting, including his statement that TransCanada would not face competition.

- Smith's daily calls with Poirier after the January 7 Meeting, including their conversations before and after every communication between Skaggs and Girling.

- Smith's encouragement of a bid during February 2016, which caused Poirier to wonder about what message Smith was conveying.

- Smith's reassurance that the script for inbound calls was a product of the Columbia management team's desire to get a deal done with TransCanada.

- Smith's representation after the *Wall Street Journal* leak and an inbound inquiry that exclusivity would not be a problem because Columbia's Board was "freaking out" and had instructed management to get a deal done "whatever it takes."

Poirier did not simply wonder about these messages on his own. He asked Wells Fargo what message Skaggs and Smith might possibly be conveying, and Wells Fargo advised that Skaggs and Smith were saying that they wanted to sell at any defensible price.

Poirier also knew that Skaggs and Smith had powerful financial motivations to sell. They seemed to want an exit badly and kept committing unforced errors. Poirier and TransCanada had constructive knowledge that Smith and Skaggs were breaching their duty of loyalty by trying to lock in their change-in-control benefits and retire. At a minimum, TransCanada knew that Skaggs and Smith were breaching their duty of care by acting like a bunch of noobs who didn't know how to play the game.

TransCanada also had constructive knowledge that the Board was breaching its duty of care. Although TransCanada did not have direct interaction with any Board members and was not inside the boardroom for any meetings, TransCanada saw the results. TransCanada was like a driver who could not see inside the car ahead but witnessed it weaving across the centerline, then onto the shoulder, then back across the centerline again. Poirier closely analyzed everything that Columbia was doing. He and TransCanada had constructive knowledge that the Board was breaching its duty of care by failing to take the wheel from a conflicted management team that lacked M&A experience.

144

For the knowledge dimension of aiding and abetting, that is enough. Knowledge alone, of course, is not sufficient to satisfy the element of knowing participation. The third party must also culpably participate in the sell-side breach. If TransCanada had only known about the sell-side breaches and allowed Skaggs, Smith, and the Board to make unforced errors, then TransCanada could have taken advantage of their mistakes without opening itself to liability. But as discussed in the next section, TransCanada went further.

### c.    Exploitation

The culpable participation dimension of an aiding and abetting claim requires that the third-party bidder create, exacerbate, or exploit the sell-side breach. The plaintiffs proved that TransCanada exploited—with gusto—the breaches of fiduciary duty by Skaggs, Smith, and the Board.

TransCanada definitively crossed the line into exploitation when Poirier reneged on the $26 Deal and ambushed Kettering with the $25.50 Offer. Poirier put a seventy-two-hour fuse on the offer and threatened that if Columbia did not accept it, TransCanada would publicly disclose that talks had ended. That threat breached the Standstill. TransCanada knew that a threat of that type constituted a breach, not only from the terms of the Standstill, but because TransCanada's outside counsel had flagged the issue. JTX 517 at 7.

Delaware law distinguishes between a coercive threat and a factual statement about natural consequences.[36] If the $25.50 Offer had been TransCanada's final offer, then

---

[36] *See In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *24 (Del. Ch. June 11, 2020) (discussing distinction); *compare Eisenberg v. Chi. Milwaukee*

Poirier's statement about disclosure would have been an accurate statement about the action that TransCanada was required to take under the rules of the Toronto Stock Exchange. But Poirier admitted that the $25.50 Offer was not TransCanada's best and final offer, and he agreed that TransCanada would have reconsidered and tried to complete the acquisition. Poirier also admitted that he referred to a public disclosure to put pressure on Columbia. Poirier made a coercive threat that the NDA prohibited. Wedded to a sale and worried about losing the deal, Skaggs and Smith did not push back.

Poirier and TransCanada only had the confidence to take the bold step of reneging on the $26 Deal, substituting the $25.50 Offer, and backing it up with a coercive threat because of the knowledge they had gained from exploiting Skaggs and Smith over the prior four months. During that period, Poirier and TransCanada consistently and repeatedly breached the Standstill, thereby violating a boundary that the Board had established to protect the integrity of any sale process. The breaches of the Standstill were not close calls. When Skaggs and Smith did not mention the Standstill, Poirier sensed he was being invited in. When Columbia's in-house counsel took the position that even an offer would not be a violation, Poirier and TransCanada knew management was opening the gates.

---

*Corp.*, 537 A.2d 1051, 1062 (Del. Ch. 1987) (holding that inaccurate disclosures about de-listing rendered a self-tender offer coercive), *with Williams v. Geier*, 671 A.2d 1368, 1383 (Del. 1996) (explaining that a fiduciary is obligated to give truthful disclosures about the negative consequences of a particular course of action, even if they may dissuade stockholders from adopting it), *and Gradient OC Master, Ltd. v. NBC Universal, Inc.*, 930 A.2d 104, 120 (Del. Ch. 2007) ("Accurately disclosing circumstances or realities surrounding a [transaction] . . . is not actionably coercive.").

During the four-month period, Poirier also exploited Smith. First, Poirier skillfully cultivated Smith by trading on their past professional friendship. Then, Poirier manipulated Smith by creating the impression that the two of them were the Svengalis behind the scenes, working together as partners to pull everyone's strings, script their bosses' conversations, and generally make the deal happen. Co-opted by Poirier, Smith spoke freely, giving Poirier the information he needed to take advantage of the situation.

TransCanada's own self-assessment of the sale process evidences successful exploitation. In 2019, TransCanada conducted an after-action review of the Columbia acquisition which noted that the negotiations "were significantly enhanced by previous strong relationships between TransCanada and Columbia management." JTX 1522 at 3. The presentation recommended that TransCanada management cultivate similar relationships that could be exploited in future transactions. *Id.* at 28. Framed in the understated language of a business assessment, TransCanada implicitly acknowledged that it had taken advantage of Columbia's fiduciaries and hoped to repeat the strategy, albeit without creating a similar evidentiary record.

As in *Revlon*, *Mills Acquisition*, *Del Monte*, *Presidio*, and *Mindbody*, TransCanada secured the cooperation of sell-side players. As in *Mills Acquisition*, *Del Monte*, *Presidio*, and *Mindbody*, TransCanada violated the boundaries that the Board established. After determining that the sell-side fiduciaries were breaching their duties, TransCanada exploited them with the $25.50 Offer.

Because a bidder is entitled to negotiate aggressively, whether a bidder's behavior crosses the line will depend on the facts and circumstances. Without the final act of

147

reneging on the $26 Deal, making the $25.50 Offer, and adding a coercive threat that violated the NDA, TransCanada's accumulated actions would not have toppled over the line into liability. With that final act, the tower fell.

TransCanada's expert provided a helpful analogy that illustrates the type of negotiating behavior that falls on the acceptable side of the line:

> To take a simple example, if I deliberately go to a car dealership on the last day of the month, and I am aware that my salesman can achieve his monthly bonus by getting me to buy a car, I am not aiding-and-abetting an injury to the car dealership if I get a low price for my car. To the contrary, such tactics would reflect what are universally considered to be negotiation best practices.

Subramanian Report ¶ 72. In other words, if a buyer simply takes a sell-side fiduciary as the buyer finds him, then the buyer can negotiate aggressively.

The problem with the expert's simple hypothetical is that it is too simple to provide an analogy for this case. TransCanada was not like a customer who simply walks into a store on the last day of the month and negotiates with a salesman. TransCanada agreed to the Standstill and repeatedly violated it, which is like the customer promising never to enter the store without the owner's consent, then coming in anyway. And Poirier worked over Smith for months, which is like the customer wining and dining the salesman while eliciting confidential information. And TransCanada agreed not to threaten to publicly disclose the merger discussions, then did so anyway to put the pressure of a coercive threat behind a lowered bid. It is hard to find a retail analogy for that final act.

TransCanada's persistent and opportunistic violations of the Standstill should not be brushed away as legitimate instances of aggressive bargaining. They need to be taken

148

seriously to enable sell-side fiduciaries to fulfill their duties. If accountability for persistent and opportunistic violations of a process boundary only falls on the sell-side fiduciary and not on the bidder, then bidders will keep crossing boundaries. That puts the sell-side fiduciaries in a bind, because they must decide whether to sue to enforce the boundary, potentially putting a valuable deal at risk, or lose negotiating leverage by looking the other way. The better approach is to take into account a bidder's persistent and opportunistic violations of process boundaries like standstill agreements, no-teaming agreements, or prohibitions on unsupervised contacts with management. A bidder who breaks those rules is not merely taking advantage of a sell-side fiduciary's missteps. The bidder is forcing the fiduciary to blunder. Taking those violations seriously gives bidders an incentive to respect the boundaries that a board establishes, which in turn enables the board to manage the sale process.[37]

---

[37] At a conceptual level, treating *persistent and opportunistic* breaches of contract as distinct from an isolated breach, finds support in Section 39 of the *Restatement (Third) of the Law of Restitution*. Titled "Profit from Opportunistic Breach," it states:

(1) If a deliberate breach of contract results in profit to the defaulting promisor and the available damage remedy affords inadequate protection to the promisee's contractual entitlement, the promisee has a claim to restitution of the profit realized by the promisor as a result of the breach. Restitution by the rule of this section is an alternative to a remedy in damages.

(2) A case in which damages afford inadequate protection to the promisee's contractual entitlement is ordinarily one in which damages will not permit the promisee to acquire a full equivalent to the promised performance in a substitute transaction.

This framework provides a bidder like TransCanada with a clear path to avoiding liability for aiding and abetting: Comply with contractual commitments and sale process rules. The easiest way for TransCanada to have avoided aiding and abetting liability was to stand by the $26 Deal, not make the $25.50 Offer, and not back it up with a coercive threat that violated the NDA. TransCanada had secured a good deal that was a win-win for both sides. But TransCanada saw weakness and wanted more.

TransCanada also could have undermined the case for aiding and abetting by not persistently and opportunistically breaching the Standstill. Particularly when Poirier wanted to set up the January 7 Meeting, TransCanada's in-house counsel could have sent a straightforward message to her counterpart: "We are interested in acquiring Columbia. We cannot proceed without a written invitation from the Board. Unless we receive such an invitation, no discussions can take place. Please advise how you would like to proceed." If

---

(3) Breach of contract is profitable when it results in gains to the defendant (net of potential liability in damages) greater than the defendant would have realized from performance of the contract. Profits from breach include saved expenditure and consequential gains that the defendant would not have realized but for the breach, as measured by the rules that apply in other cases of disgorgement (§ 51(5)).

*Restatement (Third) of Restitution and Unjust Enrichment* § 39 (Am. L. Inst. 2011), Westlaw (database updated May 2023). The *Restatement* is obviously talking about a remedy, not a basis for liability, but the doctrine recognizes the difference between a mere contractual breach and an exploitive one. "Not by coincidence, the contractual entitlements that are vulnerable in the manner just described are those for which the promisee would most often be entitled to protection by injunction . . . ." *Id.* cmt. b. Similar policy interests apply when a bidder engages in destabilizing acts of exploitation by breaching a contract, like a standstill, that could support injunctive relief.

the response was some variant of "don't worry about it" (consistent with what actually happened), then TransCanada could have insisted on a written invitation from the Board. Such a message would have created some risk that the Board would invoke the Standstill, but it would have forced Skaggs and Smith to go to the Board, and TransCanada would have protected itself. TransCanada's in-house counsel could have made a similarly frank and uncompromising demand for a written invitation from the Board later in January 2016, before Girling provided Skaggs with an expression of interest containing a price term. Instead, TransCanada's in-house counsel accepted an implausible assurance that the Standstill did not apply, while expressing doubt about that reassurance by noting that "if we were to move forward, the words in the standstill that we agreed would appear to require more explicit Board direction for an offer (even if conditional)." JX 623. TransCanada could have protected itself by insisting on the written Board-level invitation that the Standstill required.

TransCanada's behavior in this case does not mark the company as an incorrigible wrongdoer that committed an unforgivable crime. To the good, TransCanada did not offer Skaggs or Smith any inducements that led to their behavior. The conflict of interest that undermined the sale process resulted from generous change-in-control arrangements and their desire to retire early. TransCanada did not convince Skaggs and Smith that it was time to hang up their spurs, and TransCanada had no role in the change-in-control benefits.

TransCanada is also not liable for aiding and abetting simply because it knew about the sell-side breaches of duty or, at a minimum, had constructive knowledge. Nor is TransCanada liable for aiding and abetting simply because it took advantage of its

151

counterparty's mistakes. TransCanada's conduct reached the level of culpable participation when it exploited the sell-side fiduciaries by reneging on the $26 Deal, making the $25.50 Offer, and backing it up with a coercive threat that violated the NDA. TransCanada took that step because Poirier and his colleagues believed that they could exploit the conflicted counterparties on the other side. And TransCanada was only emboldened to take that final step because Poirier had been breaching the Standstill and exploiting Skaggs and Smith throughout the prior months. An isolated breach of the Standstill would not have supported a claim for aiding and abetting. *See In re Comverge, Inc.*, 2014 WL 6686570, at *11–12 (Del. Ch. Nov. 25, 2014). The conduct in this case involved persistent and opportunistic breaches over an extended period, culminating in the exploitative $25.50 Offer.

The morals of the marketplace prevail in many instances, but everything is not a Hobbesian free for all. Just as a party must be careful that its solicitations of business do not cross the line into tortious interference with a contract or business opportunity, and just as a party must be careful that its pitches do not cross the line into falsehood and libel, so too a party that engages with a fiduciary must be careful about the possibility that the fiduciary may be engaging in breach. A party who identifies a breach and zestfully exploits it engages in culpable participation.

That is what TransCanada did. TransCanada is therefore jointly and severally liable for the consequences that flowed from sell-side fiduciaries' breaches of duty that took place during the sale process.

### 4. Damages For The Sale Process Claim

The final element of an aiding and abetting claim is proof of causally related damages. *Malpiede*, 780 A.2d at 1097. The plaintiffs proved their entitlement to an award of damages based on the $26 Deal.

"[D]amages flowing from [a breach of fiduciary duties] are to be liberally calculated." *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 444 (Del. 1996). "[M]athematical certainty is not required." *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999), *aff'd*, 766 A.2d 437 (Del. 2000). "[O]nce a breach of [fiduciary] duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer." *Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at *12 (Del. Ch. Oct. 29, 1993), *aff'd*, 676 A.2d 436, 444 (Del. 1996). An aider and abettor is jointly and severally liable for the damages that a fiduciary would owe, so the same principles apply.[38]

---

[38] *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002) ("[T]he Court of Chancery properly held HGI, Gumbiner, and Guzzetti jointly and severally liable with the General Partner for aiding and abetting the General Partner's breach of fiduciary duties created by the Partnership Agreement."); *Laventhol, Krekstein, Horwath & Horwath v. Tuckman*, 372 A.2d 168, 170 (Del. 1976) ("[P]ersons who knowingly join a fiduciary in an enterprise which constitutes a breach of his fiduciary duty of trust are jointly and severally liable for any injury which results."); *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 619 (Del. Ch. 2010) (imposing joint and several liability on defendants for breaches of fiduciary duty and for aiding and abetting the breach), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010); *Triton Const. Co., Inc. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *28 (Del. Ch. May 18, 2009) ("Defendants Eastern and Elliott aided and abetted Kirk's breaches of fiduciary duty. Therefore, they are jointly and severally liable for the damages imposed to remedy those breaches."), *aff'd*, 988 A.2d 938 (Del.2010).

"If the plaintiffs prove that the defendants could have sold the corporation to the same or to a different acquirer for a higher price, then the measure of damages should be based on the lost transaction price."[39] The plaintiffs proved that but for the sell-side fiduciaries' breaches of duty, aided and abetted by TransCanada, the parties would have executed a merger agreement based on the $26 Deal. Columbia and TransCanada had reached an agreement in principle reflected in the $26 Deal. Although that deal had conditions, the agreement was firm. Skaggs believed the parties were on "a tight Critical Path to MA signing." PTO ¶ 382. He was sufficiently confident that he had a deal that he acted as if exclusivity had been renewed even before the agreement was signed. Smith believed the deal was done and went on vacation. Other contemporaneous evidence supports the existence of an agreement in principle, including statements by Wells Fargo bankers and texts among TransCanada executives. *See* JTX 1120 at 1, 6, 8; JTX 779.

---

[39] *PLX*, 2018 WL 5018535, at *51; *see Dole*, 2015 WL 5052214, at *46 (awarding damages of $2.74 per share, which suggested that "Murdock and Carter's pre-proposal efforts to drive down the market price and their fraud during the negotiations reduced the ultimate deal price by 16.9%"); *HMG/Courtland Props. v. Gray*, 749 A.2d 94, 117 (Del. Ch. 1999) (finding that although price fell within lower range of fairness, "[t]he defendants have failed to persuade me that HMG would not have gotten a materially higher value for Wallingford and the Grossman's Portfolio had Gray and Fieber come clean about Gray's interest. That is, they have not convinced me that their misconduct did not taint the price to HMG's disadvantage"); *see also Bomarko*, 794 A.2d at 1184–85 (holding that although the "uncertainty [about] whether or not ITI could secure financing and restructure" lowered the value of the plaintiffs' shares, the plaintiffs were entitled to a damages award that reflected the possibility that the company might have succeeded absent the fiduciary's disloyal acts), *aff'd*, 766 A.2d 437 (Del. 2000).

At trial, TransCanada sought to demonstrate that the conditions to the $26 Deal failed such that it was no longer viable. TransCanada's skilled litigation team assembled some evidence to support their story, but it was not persuasive. The first condition was for the TransCanada underwriters to support the $26 Deal, which they did by standing by their commitments. The second condition was for the rating agencies to opine that TransCanada's rating would not fall below investment grade, which the ratings agencies gave. The final condition was for TransCanada's stock not to fall below $49 Canadian per share. It did, but only briefly.

Notwithstanding TransCanada's protestations, the record demonstrates that the $26 Deal was still real. Poirier admitted as much, testifying that TransCanada had not committed to break off negotiations if Columbia rejected the $25.50 Offer and that if Columbia had pushed back, TransCanada would have considered other bids, including the $26 Deal. JTX 1902 at 2; *see* Poirier Tr. 264, 296; Johnston Tr. 648–49.

The plaintiffs' expert proved at trial that the consideration contemplated by the $26 Deal was worth $26.50 per share at closing, because TransCanada's stock price increased during the interim. Poirier had insisted on using a fixed exchange ratio in which Columbia stockholders would receive $23.40 in cash plus a number of TransCanada shares equal to $2.60 in cash on the date of the announcement. JTX 953 at 1. Using TransCanada's actual stock price performance, the shares worth $2.60 on the date of the announcement were worth $3.10 on the date of closing. *See* JTX 1664 ¶¶ 73–78; Meinhart Tr. 1197–202. Those calculations are undisputed.

For purposes of the Sale Process Claim, TransCanada is liable to the class in the amount of $1.00 per share. This award necessarily results in the plaintiffs in this case receiving more than the fair value of their shares, which the *Appraisal Decision* determined to be $25.50 per share. That is because an appraisal measures the value of the corporation as a standalone entity, as if the merger giving rise to appraisal rights never happened. An appraisal does not take into account other injuries, such as the possibility that sell-side fiduciaries could breach their fiduciary duties by failing to obtain a higher-valued transaction. *See generally Dismissal Decision*, 2021 WL 772562 at *56 (explaining why the fair value determination did not foreclose fiduciary duty claims).

**B.     The Disclosure Claim**

In addition to the Sale Process Claim, the plaintiffs advanced the Disclosure Claim. The plaintiffs proved that Skaggs, Smith, and the Board breached their fiduciary duty of disclosure by seeking stockholder action based on a proxy statement that contained material misstatements and omissions. The plaintiffs proved that TransCanada knowingly participated in the disclosure violations. TransCanada knew information that the Proxy Statement failed to disclose, such as material interactions that Girling, Poirier, and Fornell had with Skaggs and Smith. TransCanada had a contractual obligation to provide information about the disclosures to Columbia. TransCanada chose to remain silent, dismissing the Proxy Statement as Columbia's document. By doing so, TransCanada knowingly participated in a breach of fiduciary duty.

### 1. The Fiduciary Relationship For The Disclosure Claim

As with the Sale Process Claim, the first element of the claim for aiding and abetting is easily satisfied. The Columbia directors, including Skaggs, were fiduciaries. So were Skaggs and Smith in their capacity as officers. But Justice Frankfurter's questions show that fiduciary status is not enough. The more important questions are to whom the duty is owed, the nature of the duty, and whether it was breached.

Pertinent to this case, directors of a Delaware corporation owe "a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992). The Merger required a stockholder vote to become effective. 8 *Del. C.* § 251(c). When the directors submitted the Merger for a stockholder vote, they owed a duty to the stockholders to disclose fully and fairly all material information within their control.

As officers, Skaggs and Smith owed a duty of disclosure that was "the same as those of directors." *Gantler*, 965 A.2d at 709. This court has sustained claims against officers for failing to disclose material information in proxy statements for mergers. *See, e.g.*, *Warren Gen. Empls.' Ret. Sys. v. Roche*, 2020 WL 7023896, at \*19–23 (Del. Ch. Nov. 30, 2020); *In re Baker Hughes, Inc. Merger Litig.*, 2020 WL 6281427, at \*15–16 (Del. Ch. Oct. 27, 2020). For Skaggs, that duty was particularly stark, as he signed the Proxy Statement.

The duty to disclose all material information does not stop with the knowledge that corporate fiduciaries happen to have readily available in their minds. The duty encompasses material information that the fiduciaries can reasonably obtain. *See Delman*

*v. GigAcquisitions3, LLC*, 288 A.3d 692, 726–27 (Del. Ch. 2023). It therefore requires good faith investigation to determine what material information needs to be disclosed.

Information is material if it "would have assumed actual significance in the deliberations" of a reasonable stockholder deciding how to vote. *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985). A plaintiff need not prove that a reasonable stockholder would have voted differently, nor even that there was a substantial likelihood that a stockholder could vote differently. All that materiality requires is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Rosenblatt*, 493 A.2d at 944 (cleaned up).

Fiduciaries also have a duty to speak completely. "[W]hen a board chooses to disclose a course of events or to discuss a specific subject, . . . it cannot do so in a materially misleading way, by disclosing only part of the story, and leaving the reader with a distorted impression." *Appel v. Berkman*, 180 A.3d 1055, 1064 (Del. 2018). "Partial disclosure, in which some material facts are not disclosed or are presented in an ambiguous, incomplete, or misleading manner, is not sufficient to meet a fiduciary's disclosure obligations." *Id.*

For the duty of disclosure, there is no separate standard of review. As Chancellor Allen explained, "[T]he question whether shareholders' have, under the circumstances, been provided with appropriate information upon which an informed choice on a matter of fundamental corporate importance may be made, is not a decision concerning the

158

management of business and affairs of the enterprise."[40] Therefore, "the independence (or good faith or due care) of a board is not directly relevant to a determination whether a disclosure obligation has been satisfied (disclosure not being a question of business judgment.)"[41] The plaintiff must prove the elements of a claim that is tied to the standard of conduct itself.

---

[40] *In re Anderson, Clayton S'holders Litig.*, 519 A.2d 669, 675 (1986) (Allen, C.) (citation omitted); *accord In re Tri–Star Pictures, Inc. Litig.*, 1990 WL 82734, at \*8–9 (Del. Ch. June 14, 1990) (same); *Lewis v. Leaseway Transp'n Corp.*, 1990 WL 67383, at \*6 (Del. Ch. May 16, 1990) (same).

[41] *In re Mobil Comm. Corp. Consol. Litig.*, 1989 WL 997182, at \*1 (Del. Ch. Apr. 3, 1989) (Allen, C.). There is a separate line of cases that could be read to suggest that the business judgment rule protects a board's decisions about what to disclose such that a plaintiff must rebut one of its elements to prevail on a disclosure claim. In the *3Com* decision, when denying a plaintiffs' motion seeking expedited discovery into disclosure claims, this court remarked that "[s]o long as the proxy statement, viewed in its entirety, sufficiently discloses and explains the matter to be voted on, the omission or inclusion of a particular fact is generally left to management's business judgment." *In re 3Com S'holders Litig.*, 2009 WL 5173804, at \*1 (Del. Ch. Dec. 18, 2009). For that proposition, the court cited *Kaplan v. Goldsamt*, 380 A.2d 556 (Del. Ch. 1977), a post-trial decision which said something similar, *id.* at 565. The *Kaplan* decision in turn relied on *Schiff v. RKO Pictures Corp.*, 104 A.2d 267 (Del. Ch. 1954), which involved an application to enjoin an interested sale of assets to a dominant stockholder and was issued after an evidentiary hearing. One of the issues was whether the proxy statement should have provided values for a film library and a share of the profits from a movie called "The Robe." Chancellor Seitz viewed those assets as particularly difficult to value, noting that "much of the success of the movie industry is dependent upon the whims of a fickle public" and that managers in the movie business "often succeeded only by the application of unorthodox business methods." *Id.* In that context, he declined to find that the omissions of valuations for these assets constituted disclosure violations, observing that the omission or inclusion of that type of valuation was "within an area of management judgment." *Id.* at 280. Chancellor Seitz's observation was thus far more limited than how *3Com* and *Kaplan* portrayed it.

In a case involving stockholder action, a claim for breach of the duty of disclosure requires proof of only two elements: (1) a request for stockholder action, and (2) a material misrepresentation or omission. Whether a plaintiff must prove more turns on the remedy that the plaintiff seeks. If the plaintiff seeks compensatory or rescissory damages based on the harm that the breach of duty caused, then the record must establish the causal chain necessary to support that remedy. The stockholder must have relied on the misrepresentation or material omission in making a decision, the decision must have caused

---

A decade ago, only two decisions referenced the *3Com* formulation. *See Ehlen v. Conceptus, Inc.*, 2013 WL 2285577, at *2 (Del. Ch. May 24, 2013); *In re Micromet, Inc. S'holders Litig.*, 2012 WL 681785, at *10 (Del. Ch. Feb. 29, 2012). Recently, the phrase experienced a renaissance, and it has appeared in four decisions in the last two years. *See Teamsters Loc. 677 Health Servs. & Ins. Plan v. Martell*, 2023 WL 1370852, at *10 (Del. Ch. Jan. 31, 2023); *In re Match Gp., Inc. Deriv. Litig.*, 2022 WL 3970159, at *27 (Del. Ch. Sept. 1, 2022); *City Pension Fund for Firefighters & Police Officers in City of Mia. v. The Trade Desk, Inc.*, 2022 WL 3009959, at *16 (Del. Ch. July 29, 2022); *Teamsters Loc. 237 Additional Sec. Benefit Fund v. Caruso*, 2021 WL 3883932, at *29 (Del. Ch. Aug. 31, 2021).

None of the cases actually apply the business judgment rule to a disclosure issue. If *3Com* simply means that a proxy statement should be read as a whole, then I am on board. *See In re GGP, Inc. S'holder Litig.*, 282 A.3d 37, 73 (Del. 2022) (Traynor, J., concurring in part) ("'When determining whether there has been a disclosure violation, a proxy statement should be read as a whole.'" (quoting *IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *18 (Del. Ch. Dec. 11, 2017), and two other decisions, including *3Com* and its reference to "management's business judgment.")). Corporate fiduciaries should get the benefit of the doubt on a hard disclosure call made under factually ambiguous circumstances. But *3Com* should not be read to suggest that the business judgment rule protects any rational decision that a fiduciary makes about what to disclose. That interpretation would replace the duty to disclose material information with a duty to disclose only what the fiduciary rationally believes constitutes material information.

the damages, and the damages must be quantified. *See Dohmen v. Goodman*, 234 A.3d 1161, 1168 (Del. 2020). The court must also determine whether the disclosure violation resulted from a breach of the duty of loyalty or care, and a plaintiff that seeks to recover damages for a breach of the duty of disclosure must establish that the fiduciary acted with "a culpable state of mind" or engaged in "non-exculpated gross negligence." *Wayport*, 76 A.3d at 315. If a plaintiff seeks a remedy that is not tied to actual harm, then those additional elements are superfluous. In that setting, "a beneficiary need not demonstrate other elements of proof—reliance, causation, or damages." *Dohmen*, 234 A.3d at 1168.

The first two elements of a claim for aiding and abetting a breach of the duty of disclosure consider only the underlying fiduciary relationship and the existence of a breach. A plaintiff can satisfy those elements by pointing to a request for stockholder action and proving a material misstatement or omission. *See Mindbody*, 2023 WL 2518149, at *43.

## 2. The Breaches Of The Duty Of Disclosure

The plaintiffs proved that Columbia's directors and officers breached their duty of disclosure by failing to disclose material information about contacts between Columbia and TransCanada during the sale process. For Skaggs and Smith, the breach of the duty of disclosure sounded in loyalty, because they knew about their interactions and the resulting violations of the Standstill. For the other directors, the breach of the duty of disclosure sounded in care.

This court held in the *Appraisal Decision* that the Proxy Statement "contained material misstatements and omissions." 2019 WL 3778370, at *36. The *Appraisal Decision* identified the three "most significant" disclosure omissions as (i) "Smith invited a bid and

161

told Poirier that TransCanada did not face competition" at the January 7 Meeting; (ii) Dominion, NextEra, Berkshire, and TransCanada were subject to Standstills, TransCanada breached its standstill, and that Columbia ignored TransCanada's breach; and (iii) Skaggs and Smith were planning to retire in 2016. *See id.* at \*35–36.

The plaintiffs proved additional material omissions at trial. First, the plaintiffs proved that TransCanada and Columbia had other communications about a potential transaction in December 2015 that the Proxy Statement did not disclose. In cases involving publicly traded companies, sell-side fiduciaries must provide their stockholders with an accurate, full, and fair description of significant meetings or other interactions between target management and a bidder.[42] "Although a fiduciary need not give a play-by-play

---

[42] *See, e.g.*, *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1280–82 (Del. 1994) (reversing a grant of summary judgment in favor of defendants on disclosure claim where proxy failed to disclose the existence of a bid because "once defendants traveled down the road of partial disclosure of the history leading up to the Merger and used the vague language described, they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events," including the existence of the bid); *Presidio*, 251 A.3d at 261 ("It is reasonably conceivable that the existence of the tip was material information that should have been disclosed to the stockholders. The Proxy made no mention of LionTree's tip to BCP."); *In re Xura, Inc. S'holder Litig.*, 2018 WL 6498677, at \*13 (Del. Ch. Dec. 10, 2018) (holding that plaintiff adequately pled a claim for breach of the duty of disclosure where stockholders appeared to lack information about private communications between CEO and bidders); *In re OM Gp., Inc. S'holders Litig.*, 2016 WL 5929951, at \*12 (Del. Ch. Oct. 12, 2016) ("[O]ur Supreme Court recognized that a partial and incomplete disclosure of arguably immaterial information regarding the history of negotiations leading to a merger might result in a materially misleading disclosure if not supplemented with information that would allow the stockholders to draw the complete picture."); *Alessi v. Beracha*, 849 A.2d 939, 946 (Del. Ch. 2004) (holding that negotiations between buyer's and target's CEOs were material when the parties discussed "significant terms" including "valuation"); *see also PLX*, 2018 WL 5018535, at \*33–34 (finding after trial that recommendation statement omitted material information where it

162

account, when fiduciaries choose to provide the history of a transaction, they have an obligation to provide shareholders with an accurate, full, and fair characterization of those historic events." *Mindbody*, 2023 WL 2518149, at \*39 (cleaned up).

The Proxy Statement omitted or misleadingly represented a series of interactions between TransCanada and Columbia management that were sufficiently extensive to alter the total mix of information:

- On November 25, 2015, immediately after the Board terminated the November sale process, Smith told Poirier that Columbia "probably" would want to pick up merger talks again "in a few months." PTO ¶ 253. Based on that conversation, Poirier understood that Columbia's management team "would be supportive of a sale." JX 413 at 3.

- On December 2, 2015, Skaggs and Girling had what Fornell described as a "good call." JX 439. That same day, Fornell called Smith twice, then provided Poirier with a proposed engagement letter for Wells Fargo to act as a financial advisor to TransCanada in its potential acquisition of Columbia. PTO ¶ 273.

- On December 8, 2015, Fornell met with Skaggs and Smith at an energy conference and checked in about a potential transaction. *See id.* ¶¶ 275–278.

- On December 17, 2015, Poirier called Smith to reiterate TransCanada's interest in a deal with the Company. *See* JTX 273 at 2. During the call, Poirier indicated that TransCanada would be willing to pay around $28 per share. *See* PTO ¶ 282.

- On January 4, 2016, Poirier called Smith in anticipation of the January 7 Meeting. The Proxy Statement stated that the purpose of the call was to request a meeting. JTX 1291 at 46. That was misleading because the January 7 Meeting had been planned since mid-December 2015. Based on those calls, Smith sent Poirier the package of information that Columbia had given to bidders in November 2015, plus updated projections. He also agreed that TransCanada could have access to a data room.

---

failed to disclose a communication between a director and a potential bidder about the bidder's interest in acquiring the company and the likely timeframe for a bid).

163

- During the January 7 Meeting, Poirier indicated that TransCanada could be willing to pay around $28 per share. *See* PTO ¶ 282.

- On February 9, 2016, Skaggs and Smith met with Fornell and discussed the potential acquisition, including the state of TransCanada's financing. *Id.* ¶ 317. The Proxy Statement only included vague descriptions of "discussions" "[f]rom February 8, through February 12, 2016" about the feasibility of a tender offer. JTX 1291 at 48.

By omitting or mischaracterizing these interactions, the Proxy Statement painted a misleading picture of the nature and extent of the contacts between TransCanada and the Columbia management team.

The Proxy Statement also failed to disclose that from November 25, 2015, through March 4, 2016, TransCanada's contacts with Columbia breached the Standstill, that Columbia management chose not to enforce the Standstill, and that Columbia management did not bring those breaches to the attention of the Board so that the Board could determine how to proceed. Omitting those facts changed the total mix of information by preventing stockholders from understanding how receptive Columbia management was to TransCanada's approaches. *See Appraisal Decision*, 2019 WL 3778370, at *35–36.

The plaintiffs also proved that Columbia's fiduciaries breached their duty of disclosure by omitting the fact that Columbia's officers accepted the $26 Offer, resulting in the $26 Deal. The Proxy Statement contained a partial and misleading description of the $26 Offer. The Proxy Statement described it as an "an indicative offer." JX 1291 at 53. The $26 Offer was a real offer, although it came with three conditions attached. An offer with conditions is still an offer. TransCanada made an offer, and Columbia accepted it.

The Proxy Statement also contained a material misleading description of TransCanada's reasons for lowering its bid. According to the Proxy Statement,

164

TransCanada management told Columbia that it reneged on the agreement in principle because

> concerns over execution risk on TransCanada's proposed subscription receipts offering and the deterioration of TransCanada's stock price following the leak, indicated that TransCanada's board of directors had concluded it could not maintain the $26 per share mixed-consideration proposal and that TransCanada's final proposal was to acquire Columbia at a price of $25.50 in cash per share of Columbia common stock.

*Id.* at 56. While it is true that Poirier said those things, the Proxy Statement implies that they were accurate. In fact, the TransCanada Board had not concluded that TransCanada could not maintain the $26 Offer, and TransCanada's underwriters had remained confident in their ability to execute the proposed subscription receipts offering. Poirier cited those reasons as pretexts for reneging on the $26 Deal and substituting the $25.50 Offer. He admitted that the $25.50 Offer was not a best-and-final bid, and that TransCanada would have considered adding back a stock component if Columbia had said no.

### 3. Knowing Participation In The Disclosure Violations

The third element of an aiding and abetting claim requires proof of knowing participation in the breach of duty. The plaintiffs carried their burden.

This court has held that an acquirer knowingly participates in a disclosure violation when the acquirer has the opportunity to review a proxy statement, has an obligation to identify material misstatements or omissions in the proxy statement, and fails to identify those misstatements or omissions. *See Mindbody*, 2023 WL 2518149, at *43–44. That was the case here. *See* MA § 5.01(a).

165

TransCanada knew about the interactions that did not appear in the Proxy Statement and what really took place during those interactions. TransCanada also knew that its pre-March 2016 interactions violated the letter of the Standstill. Indeed, TransCanada was more focused on the Standstill than Columbia. Poirier and Johnston both read and understood it. They advised the TransCanada deal team about what it meant, and Poirier informed Girling. TransCanada also knew that the $26 Offer had been a real (albeit conditional) offer and that the reasons Poirier gave to Columbia for reneging on the $26 Deal were pretextual.

TransCanada reviewed the Proxy Statement in detail. At trial, Poirier testified that "[t]here was exchange of drafts between both companies to verify its completeness and accuracy." Poirier Tr. 164. Poirier read the Proxy Statement and provided comments on both the preliminary and definitive versions. *Id.* 289; JTX 1196: JTX 1281. Girling, Johnson, Fornell, and Mayer Brown also reviewed it.

TransCanada chose not to correct the material misstatements or omissions in the Proxy Statement. TransCanada did so because Girling viewed the Proxy Statement as Columbia's document and told his team not to worry about it.

TransCanada also knowingly participated in a breach of the duty of disclosure based on the Proxy Statement's failure to disclose Skaggs and Smith's plans to retire. TransCanada did not actually know of Skaggs and Smith's plans, but TransCanada had constructive knowledge. Both Lazard and Smith told TransCanada that there would be no social issues in the deal, and Skaggs and Smith behaved like executives who wanted to call it a day. In the face of that constructive knowledge, TransCanada ignored its contractual obligation by failing to raise the issue.

166

TransCanada also had constructive knowledge of the Proxy Statement's failure to disclose that other bidders from the November 2015 process were bound by don't-ask-don't waive standstills. TransCanada's own NDA contained one, and while TransCanada had negotiated to reduce the length of its Standstill from eighteen months to twelve, TransCanada had not eliminated it. TransCanada had surmised in real time that its competitors had agreed to similar standstills, and it sought in the exclusivity agreement to have the right to control whether Columbia could "release any person from or waive any provision of, any confidentiality or standstill agreement." JTX 643 at 3. In the face of that constructive knowledge, TransCanada again proceeded recklessly by ignoring its contractual obligation and failing to raise the issue.

TransCanada had an easy way to fulfill its contractual obligation and eliminate any risk of liability for aiding and abetting. For points in the sales process where TransCanada knew what took place, TransCanada could have provided Columbia in writing with specific disclosures about those meetings or communications. For points where TransCanada had constructive knowledge, TransCanada could have asked Columbia in writing about those areas and instructed Columbia to include all material information. For example:

- TransCanada could have sent a written communication stating: "TransCanada believes the Proxy Statement needs to include the following disclosure: 'On December 19, 2015, Poirier called Smith, expressed TransCanada's interest in an acquisition, and indicated that TransCanada's views regarding Columbia's value had not changed. Before making that call, TransCanada did not obtain permission from the Board of the Company as required by the standstill.' Under Section 5.01 of the Merger Agreement, we ask that you include this statement."

- To address Skaggs and Smith's interest in retirement, TransCanada could have sent a letter or email stating: "We have reason to believe that members of the Columbia management team, including Skaggs and Smith, intend to retire after this

167

transaction. For example, we were told several times that there would be no social issues in this deal. We are aware that in *In re Lear Corp. S'holder Litig.*, 926 A.2d 94 (Del. Ch. 2007), the Delaware Court of Chancery determined that a proxy statement omitted a material fact by not describing the economic motivations of the CEO and lead negotiator, including his desire to retire. Under Section 5.01 of the Merger Agreement, we ask that you investigate this issue and advise us of the result of the investigation so that we can consider appropriate disclosure."

- To address the existence of other standstills, TransCanada could have sent a letter or email stating: "We have reason to believe that other bidders who engaged with the company in 2015 may have signed NDAs with don't-ask-don't-waive standstills. TransCanada signed an NDA with a don't-ask-don't-waive standstill, and we assume that you started with a standard agreement for all participants. We are aware that the Delaware courts have regarded the existence of don't-ask-don't-waive standstills as a material fact. *See In Ancestry.com Inc. S'holder Litig.*, Consol. C.A. No. 7988-CS, Dkt. 125 at 233–35 (Del. Ch. Dec. 17, 2012) (TRANSCRIPT) (finding material omission where proxy statement did not disclose the existence of a don't-ask-don't-waive standstill); *In re Complete Genomics, Inc. S'holder Litig.*, Consol. C.A. No. 7888-VCL, Dkt. 66 at 17–22 (Del. Ch. Dec. 27, 2012) (TRANSCRIPT) (holding that a failure to disclose a don't-ask-don't-waive standstill constituted a failure to "disclose material information"). Under Section 5.01 of the Merger Agreement, we ask that you investigate this issue and advise us of the result of the investigation so that we can consider appropriate disclosure."

Because TransCanada did not take steps of this kind, it is not possible to say with certainty what the outcome would have been. The answer would turn on facts and circumstances, including how clearly TransCanada asserted its position and the credibility of Columbia's response. But if Columbia ultimately refused to include a particular point of disclosure, then TransCanada could have defended against charge of knowing participation by arguing that even if it had actual or constructive knowledge about a disclosure breach, it had not culpably participated.

### 4. Damages For The Disclosure Claim

The final element of an aiding and abetting claim is proof of causally related damages. *Malpiede*, 780 A.2d at 1097. The plaintiffs seek an award of rescissory damages in the amount of $3.032 billion.

Because the fourth element of an aiding-and-abetting claim requires causally related damages, it resurrects questions that this decision passed over when considering the element of breach. For an aiding-and-abetting claim based on a breach of the duty of disclosure, the issue of causally related damages resurrects the question of reliance, because the absence of reliance breaks the chain of causation between the misstatement or omission and the damages. *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006).

The plaintiffs did not introduce any evidence on the issue of reliance. TransCanada argues that the plaintiffs therefore cannot recover damages. The plaintiffs respond that for stockholders in a publicly traded corporation, where there are millions of beneficial owners and shares trading every millisecond, proving reliance on an individualized basis is impossible. If a plaintiff must prove individualized reliance, then the Delaware fiduciary duty of disclosure cannot support a class-wide claim to recover compensatory or rescissory

damages. Yet many decisions have recognized that compensatory[43] and rescissory[44] damages are available for breaches of the duty of disclosure.

As captured in *Dohmen*, the traditional formulation of a claim for breach of the duty of disclosure places the burden of proving reliance, causation, and damages on the plaintiff if the plaintiff intends to seek compensatory or rescissory damages. 234 A.3d at 1175 ("[A]n investor who proves a breach of the fiduciary duty of disclosure must prove reliance, causation, and damages."). Another important Delaware Supreme Court decision on reliance and causation is *Gaffin v. Teledyne, Inc.*, 611 A.2d 467 (Del. 1992). There, through

---

[43] *E.g.*, *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 42–53 (Del. Ch. 2014) (collecting authorities acknowledging availability of compensatory damages measured by quasi-appraisal as a remedy for a breach of the duty of disclosure). To similar effect, there are decisions relying on exculpation to bar a class-wide damages remedy for a breach of the duty of disclosure based on a breach of the duty of care. *See, e.g.*, *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 360 (Del. Ch. 2008) ("[W]here a breach of the disclosure duty does not implicate bad faith or self-interest, both legal and equitable monetary remedies (such as rescissory damages) are barred on account of the exculpatory provision authorized by 8 *Del. C.* § 102(b)(7)."); *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 597–98 (Del. Ch. 2007) ("A decision violates only the duty of care when the misstatement or omission was made as a result of a director's erroneous judgment with regard to the proper scope and content of disclosure, but was nevertheless made in good faith. Conversely, where there is reason to believe that the board lacked good faith in approving a disclosure, the violation implicates the duty of loyalty." (footnote omitted)).

[44] *See Lynch v. Vickers Energy Corp.* (*Vickers II*), 429 A.2d 497, 501 (Del. 1981) (explaining that when a breach of fiduciary duty has been alleged and proven against a self-interested controlling stockholder, the stockholder plaintiffs are not limited to an out-of-pocket measure, but rather can seek rescission or rescissory damages), *overruled in part on other grounds*, *Weinberger*, 457 A.2d at 714 (explaining that rescissory damages is not the exclusive remedy under *Vickers II*); *Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 280 (Del. 1977) (finding breaches of duty of disclosure and remanding for determination of damages).

a series of self-tender offers executed over a period of years, the defendant corporation (Teledyne) reduced its share count by two-thirds. *Id.* at 468. The plaintiffs challenged the sixth self-tender, in which Teledyne offered to purchase shares at a price of $40 each. Four months after the self-tender offer closed, Teledyne announced earnings, and the stock price jumped to $70 per share. *Id.* at 470.

The offering circular contained little information beyond the term of the offer and instructions for acceptance. *Id.* at 468–69. The plaintiff sued Teledyne for equitable fraud on the theory that the offering circular contained material misstatements and omissions. The plaintiffs also argued that Teledyne had delayed the mailing of its annual report, which contained some of the information, until late in the tender offer period so that some tendering stockholders were not able to consider it. The plaintiffs did not sue the Teledyne directors for breach of the fiduciary duty of disclosure. *Id.* The claim for equitable fraud required proof of reliance and causation. *Id.* at 472.

The Court of Chancery certified a class, rejecting Teledyne's arguments that there were two types of stockholders—sophisticated holders and other stockholders—and that individual questions of reliance predominated. The court held that Teledyne engaged in a course of conduct that affected all stockholders equally. The court acknowledged, however, that if the trial record showed that different stockholders received different levels of information, then it could be necessary to certify subclasses. *Id.* at 471. The court therefore held that for purposes of trial, "a rebuttable presumption of class-wide shareholder reliance was established by the facts that: a) each class member received the offering circular which

failed to contain material financial information; and b) each shareholder tendered shares by signing off on the offering circular's 'Letter of Transmittal.'" *Id.* at 472.

At trial, Teledyne argued that all of the material facts were already available in the total mix of information established by press releases and other public filings. Teledyne also argued that because it released its annual report before the self-tender closed, the information in the annual report cured any problems with the offering circular. The Court of Chancery rejected those defenses and held that the evidence failed to rebut the presumption of reliance. *Id.* at 472–73. In addition to the delayed mailing of its annual report (EDGAR was not yet a thing), Teledyne had failed to disclose that it viewed the repurchase of its stock as a "sound investment," and Teledyne had mispresented that its officers and directors could not participate in the tender offer, when in fact two senior officers would decide whether Teledyne's pension plan would participate, and they caused the plan to tender 1.1 million shares. *Id.* at 473–74. The court awarded damages of $1 per share on a class-wide basis. *Id.* at 467.

On appeal, the Delaware Supreme Court vacated the class-wide award, holding that "individual shareholder justifiable reliance was not proven on a class-wide basis" and that the Court of Chancery therefore should have decertified the class. *Id.* at 474. The high court found that the Court of Chancery's own factual findings showed that the presumption of class-wide reliance was rebutted. *Id.* The sophisticated stockholders could be expected to know about Teledyne's press releases regarding its financial results, and the Delaware Supreme Court treated the hand delivery of the annual report to brokers and nominees for distribution to beneficial owners as the equivalent of hand delivery to the sophisticated

172

stockholders, meaning that the high court viewed the sophisticated stockholders as having received the annual report nine days before the self-tender closed. *Id.* For other stockholders, the high court found it reasonable to assume that at least some stockholders could have received the annual report and read it. *Id.* For still other stockholders, the high court found that "significant individual questions concerning the level of knowledge possessed by each shareholder existed and, therefore, any presumption of justifiable reliance as to 'all other shareholders' was rebutted as well." *Id.* The Delaware Supreme Court concluded that because the presumption of reliance was rebutted, the Court of Chancery had erred by refusing to decertify the class. *Id.*

Notably, the Delaware Supreme Court did *not* reject the presumptions of reliance that resulted from the stockholders receiving the offering circulars. The Delaware Supreme Court held that Teledyne had successfully rebutted the presumption, not that the presumption itself was erroneous.[45]

---

[45] The *Gaffin* decision contains broader language stating that "[a] class action may not be maintained in a purely common law or equitable fraud case since individual questions of law or fact, particularly as to the element of justifiable reliance, will inevitably predominate over common questions of law or fact." *Id.* at 464. After citing authorities supporting that proposition, the Delaware Supreme Court stated: "We agree with the holdings of these cases and conclude that the trial court erred by failing to decertify the class because of the inherently individual issue involving the element of justifiable reliance in this purely common law equitable fraud case." *Id.* The Delaware Supreme Court only applied this rule and reversed the failure to decertify the class *after* holding that the presumption of reliance had been rebutted. It follows that when a presumption of reliance exists, that presumption can support class-wide relief until the defendant rebuts it. After that, individual issues predominate.

The *Gaffin* decision supports the existence of a rebuttable presumption of reliance that applies when a corporation sends a disclosure document to diffuse stockholders in connection with a request for stockholder action. This court's decisions suggest a similar paradigm. For example, in the *CBS* case, Vice Chancellor Slights observed that when directors request stockholder action and send them information on which to make a decision, "it follows logically that when stockholders act following the disclosure, a reasonable inference can be drawn that the stockholder relied upon the disclosure and that, assuming it is 'material,' any harm flowing from the stockholder's action proximately resulted from such reliance." *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *23 (Del. Ch. Jan. 27, 2021).

Most recently, in *GigAcquisitions3*, Vice Chancellor Will explained that when fiduciaries have asked the stockholders of a publicly traded entity to take action based on a common set of disclosures, the large number of stockholders gives rise to a collective action problem that makes it "impractical, if not impossible, for each stockholder to ask and have answered by the corporation its own set of questions regarding the decision presented for consideration." 288 A.3d at 712 (internal quotation marks and citation omitted). She held that in that setting, stockholders are presumed to rely on the disclosure documents that their fiduciaries have provided and, if those documents contain material misstatements or omissions, then any harm caused by the stockholder vote is presumed to be the proximate result of their reliance. *Id.* Consequently, "[i]ndividual proof of reliance is unnecessary." *Id.*

Read together, *Dohmen*, *Gaffin*, *GigAcquisitions3*, and *CBS* support the following rule of law: If corporate fiduciaries [1] distribute a disclosure document, [2] to diffuse stockholders, [3] in connection with a request for stockholder action, and [4] the disclosure document contains a material misstatement or omission, then there is a presumption that the stockholders relied on the disclosures such that individualized proof of reliance is not required. That presumption is rebuttable, and in a civil case, "the party against whom a presumption is directed has the burden of proving that the nonexistence of the presumed fact is more probable than the existence of the presumed fact." D.R.E. 301(a). The defendants thus bear the burden of proving that stockholders did not rely on the material misstatement or omission.

This outcome has the benefit of being consistent with *Corwin*, which presumes both reliance and causation by holding that when fiduciaries have satisfied their duty of disclosure in connection with a transaction that requires stockholder approval, then the effect of the vote is to lower the standard of review to an irrebuttable version of the business judgment rule. *See* 125 A.3d at 308. Stockholder approval based on full disclosure only warrants that legal effect if the stockholders have considered the disclosures, relied on them, and made a judgment to approve the transaction based on those disclosures. If the stockholders did not rely on the disclosures, or if the disclosures did not play any role in inducing the stockholder to approve the transaction, then the vote would not reflect an independent decision about the merits of the transaction, and it should not have any effect. For *Corwin* to operate, both reliance and causation must be presumed.

175

This outcome is also consistent with federal precedent, at least when the disclosure violation involves a misleading omission. In *Affiliated Ute*, the Supreme Court of the United States held that when a defendant under a duty to disclose omits or withholds a material fact, then both reliance and causation are presumed. *See Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 153–54 (1972). The Court first held that "[u]nder the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Id.* The Court next held that proof that a defendant under a duty to disclose withheld a material fact satisfied the element of causation. *Id.* at 154. Under this framework, all that the plaintiff must plead and prove is that "the facts withheld [were] material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id.* Other decisions have explained that those presumptions exist because without them, it would be virtually impossible for a plaintiff to prevail, and the claim would be a dead letter.[46]

As noted, the plaintiffs did not introduce any evidence on the issue of reliance. They simply pointed to the disclosure violations in the Proxy Statement and the results of the vote. The existence of a presumption is outcome-determinative.

---

[46] *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 173–74 (3d Cir. 2001) ("Applying [*Affiliated Ute*], we have held that the proper approach to the problem of reliance is to analyze the plaintiff's allegations, in light of the likely proof at trial, and determine the most reasonable placement of the burden of proof of reliance." (internal quotations omitted)); *Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000) ("[T]he *Affiliated Ute* presumption of reliance exists in the first place to aid plaintiffs when reliance on a negative would be practically impossible to prove."), *abrogated on other grounds by Cal. Pub. Empls.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042 (2017).

The Merger required a stockholder vote. At the time that Columbia filed the Proxy, it had 400,383,243 shares of common stock outstanding. JX 1291 at 1. Proof of individualized reliance in this setting would be impossible. *See GigAcquisitions3*, 288 A.3d at 712. The presumption discussed in this decision therefore warrants finding that Columbia's stockholders relied on the Proxy Statement.

In this case, however, the court cannot apply the presumption. At the pleading stage, the court explained that to obtain rescissory damages, the plaintiff would have to prove "quantifiable damages that are 'logically and reasonably related to the harm or injury for which compensation is being awarded.'" *Dismissal Decision*, 2021 WL 772562, at *57 (quoting *J.P. Morgan*, 906 A.2d at 773). That would mean damages resulting from reliance on the Proxy Statement. When the court issued the *Dismissal Decision*, the Delaware Supreme Court had stated in *Dohmen* that "to recover compensatory damages, an investor who proves a breach of the fiduciary duty of disclosure must prove reliance, causation, and damages." 234 A.3d at 1175.

The only reasonable takeaway from the *Dismissal Decision* was that the plaintiffs would have to prove reliance, causation, and quantifiable damages. TransCanada's post-trial argument called attention to the implications of such a rule—a practical impossibility to recover class-wide compensatory damages for breaches of the duty of disclosure. The *GigAcquistion3* decision further highlighted the destabilizing implications of such an approach. Before the post-trial phase, however, the plaintiffs had not sought a presumption of reliance, and the court had not held that one would apply.

177

The parties therefore litigated the case with the expectation that the plaintiffs would have to prove reliance, causation, and quantifiable damages. It would be unfair to TransCanada to change the rules now by implementing a presumption. Having failed to offer proof of reliance, the plaintiffs cannot recover the damages remedy they seek.

### 5. A Remedy For The Disclosure Claim

The plaintiffs have proved that Columbia's fiduciaries breached their duty of disclosure by issuing a Proxy Statement that contained material misstatements and omissions and that TransCanada aided and abetted in the breach. The plaintiffs therefore have proven a wrong. This court is a Court of Equity, and equity will not suffer a wrong without a remedy.

The Court of Chancery "has broad latitude to exercise its equitable powers to craft a remedy."[47] The court's remedial powers "are complete to fashion any form of equitable and monetary relief as may be appropriate" and "to grant such other relief as the facts of a particular case may dictate."[48] The court is not limited to choosing among the specific

---

[47] *Hogg v. Walker*, 622 A.2d 648, 654 (Del. 1993); *accord Berger v. Pubco Corp.*, 976 A.2d 132, 139 (Del. 2009) ("[T]he Court of Chancery has broad discretion to craft an appropriate remedy . . . , the propriety of a court-ordered remedy is ordinarily reviewed for abuse of discretion."); *Reserves Dev. LLC v. Severn Sav. Bank, FSB*, 961 A.2d 521, 525 (Del. 2008) ("The Court of Chancery has broad discretion to fashion equitable relief.").

[48] *Weinberger*, 457 A.2d at 714; *accord Whittington v. Dragon Gp. L.L.C.*, 2011 WL 1457455, at *15 (Del. Ch. Apr. 15, 2011) ("This Court, as a court of equity, has broad discretion to form an appropriate remedy for a particular wrong."); *Cantor Fitzgerald, L.P. v. Cantor*, 2011 WL 536911, at *3 (Del. Ch. May 11, 2001) ("[T]his 'Court, fortunately, has broad discretion to tailor remedies to suit the situation as it exists.'" (quoting *Andresen v. Bucalo*, 1984 WL 8205, at *4 (Del. Ch. Mar. 14, 1984))); *McGovern v. Gen. Hldg., Inc.*,

proposals advanced by the parties; instead, "this Court frequently has relied on its own remedial discretion to fashion a different remedy than what the parties may have requested when the circumstances so require." *PharmAthene, Inc. v. SIGA Techs., Inc.*, 2011 WL 6392906, at *2 (Del. Ch. Dec. 16, 2011). Put more poetically, the "protean power of equity" allows a court to "fashion appropriate relief," and a court "will, in shaping appropriate relief, not be limited by the relief requested by plaintiff." *Tex. Instruments Inc. v. Tandy Corp.*, 1992 WL 103772, at *6 (Del. Ch. May 12, 1992) (Allen, C.).

The Delaware Supreme Court has held that "where directors have breached their disclosure duties in a corporate transaction that has in turn caused impairment to the economic or voting rights of stockholders, there must at least be an award of nominal damages." *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 142 (Del. 1997). But nominal damages in this setting is not the symbolic award of $1 that a court grants when no greater damages were suffered or proven.[49] It is a per-share award. The monetary

---

2006 WL 1468850, at *24 (Del. Ch. May 18, 2006) ("The Supreme Court has emphasized the capacious remedial discretion of this court to address inequity."). *See generally Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.").

[49] *See, e.g.*, *Macrophage Therapeutics, Inc. v. Goldberg*, 2021 WL2582967, at *22 (Del. Ch. June 23, 2021) ("In the absence of sufficient proof of a specific injury, the court will issue a declaration that the defendant breached his fiduciary duties and award nominal damages . . . in the amount of $1.00."); *Ravenswood Inv. Co., L.P. v. Est. of Winmill*, 2018 WL 1410860, at *25 (Del. Ch. Mar. 21, 2018) ("Since I have found a breach of the duty of loyalty but am unable to award any other form of relief, I find that Plaintiff is entitled to . . . nominal damages in the amount of $1."); *Penn Mart Supermarkets, Inc. v. New Castle Shopping LLC*, 2005 WL 3502054, at *16 (Del. Ch. Dec. 15, 2005) ("[I]n recognition of

amount represents a relatively small (arguably nominal) percentage of the value of each share, but when applied across a class of shares, the amount adds up. From a defendant's standpoint, the award is not nominal.

In *Weinberger*, Chancellor Brown established the initial precedent for such an award by setting damages at $1 per share. *See Weinberger v. UOP, Inc.*, 1985 WL 11546 (Del. Ch. Jan. 30, 1985), *aff'd*, 497 A.2d 792 (Del. 1985). The Chancellor had originally held that a controlling stockholder freeze-out in which the minority received $21 per share was entirely fair, but on appeal, the Delaware Supreme Court held that the transaction was not entirely fair because of the controller's failure to disclose material information when seeking stockholder approval. *Weinberger*, 457 A.2d at 703. On remand, Chancellor Brown saw no mathematical basis for awarding a precise figure based on the breach of the duty of disclosure, and in a classic exercise of equitable discretion, he concluded that "$1 per share represents a fair measure of compensation for the wrong done to the members of the minority." *Id.* Chancellor Brown explained that the award was proportionate and reasonable by noting that the acquirer was capable of paying at least $22 per share and that the acquisition would have remained beneficial to the acquirer at that price, "both economically and in other ways." 1985 WL 11546, at *10. The damages figure represented 4.7% of the equity value of the shares measured by the deal price. Multiplied across a class of 5,688,502 shares, the damages award totaled $5,688,502.

---

the breach of the Landlord's protective covenant, the Court awards [Plaintiff] one dollar in nominal damages.").

Then-Vice Chancellor Hartnett issued a similar award in an action which challenged the disclosures issued in connection with a tender offer and short-form merger that a controlling stockholder used to eliminate minority stockholders at a price of $58 per share. The court found that the disclosure documents were materially misleading because they failed to disclose over $1 billion of gas and oil reserves. *See Smith v. SPNV Hldgs., Inc.*, 1990 WL 84218, at *17 (Del. Ch. June 19, 1990). In an exercise of equitable discretion, Vice Chancellor Hartnett awarded damages of $2 per share, explaining that the award was proportionate compared to the headline value of the undisclosed reserves, which equated to approximately $3 per share. He also noted that there were "other minor disclosure violations . . . which were indicative of a conscious decision by the defendant to be less than candid." *Smith v. Shell Petroleum, Inc.*, 1990 WL 186446, at *5 (Del. Ch. Nov. 26, 1990) (cleaned up). The Delaware Supreme Court affirmed the damages award as falling within the trial court's "broad discretion." *Shell Petroleum, Inc. v. Smith*, 606 A.2d 112, 117 (Del. 1992). The damages figure represented 3.4% of the equity value of the shares measured by the deal price. Multiplied across a class of approximately 17,182,880 shares, the damages award totaled $34,365,760.

Then-Vice Chancellor Hartnett issued a similar equitable award in the *Gaffin v. Teledyne* litigation, discussed above. The corporation acquired shares through a self-tender offer at $40 per share, and the court found after trial that the disclosure documents contained material misstatements and omissions. *See Gaffin v. Teledyne, Inc.*, 1990 WL 195914, at *18 (Del. Ch. Dec. 4, 1990), *aff'd in part, rev'd in part on other grounds*, 611 A.2d 467 (Del. 1992). In an exercise of equitable discretion, the court awarded damages of

181

$1 per share, representing 2.5% of the value of the equity at the self-tender price. Multiplied across the plaintiff class of approximately 2.5 million shares, the damages award totaled $2,500,000. The defendants did not challenge the damages calculation on appeal, and the Delaware Supreme Court allowed it to stand, but the high court reversed the class-wide dimension of the award. The high court also observed that in *Weinberger*, Chancellor Brown had pointed to record evidence that supported the proportionality of an award of $1 per share. The high court implied that a similar explanation based on record evidence was lacking in *Gaffin*.

Most recently, Chancellor McCormick awarded damages of $1 per share against the sell-side fiduciary who breached his duty of disclosure and the private equity buyer who aided and abetted the breach. *Mindbody,* 2023 WL 2518149, at \*47. The deal price was $36.50 per share. As in *Weinberger*, Chancellor McCormick explained that the award was reasonable based on record evidence about the acquirer's authority to bid up to $40 per share and the fact that the deal remained profitable for the buyer at that price. *Id.* at \*3, \*47. The resulting damages award reflected an increase of 2.7% over the deal price and equated to around $36 million.

In this case, an equitable remedy for the disclosure violations that TransCanada aided and abetted is an award of $0.50 per share. On an absolute basis, that award is less than the $1 per share awarded in *Weinberger*, *Gaffin*, and *Mindbody*, and the $2 per share awarded in *Shell.* On a percentage basis, the award represents 1.96% of the value of the equity as measured by the deal price of $25.50. That figure is well below the percentage-based awards in all of the precedents, including the 2.7% award in *Mindbody*.

Looking to the types of evidence that prior decisions have cited provides support for this outcome. The precedents have looked to contemporaneous valuations of the target company, and in the appraisal context, the Delaware Supreme Court has made clear that a trial court should regard the acquirer's assessment of the value of the target company as a highly persuasive figure. *Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.*, 210 A.3d 128, 137 (Del. 2019). Describing an acquirer's superior insight into the value of the target, the high court posited that

> [the buyer's] access to nonpublic information . . . improved [its] ability to estimate [the target's] going-concern value over that of the market as a whole. In particular, [the buyer] had better insight into [the target's] future prospects than the market because it was aware that [the target] expected its quarterly results to exceed analysts' expectations.

*Id.* at 139 (footnote omitted). These observations suggest that a buyer's internal valuations carry an extra imprimatur of reliability and are likely to provide more persuasive evidence of value than the buyer's actual bids, which are tempered by the buyer's desire to acquire the target for the lowest possible price. *See In re Dunkin' Donuts S'holders Litig.*, 1990 WL 189120, at *9 (Del. Ch. Nov. 27, 1990) ("A bidder's objective is to identify an underpriced corporation and . . . acquire it at the lowest price possible."). When the TransCanada Board approved the Merger Agreement, Wells Fargo presented a discounted cash flow analysis using Columbia management's projections, as adjusted by TransCanada, that valued Columbia's standalone business at $26.51 per share, then added another $1.93 per share in synergies for total value of $28.45 per share. The disclosure-based damages award of $0.50 per share would bring the total consideration to $26 per share, below the standalone value of $26.51 that TransCanada placed on the company.

183

Precedents also have looked to the back-and-forth of the negotiations between the parties. Columbia consistently sought a price range of $26 to $28 per share, and Girling and Poirier both indicated that TransCanada's valuation of Columbia supported a price within that range. TransCanada was unwilling to pay that price not because Columbia's value did not support it, but because the premium over Columbia's beaten-down stock price would look too big, TransCanada's own stock price might suffer as a result, and the judgment of the TransCanada management team might be questioned. TransCanada could readily finance a purchase of Columbia in the range of $26 to $28 per share, and TransCanada was prepared to do so if an interloper had surfaced. The disclosure damages award of $0.50 per share would bring the total consideration to $26 per share, at the low end of the range that Columbia sought and well below what TransCanada was willing to pay.

Precedents also have considered whether the deal would remain profitable for the acquirer after taking into account the additional damages award. In this case, the acquisition of Columbia has been extremely profitable for TransCanada and made up for flat or moderate growth in other business units. On October 12, 2017, TransCanada's head of U.S. Natural Gas Pipeline Operations emailed Poirier to congratulate him on a job well done. JTX 1399. He explained:

> Until now, I didn't realize the true impact of the [Columbia] acquisition on the company. I obviously knew the magnitude of [Columbia's] EBITDA growth, but didn't realize how flat or moderate the growth was in the other BU's. Our financial forecast would look very different w/o [Columbia's] billion $ EBITDA contribution over the next 2 years. I certainly hope your forethought and execution in getting the deal done was properly rewarded. You deserve a pot of gold, my friend!

184

*Id.* In a subsequent review of the transaction conducted in 2019, TransCanada management reported that the "Columbia acquisition should be deemed a strong success." JTX 1522 at 3. Among other things, the presentation noted that the transaction had generated "shareholder returns above similar transactions." *Id.*

These sources of evidence suggest that the court could award disclosure-based damages of up to $2.50 per share. Using the methodologies suggested by the precedents, the most persuasive figure is $0.50 per share. That price level corresponds roughly to where a deal might have ended up had stockholders voted down the transaction at $25.50 per share. Unlike the damages for the Sale Process Claim, this estimate of damages does not use the value of the $26 Deal at closing as an alternative transaction, which results in damages of $1 per share due to the increase in TransCanada's stock price. It rather envisions a negative vote after which TransCanada would have increased its bid to provide value of $26 per share using an exchange ratio that delivered $26 in value.

Studies in which scholars have valued voting rights provide a cross-check for the 1.96% award. The amounts awarded in *Weinberger*, *Shell*, *Gaffin*, and *Mindbody* addressed breaches of the duty of disclosure in a context where fiduciaries requested stockholder action. At least part of the injury in those cases flowed from the loss of the right to make an informed decision. In other words, at least part of the injury flowed from a loss of the opportunity to make an informed vote. Because the harm affected voting rights, estimates of the value of voting rights provide a useful proxy for a reasonable damages award. That framing of the injury also explains the per-share nature of the award. Because each share

185

carries the right to vote, each share suffers the decisional harm, resulting in a per-share outcome.

Some scholars have valued voting rights by comparing the trading prices of high-vote shares to low-vote shares. Studies based on United States firms imply values of 2%,[50] 3.6%,[51] 5.4%,[52] and 10.4%[53] of total equity value. An award of 1.96% of equity value measured by the deal price is a conservative measure when checked against those values.

Other scholars have valued voting rights by examining the prices at which large blocks of stock trade relative to the prices at which individual shares trade. Studies based on United States firms imply values of 1%,[54] 2.4%,[55] 4.3%,[56] and in a subset of banks

---

[50] Tatiana Nenova, *The Value of Corporate Voting Rights and Control: A Cross-Country Analysis*, 68 J. Fin. Econ. 325 (2003).

[51] Paul Docherty, Steve Easton, & Sean Pinder, *Flights-to-Control: Time Variation In The Value Of A Vote*, 66 J. Corp. Fin. 101790 (2021)

[52] Ronald C. Lease, John J. McConnell, & Wayne H. Mikkelson, *The Market Value of Control in Publicly-Traded Corporations*, 11 J. Fin. Econ. 439 (1983)

[53] Luigi Zingales, *What Determines the Value of Corporate Votes?*, 110 Q. J. Econ. 1047 (1995).

[54] Alexander Dyck & Luigi Zingales, *Private Benefits of Control: An International Comparison*, 59 J. Fin. 537 (2004).

[55] *See* Saeyoung Chang & David Mayers, *Who Benefits in an Insider Negotiated Block Trade?*, 41 Fin. Mgmt. 703 (2012).

[56] Michael J. Barclay & Clifford G. Holderness, *Private Benefits from Control of Public Companies*, 25 J. Fin. Econ. 371 (1989).

between 1964 and 1979, 26%[57] of total equity value. An award of 1.96% of equity value measured by the deal price is again a conservative measure.

Perhaps the most interesting method of valuing voting rights compares the market price of a share of common stock with the implied market price of a synthetic share of non-voting stock constructed using matching put and call options.[58] The main advantage of that method is that it enables a value to be estimated for the voting rights of a particular issuer at a particular time. As expected, the implied value of a voting right fluctuates depending on whether a vote is in order, with the right to vote generally having no value but spiking upwards during times proximate to exercise. Scholars using this method find valuations consistent with the low end of prior studies[59] and an average value for votes equal to approximately 1.58% of the stock price.[60] An award of 1.96% of equity value is reasonable compared to those results.

In a prior decision, the court reviewed this literature when assessing the value of a settlement that imposed restrictions on the voting rights associated with high vote stock.

[57] Larry G. Meeker & O. Maurice Joy, *Price Premiums for Controlling Shares of Closely Held Bank Stock*, 53 J. Bus. 297 (1980).

[58] Avner Kalay, Oğuzhan Karakaş, & Shagun Pant, *The Market Value of Corporate Votes: Theory and Evidence from Option Prices*, 69 J. Fin. 1235 (2013).

[59] Edward Fox, *Is There A Delaware Effect for Controlled Firms?*, 23 U. Pa. J. Bus. L. 1, 21 (2020).

[60] Morgan White-Smith, *Revisiting* Revlon*: Should Judicial Scrutiny of Mergers Depend on the Method of Payment?*, 79 U. Chi. L. Rev. 1177, 1191 (2012) (discussing earlier, unpublished version of Kalay, Karakaş, and Pant's analysis).

The court found that valuing the restrictions at 3.5% of equity value was conservative. *In re The Mosaic Co, S'holder Litig.*, C.A. No. 6228-VCL, Dkt. 117 at 48–50 (Del. Ch. Sept. 15, 2011) (TRANSCRIPT). An award of 1.96% of equity value is moderate in comparison.

This decision has used these studies only as a cross-check. They support the reasonableness of the precedent-based award.

This court awards damages of $0.50 per share for the Disclosure Claim. That amount is distinct from and less than the $1 per share awarded for the Sale Process Claim.

## C.     Are The Remedies Concurrent Or Cumulative?

This decision has awarded damages of $1 per share for the Sale Process Claim and $0.50 per share for the Disclosure Claim. But are the remedies cumulative, such that the damages aggregate to $1.50 per share? Or do they overlap, such that the damages equate to $1 per share? The answer is that they overlap, with the disclosure damages providing a floor.

Delaware courts have generally calculated damages for breach of the duty of disclosure using the value of the underlying economic rights harmed by the breach. Thus, a standard measure of compensatory damages for a breach of the duty of disclosure in a merger is quasi-appraisal, which awards the fair value of the equity interest that the stockholder otherwise could have retained (if the transaction had been voted down) or secured through an appraisal (if the stockholder had elected that remedy). *See Orchard*, 88 A.3d at 42–53 (collecting authorities). An alternative measure of compensatory damages for a breach of the duty of disclosure looks to the deal price that unconflicted negotiators could have obtained after a negative vote, or which the acquirer would have had to pay to

188

secure an affirmative vote. *See PLX*, 2018 WL 5018535, at *51 (collecting authorities). In both scenarios, the damages for breach of the duty of disclosure are measured by the lost economic opportunity. The same is true for rescissory damages. That restitution-based remedy restores to the plaintiff the economic value that the plaintiff would have possessed at the time of judgment, had the wrongdoer not wrongfully deprived the plaintiff of its property. The value of the remedy is again measured by the value of the underlying property.

In theory, there could be an award of damages for the loss of voting rights that is separate from and additive to the economic loss. The *Loudon* decision, for example, states that damages will be available when a disclosure violation results in "deprivation of stockholders' economic or voting rights." 700 A.2d at 142; *accord id.* at 147. The "or" suggests that the two could be separate.

An example illustrates the point. Envision a case in which we have divine knowledge that the value of the common stock at the time of a merger was precisely $10 per share, but the deal in fact paid $9 per share. Imagine that the defendant fiduciaries also committed disclosure violations that deprived the stockholders of their right to make an informed decision on the merger. In theory, each stockholder could be entitled to $1 per share of economic damages plus some additional dollop of disclosure damages. But Delaware decisions have never calculated damages that way. Delaware courts have only awarded damages based on the economic harm. In a disclosure case warranting a quasi-appraisal remedy, the plaintiff receives only its pro rata share of the value of the company as if it had remained a standalone entity. The plaintiff does not receive that value plus an

additional measure of damages tied to the lost voting right. Likewise, cases that have found a sale-process injury and a disclosure-based injury have only awarded a singular recovery tied to the economic harm. *E.g.*, *Mindbody*, 2023 WL 2518149, at *48 (awarding singular recovery based on lost deal value for both sale process claim and disclosure claim); *Rural Liability*, 88 A.3d 107–09 (awarding singular recovery based on standalone value for both sale process claim and disclosure claim).

That tradition indicates that Delaware law views voting rights as an instrumental protection for economic rights such that when a damages award compensates a stockholder for its lost economic rights, no additional remedy is warranted for the conceptually separate harm to voting rights. The remedy for the economic loss is sufficient. The awards in *Weinberger*, *Shell*, and *Gaffin* occurred where there was an adjudicated disclosure violation that deprived stockholders of their voting rights, but the economic harm was difficult to measure. That in turn suggests that damages for a disclosure violation establish a floor. If economic damages exceed disclosure damages, then the plaintiff receives economic damages. Otherwise, the plaintiff receives disclosure damages. The plaintiff does not receive both. In *Mindbody*, the Chancellor awarded the same $1 per share for both economic damages and disclosure damages. She did not add them together.

The plaintiffs are entitled to damages of $1 per share for the Sale Process Claim. That amount exceeds the $0.50 per share for the Disclosure Claim, so it is all that the plaintiffs can recover. If some or all of the class members were not able to recover the $1 in damages for the Sale Process Claim, then those class members could potentially recover the $0.50 per share for the Disclosure Claim as a fallback.

190

This decision does not calculate the damages that TransCanada owes. TransCanada has indicated that it will seek a credit against any damages award based on the settlement that Skaggs and Smith reached. The parties have not briefed that issue, but a settlement credit appears warranted. *See In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205 (Del. Ch. 2014) (analyzing settlement credit under Delaware Uniform Contribution Against Tortfeasors Act). TransCanada has also suggested that the appraisal claimants may be bound by prior factual findings from the *Appraisal Decision* such that their recovery could be limited. The parties have not briefed that issue either, and while conceivable before the issuance of this decision, that possibility now seems strained. In any event, there are hurdles to overcome before a damages award can be quantified.

## III.    CONCLUSION

TransCanada is liable for aiding and abetting the sell-side fiduciaries' breaches of duty during the sale process. The plaintiffs are awarded economic damages of $1 per share based on the $26 Deal, which provides persuasive evidence of the value that the plaintiffs would have received but for the sell-side breaches of duty and TransCanada's culpable participation.

TransCanada is liable for aiding and abetting the sell-side fiduciaries' breaches of the duty of disclosure. The plaintiffs are awarded disclosure damages of $0.50 per share, representing a discretionary amount designed to remedy the harm to the stockholders' decisional and economic rights in a setting where fiduciaries requested stockholder action, yet failed to provide the stockholders with the information necessary to make an informed decision.

191

The awards overlap. They are not cumulative. The maximum amount of damages is $1 per share.

During earlier phases of the case, the parties have pointed to issues that still need to be addressed before a final order can be entered. Within thirty days, the parties will submit a joint letter that identifies the unresolved issues and proposes a schedule for bringing this case to a conclusion at the trial level.